UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

AMBUR HALE,                    )
        Plaintiff,             )
                               )
vs.                            )   CIVIL ACTION NO.
                               )   7:18-CV-0097-M
TEXAS DEPARTMENT OF            )
CRIMINAL JUSTICE, AND          )   JURY DEMAND
MAJOR JONATHAN EASTEP          )
        Defendants.            )

\* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION

AMBUR HALE

April 24, 2019

\* \* \* \* \* \* \* \* \* \* \*


        ORAL DEPOSITION OF AMBUR HALE, produced as a

witness at the instance of the Defendants and duly

sworn, was taken in the above-styled and numbered

cause on April 24, 2019, from 12:53 p.m. to 5:08

p.m., before Cheryl Duncan, CSR, in and for the State

of Texas, reported by computerized stenotype machine

at the Law Office of Cooper & Scully, PC, 900 Jackson

Street, Suite 100, Dallas, Texas, pursuant to the

Federal Rules of Civil Procedure.            ORIGINAL

Plaintiff's App. 1

EXHIBIT A

Ambur Hale
April 24, 2019

1    A.      Birth control.

2    Q.      Don't need to go any further than that.

3            What did you do to prepare to come in

4  and give your testimony today?  And let me say first,

5  do not talk about any discussions you had with your

6  counsel, okay?

7    A.      Okay.  Just by your request, reviewing over

8  the OIG interview.

9    Q.      Okay.  Did you listen to the OIG interview

10  before you came in?

11   A.      No, sir.

12   Q.      Did you review the video that we've been

13  talking about, other than when we've been sitting and

14  watching during the deposition?

15   A.      No, sir.

16   Q.      Okay.  Did you look at any of your

17  statements at any time prior to coming in?

18   A.      No, sir.

19   Q.      All right.  What year were you born, ma'am?

20   A.      1983.

21   Q.      And where were you born?

22   A.      San Francisco, California.

23   Q.      And how long did you stay in San Francisco?

24   A.      Maybe a year or two.

25   Q.      Why don't you take me through the real

1  quick life story of Ms. Hale to get you to Texas,

2  okay?

3       A.    My father was in the Coast Guard, so we

4  moved back and forth on the coast of the United

5  States.  And then when he, he ended his career in the

6  Coast Guard, we moved to Colorado because that's

7  where my grandparents lived.  He got a job there.

8  He's a physician's assistant.  He got offered a job

9  in Wichita Falls or -- by one of the hospitals, so we

10 moved here.  He opened a clinic there.  And we just

11 stayed from there.

12      Q.    About what year did you move to Wichita

13 Falls?

14      A.    Might have been like 1990.  I was in fifth

15 grade.

16      Q.    A child of a Coast Guard officer or Coast

17 Guard -- was that a Coast Guard brat, like an Army

18 brat and a Navy brat?

19      A.    We have kind of a military mind-set a --

20      Q.    Absolutely.

21      A.    -- little bit.  A little bit more

22 freewheeling because we were always on a beach.

23      Q.    A little more free willy?

24      A.    Yeah.

25      Q.    I like that.  I hadn't heard that phrase.

1   that make sense?

2       A.    Honestly, at the time, that was my only

3   concern.  I thought I was only going to be there for

4   a year.  So he could graduate.

5       Q.    And here we are.

6       A.    Yes.

7       Q.    I think a number of them end up that way,

8   don't they?

9       A.    Yes, sir.

10      Q.    Very good.

11              So when you got through -- do you

12  remember the time when you got through the academy?

13  About what time that was, what year?

14      A.    It was in 2006.  I started the academy in

15  October.  And around the end of November was when I

16  was about in the mentor stage.

17      Q.    Okay.  So about six weeks in the academy?

18      A.    Yes, sir.  I believe so.

19      Q.    And then where -- did you start immediately

20  at the Allred Unit?

21      A.    Yes, sir.

22      Q.    And do they give you a rank when you start,

23  as a, as a new employee?

24      A.    At the time, I was -- when you first go

25  into preservice or the academy, you're a CO1.  Now, I

1    to male officers?   I'm talking about just

2    correctional officers, CO through CO 5, when you got

3    on the facility.  Do you have any idea what it was?

4        A.     No, sir.

5        Q.     Do you have a feel for what it was at all

6    that --

7        A.     Without actual numbers, no.

8        Q.     Okay.

9        A.     Looking around in a shift turnout, there

10   were a lot more white males than black males.   There

11   were more males than females.   But I wouldn't know

12   the actual breakdown.

13       Q.     Have you worked on any other facilities

14   besides the Allred Unit?

15       A.     No, sir.

16       Q.     Okay.  Have you done any overtime at any

17   other facilities besides Allred?

18       A.     No, sir.

19       Q.     But it was your general impression -- and I

20   would assume it's still your general impression

21   today -- that there are more white male officers than

22   black male officers and more males than females?

23       A.     On the Allred Unit.  I'm sure in different

24   areas, those numbers change.

25       Q.     And for the purposes of this deposition,

```
 1      Q.     Okay.  I would assume you also received

 2   training regarding EEO or discrimination?

 3      A.     Yes, sir.

 4      Q.     Okay.  Did you feel that was adequate to at

 5   least describe -- or you understood your rights or

 6   what was supposed to happen to you?

 7      A.     I do feel the video needs to be updated.

 8      Q.     Okay.

 9      A.     I don't feel like it's adequate enough, no.

10      Q.     In what areas do you think it's not

11   adequate enough?  Just what do you think would be

12   better?

13      A.     I think maybe there should be more of a

14   handout and not just a video.  The video's long and

15   outdated and most people stop watching it after a

16   while.

17      Q.     Do they show the same video over and over

18   again?

19      A.     Yes.

20      Q.     Other than what you described as kind of

21   our -- kind of your -- and excuse me if I use the

22   wrong term -- your naivety when you walked onto the

23   prison at your age and your experience level, did you

24   feel at least that the training was as adequate as it

25   could be for you or good enough to get you started,
```

Ambur Hale
April 24, 2019

1   pod, and then Tuesday when I came in, I would be

2   moved to D pod.  I would work there for that 12

3   hours.  Wednesday, I would go to F pod.

4        Q.     Why would they move you from one pod to

5   another versus let you stay working in the same pod?

6        A.     Normally it's for -- to make sure the

7   officers don't become complacent or over-familiar

8   with the offenders on the pod.  And they, they rotate

9   the people you work with, so it's -- you don't work

10  with the same people normally.  You rotate those, as

11  well.

12       Q.     So -- and if I describe this wrong, please

13  correct me.  It sounds like you would not, then --

14  when you started your card, your four days, you

15  wouldn't work with Officer A and Officer B at the

16  same place during those four days, you would shift

17  and you would switch with officers and switch your

18  location where you worked; is that fair?

19       A.     Yes, sir.

20       Q.     Okay.  When you came out as a -- working as

21  a correctional officer, were you assigned to any

22  particular pods regularly, like general population or

23  your close custody or anything like that?  Did you

24  find yourself being assigned to any more often than

25  others?

1     A.     When I very first started I did not work 8

2  building.   They typically don't have females work on

3  8 building, but --

4     Q.     And just quickly, why do you understand

5  they don't have -- new females don't work on 8

6  building?

7     A.     The offenders on 8 building are the worst

8  custody level in general population.

9     Q.     Is that a G5?

10     A.     They were G4s at the time.   They're about

11  to be G5s again.

12     Q.     Okay.

13     A.     So G4s at the time were the worst in

14  general population, disciplinary-wise.   It became

15  more work than a supervisor wanted to have a female

16  over there, due to the sexual misconduct, the added

17  aggression that offenders might have towards a female

18  staff member.   So they kind of vetted you out before

19  they let you as a female go over there.

20     Q.     "Vetted you out," does that mean that --

21  they wanted to make sure you could handle your

22  business before you went into 8 building, is that an

23  accurate way of describing vetting you out?

24     A.     Yes, sir.

25     Q.     Okay.   And I assume by the way you gave

Ambur Hale
April 24, 2019

1    that answer that at some point you got vetted out and

2    were able to go into A building; is that fair?

3        A.    Yes, sir.

4        Q.    So you were at least seen as an officer who

5    could handle her business and can handle the G4s who

6    were on their way to being G5s?

7        A.    Yes, sir.

8        Q.    And I just have to ask you, did you ever

9    have a problem dealing with the G4 slash G5

10   knuckleheads, let's call them?

11       A.    No more than any other male officer.

12       Q.    Fair enough.  So you got to keep working in

13   8 building?

14       A.    On and off, yes, sir.

15       Q.    And I would assume you rotated into there

16   just like you did the other positions; is that fair?

17       A.    Yes, sir.

18       Q.    And, again, these rotations and these

19   changing of these -- the officer assignments of

20   working together, that's to stop -- what were the

21   terms you used?

22       A.    Over-familiarization and complacency.

23       Q.    Why is over-familiarization a problem in a

24   penitentiary?

25       A.    Offenders are known to manipulate staff,

1   saying it?

2        A.    Yes, sir.

3        Q.    And I assume now that you're a trainer, are

4   you in an office most of the time?

5        A.    I'm at a college setting, so, yes, sir.

6        Q.    Okay.  So was that answer that you just

7   gave, the addition of being in an office specifically

8   referring to you there, about how you have less

9   opportunity to --

10       A.    No.  Pretty much all of the offices on the

11  Allred Unit are on the safer side of the sally port.

12  So you don't have -- the only offenders that are

13  allowed on that side are your G1 offenders.

14       Q.    Your SSIs and your trustees?

15       A.    Yes.

16       Q.    Okay.

17       A.    And so they are the lowest custody level.

18  They've been reviewed by classification to make sure

19  that they don't have certain crimes, that they are

20  being released within a certain window.  So they're

21  less likely not -- they could still do something, but

22  they're less likely to take a hostage or to escape

23  because they're the lowest risk disciplinary-wise.

24       Q.    And that's because they've proven it

25  over -- usually an extended period of time of

1   because that was another suggestion that I got about

2   applying for sergeant, that I needed to go to days,

3   so that I could -- so people could see my work

4   performance.

5        Q.    And just so the jury is aware, there are

6   more staff there in the day than there are during

7   nighttime?

8        A.    More administrative staff, yes, sir.

9        Q.    Administrative staff such as?

10       A.    The wardens, the majors, the captains.

11  There's more supervisors during day shift.

12       Q.    And I guess the logic being, if you go to

13  day shift, more supervisors who have more pull can

14  see the work you're doing and the quality of the

15  work; is that correct?

16       A.    Yes, sir.

17       Q.    And how long did you work on day shift

18  before you -- do you think you went ahead and

19  applied?

20       A.    Maybe three to six months.

21       Q.    Okay.  And then a sergeant position opened

22  up?

23       A.    Yes, sir.

24       Q.    And you applied at the board.  Did any

25  supervisors or anybody encourage you to apply?

```
1        A.      Pretty much all of my supervisors.

2        Q.      Do you -- can you give me any names of who

3   encouraged you at that time?

4        A.      Well, Major Eastep was one of them if

5   that -- I'm sure that's the name you're looking for.

6        Q.      I'm looking for all the names.

7        A.      Okay.  Captain Miller.

8        Q.      And by the way, this is not a test.  I

9   don't have a list somewhere of everybody who did

10  this.  I just want your memory.

11       A.      Okay.  Captain Miller.  I don't believe he

12  was a captain at the time.  Captain Cook.  He was, I

13  believe, a lieutenant at the time.  Numerous

14  sergeants, Sergeant Shabez (phonetic).  Oh, there's

15  so many.  Pretty much -- Lieutenant Smith.  Just

16  about anybody I worked for felt like I was a good

17  example of what a female officer should be and that I

18  should be a sergeant so that I could have more

19  influence.

20       Q.      And do you recall when you actually were

21  promoted to sergeant or when you received -- the

22  bars, do you receive bars?  What's the term?

23       A.      They do pin you.  And then you go to a

24  sergeants academy.

25       Q.      Okay.  Tell me a little bit about the --
```

1    well, first --

2         A.    I don't remember the date.

3         Q.    Okay.  Again --

4         A.    I have to go look.

5         Q.    Not a test.  Do you have a year and a

6    season?  That's close enough for me.

7         A.    Okay.  Maybe 2000 -- oh, jees.  What is it,

8    2009 right now -- 2019.

9         Q.    Unfortunately, yes.

10        A.    Let's see.  Say about 2010.

11        Q.    Okay.

12        A.    Maybe.

13        Q.    So you'd been at the system approximately

14   three, three and a half years and then you promoted

15   up to sergeant?

16        A.    I felt like it was longer than that.  Maybe

17   I'm wrong.  No, because I remember distinctly -- oh,

18   let's see.  I was about to turn 30.  I was 29 when I

19   went to the -- see, you're making me do math.  So

20   2019 -- I would say, what, that would be like 2014,

21   2013.

22        Q.    Okay.  And when you -- in 2013 or

23   approximately there, you went to the sergeant's

24   academy, I think you said.  What do they train you on

25   in the sergeant's academy?

1  were you assigned to your buildings where you were

2  going to work for your four-day card or your -- the

3  period of your card?

4      A.    So depending on your supervisor, which

5  usually was your captain.  The captain made rotation

6  schedule.  And then -- so on our unit, it's -- in

7  general population it would be 3 building, 4

8  building, then you would be utility officer, which

9  meant -- or utility sergeant, which meant that you

10 were a floater for transports or if someone called in

11 sick, another supervisor, you would take over their

12 building for that time period.  Then it would be 7

13 building, 8 building, the dorms, and then utility

14 again.

15              So you would just do that rotation.

16 Depending on your captain, you could do that for two

17 weeks or you could do it for a month.

18      Q.    Okay.  And we should have probably gone

19 over this earlier, we've talked about COs, the next

20 rank above that is sergeant.  Just please briefly

21 describe for the jury what the chain of command is

22 above sergeant, please.

23      A.    It would be a sergeant and then a

24 lieutenant, then the captain, then the major, and

25 then the wardens.  You have -- on our unit, we have

```
 1   getting disrespected or something like that, or if a
 2   supervisor is being rude to you or counseling you,
 3   whatever the situation, then when you go back and the
 4   supervisor is gone, they're going to tell you how
 5   great you are, they're going to try to manipulate you
 6   into "them against us" situation.  We think you're
 7   doing a great job.  They're not right for talking to
 8   you like that or -- those kind of examples, where
 9   they could use it as a manipulation tool.  Kind of
10   like if mom and dad are arguing and the kid sees it,
11   then they can try to work that --
12        Q.    Split the two?
13        A.    Yes, sir.
14        Q.    Okay.  So you were trained that one of the
15   things to do is to isolate the officer and have that
16   conversation in private to where no other people
17   could hear the conversation; is that fair?
18        A.    Yes, sir.
19        Q.    Unless, like you said, it might be a
20   situation where that officer might feel
21   uncomfortable, so you might want another officer in
22   there of the same gender?
23        A.    Yes, sir.
24        Q.    Okay.  And I think the goal is to
25   basically -- would it also be to not maybe embarrass
```

Ambur Hale
April 24, 2019

1  the officer if he's in front of offenders?

2      A.    Yes, sir.

3      Q.    And also to keep the business within TDCJ

4  people, would be a fair reason to do it?

5      A.    Yes, sir.

6      Q.    And I would assume it is not your practice

7  as a sergeant to walk onto a housing area and see

8  something that might be improper by an officer and

9  scream at that officer from across the hallway or

10 across the pod.  Is that fair?

11     A.    It depends on what you're saying.

12     Q.    Sure.

13     A.    But yes it would be inappropriate.

14     Q.    If it was something that could be fixed in

15 private, your preference would be to do that in

16 private?

17     A.    Yes, you would -- if you're on a pod, you

18 would maybe signal for them to come out into what's

19 called the D space, it's like a hallway area around

20 the control room.  There's an officers closet and you

21 could talk to them in more privacy than if you were

22 in the dayroom where all the other offenders could

23 watch.

24     Q.    And they're all hearing and then using

25 those same things that you had said earlier, hey,

DUNCAN COURT REPORTING
214.676.0898

Plaintiff's App. 16

1   at some time?

2       A.     Yes, I believe so.

3       Q.     Okay.  Well, just put it aside for a

4   second.  I want to go down a little bit.

5              Now, this is the part of the

6   deposition where I've got to go into the facts of the

7   case a little more, okay?  And I just want to hear

8   your side, because, like I told you earlier, I'm

9   usually over there.  So let's get through this and

10  get through it as quickly as we can.  If you need to

11  take a break at any time, please let me know, okay?

12      A.     Okay.

13      Q.     Now, in your lawsuit, you are claiming

14  that, of course, Mr. Eastep did something very

15  inappropriate.  I'm not going to deal with that right

16  now.  But you also claim that you were retaliated

17  against by some officers or some staff at the Allred

18  Unit, okay?  And what I'd like to do is I'd like to

19  focus on who you feel might have been behind the

20  retaliation against you, okay?

21      A.     Okay.

22      Q.     So could you tell me who -- well, first,

23  what was the retaliation that you felt was

24  retaliatory for you filing the complaint, and then

25  who did that?

Ambur Hale
April 24, 2019

1      A.    Well, I was originally written up for a use
2  of force that they felt I did not do my job in that
3  situation.  It was reduced later.  But I feel like
4  the administration, as in the wardens and the majors,
5  had a play in that situation, in that writeup.
6      Q.    And the majors would be Major West?
7      A.    Yes.
8      Q.    And Major Eastep --
9      A.    Yes.
10     Q.    -- at that time?
11              Were there any other majors at the
12 Allred Unit at that time?
13     A.    I cannot recall the third major.  I think
14 we were going through a promotion time.
15     Q.    And I guess I should ask.  Is it normal
16 that a facility such as the Allred has three majors
17 normally assigned to it?
18     A.    Yes.
19     Q.    Okay.
20     A.    One is the dominant supervisor for each
21 department.  We have three departments on our
22 facility.
23     Q.    We probably should go through that.  You
24 have the three departments.  What are the majors, the
25 heads of which departments?

1    Sarhoney (phonetic) had come over to the facility and

2    took over Warden Horsley's position.  So he wasn't

3    there during my sexual harassment complaint.  He was

4    there during my disciplinary complaint.

5        Q.    Okay.  So -- and the sexual harassment

6    complaint was filed in June?

7        A.    Yes, sir.

8        Q.    And then I believe the disciplinary was

9    around August of that year?

10       A.    Yes, sir.

11       Q.    So he applied --

12       A.    Maybe July.

13       Q.    So he arrived after the June 15th incident?

14       A.    Yes.

15       Q.    And was he the disciplining, or the --

16       A.    The reprimanding authority.

17       Q.    Thank you.  The reprimanding authority.

18       A.    No.  The -- a little bit of back story.

19   August is usually when we have a lot of turnover.

20       Q.    Okay.

21       A.    Because our fiscal year starts in

22   September.  So if you're going to retire, you do it

23   in August before your sick time rolls over.  So a lot

24   of them will go out earlier than their actual

25   retirement date.  So then we'll have like a little

Ambur Hale
April 24, 2019

1   lull.  They're on the books as a supervisor there.

2   But they're not actually on the facility.

3       Q.      Understood.  They're running out their

4   time?

5       A.      Yes, sir.

6       Q.      Okay.

7       A.      So Warden Sarhoney was coming over, Warden

8   Wathen was the head warden at the time and he was

9   retiring.  So when my disciplinary was run for the

10  use of force, the reprimanding authority would have

11  been Warden Richardson because he took Warden Wathen

12  spot.

13      Q.      Did Warden Richardson come from another

14  unit?

15      A.      Yes, sir.

16      Q.      So Richardson replaces Wathen?

17      A.      Yes, sir.

18      Q.      Sometime in that summer?

19      A.      Yes, sir.

20      Q.      And then Richardson is the reprimanding

21  authority -- if I use the term right.

22      A.      Yes, sir.

23      Q.      Had Warden Richardson ever worked on the

24  facility prior to being a warden there?

25      A.      No, sir.

1    Q.    Did he have -- are you aware of him having

2    any familiarity at all with your situation in regards

3    to Mr. Eastep?

4    A.    Yes, he did know about it.

5    Q.    How do you know that he knew about that?

6    A.    Because we had a discussion about it.

7    Q.    Was he aware of it before or -- did he

8    bring it up, or did you, during this discussion?

9    A.    I'm unsure of that.  He made a statement

10   that I reminded him of his daughter and that if Major

11   Eastep -- he could not control what happened to Major

12   Eastep prior to, but if something happened again, he

13   would make sure it was taken care of.

14   Q.    Okay.  And that was Warden Richardson who

15   told you that; is that correct?

16   A.    Yes.

17   Q.    When he told you that, did you believe him?

18   A.    Not really, no.

19   Q.    Why not?

20   A.    I felt like he was just trying to appease

21   me so that I would stop my complaining.

22   Q.    Did you have any conversations with Warden

23   Wathen about the situation with Major Eastep?

24   A.    During the EEO, yes, sir, during the EEO

25   investigation.

Ambur Hale
April 24, 2019

1  the retaliation against you?

2      A.     I believe that he had knowledge and that he

3  was aware.  And that he turned a blind eye, which

4  would make him still culpable in this situation.

5      Q.     Do you have any conversations -- did you

6  have any conversations with him or, do you have any

7  documentation or anything that would lead you to that

8  belief?

9      A.     No.

10     Q.     Okay.  So is it fair to say that that's

11 just your feeling you derived from it, from being in

12 the situation?

13     A.     From my experience of working with TDCJ,

14 yes, that is my feeling.

15     Q.     And to be clear, the retaliation that you

16 are alleging is the disciplinary case against you?

17     A.     Yes, sir.

18     Q.     And is there any other acts that you feel

19 retaliatory for you filing the grievance?

20     A.     Well, it's in the complaint that they came

21 to my building to do cleanliness inspections, which

22 was something that was out of the normal realm for

23 them.

24     Q.     Okay.  And "for them," you mean -- I

25 believe the petition mentioned the warden and the

1   major?

2       A.      And the major and the assistant warden,

3   yes, to come to your building and check for

4   cleanliness.

5       Q.      Okay.  And are those the only incidents of

6   retaliation that you are claiming that you can

7   testify to?

8       A.      I think not being moved into a different

9   area is also an issue, a different department.

10      Q.      And just -- I probably should have asked

11  this earlier.  You were in general population,

12  working that area; is that correct?

13      A.      Yes, sir.

14      Q.      When this happened.  And I assume what you

15  mean is you feel you should have been moved to

16  possibly the, the administrative segregation or the

17  ECB?

18      A.      Yes, sir.

19      Q.      Under one of the other two majors?

20      A.      Yes, sir.

21      Q.      Okay.  Now, we've covered the retaliation

22  with you -- or who you feel retaliated against you in

23  the disciplinary matter.  In regards to the

24  unannounced or the visits on your housing area in

25  your housing block, were those the only two

Ambur Hale
April 24, 2019

1    A.    Yes, sir.

2    Q.    Okay.  A little over the top?

3    A.    Yes, sir.

4    Q.    Did you see any other supervisors that kind

5  of carried themselves the way he did?  To that

6  extreme is what I'm talking about.

7    A.    Not to his extreme, no.

8    Q.    Okay.  And during the time that you were CO

9  and he was a captain, other than that just kind of

10 uncomfortable vibe that he gave out to you, did you

11 have any other interactions with him that you would

12 consider negative?

13   A.    No, not really.

14   Q.    Was he supportive of you as a correctional

15 officer?

16   A.    Yes.

17   Q.    Was he supportive of other correctional

18 staff, as well, in their jobs?  At least from what

19 you witnessed.

20   A.    Yes.

21   Q.    Okay.  Did you ever see him act

22 inappropriately with any female correctional staff

23 while on shift when you were a CO and he was a

24 captain?

25   A.    Not firsthand.  Just the, the rumors.

DUNCAN COURT REPORTING
214.676.0898

Plaintiff's App. 24

1    Q.   Okay.  And did you speak to any of the

2  female bosses, who -- during this time frame, I'm

3  talking about captain and you're a CO -- that relayed

4  those worries or those comments to you at that time

5  frame?

6    A.   I had one female that said that he prefers

7  women that wear acrylic nails.  And so a lot of

8  females chose not to wear acrylic nails when he was

9  on shift.

10    Q.   And do you know why -- would he just

11  comment on them, or what?

12    A.   He would like to ask ladies to look at

13  their nails.  And so that would be a way for him to,

14  to hold -- to touch their hand and things like that.

15    Q.   Do you know anybody -- can you name any of

16  the correctional officers that relayed that story to

17  you or that you actually saw him do that with?

18    A.   A woman named Kelly Webb, but she is no

19  longer employed with the state.  She's the one who

20  told me about the acrylic nails.

21    Q.   But you never saw him actually do that or

22  make any comments about that?

23    A.   No.

24    Q.   Was Eastep -- did he encourage you to

25  promote or to try to become a better correctional

1          THE WITNESS:  Okay.

2     A.    So probably around 2014.

3     Q.    So you started working day shift

4  approximately 2014.  I'm not going to hold you to any

5  of those dates.  But when you went to day shift, did

6  Eastep -- was he already on day shift or was he still

7  on night shift, do you know?

8     A.    He would have been on day shift.

9     Q.    Okay.  So you went to day shift, then,

10  you're now again working about the same times he is;

11  is that fair?

12     A.    Yes, sir.

13     Q.    And, again, as the major, he's not making

14  your shift assignments where you work, you're on that

15  rotation; is that correct?

16     A.    Well, now that I'm in administrative

17  segregation, it's a different --

18     Q.    Different major?

19     A.    Well, there's a different major, a

20  different rotation because of the building layout and

21  the custody levels.

22     Q.    Okay.  And when did you transfer back into

23  general population and under the chain of command

24  structure with Major Eastep?

25     A.    Around 2015.

 1      Q.      Do you know approximately the month?

 2      A.      Might have been in January or so.

 3      Q.      Let's just say early 2015.

 4      A.      Yes.

 5      Q.      And during that time, from the time you

 6  moved to day shift sergeant, early 2015, until, let's

 7  say, May of 2016, did you have any problems with

 8  Mr. Eastep?  And if so, what were they?

 9      A.      Well, the --

10      Q.      Actually that's April.  Let's go to

11  February -- or March.

12      A.      It would have been the asking about the toe

13  sucking and the holding of the hand, trying to kiss

14  my hand.

15      Q.      And I believe in the petition, it was

16  mentioned that that occurred approximately -- it just

17  has prior to.  Do you know approximately what time --

18  what months, when those incidents happened?

19      A.      No, I would have to look at a calendar or

20  something.

21      Q.      And we've talked over the forms of

22  harassment you took -- or that he engaged in.  And

23  you described the grabbing her hand, leaning in with

24  his mouth, lips puckered, as if to kiss her hand.

25  That was the time Mr. Eastep tried to kiss your hand

Ambur Hale
April 24, 2019

1  you feel; is that correct?

2      A.    Yes, sir.

3      Q.    Do you remember approximately what time

4  frame or when that happened?

5      A.    I don't.  I don't.  I just remember where

6  it happened.

7      Q.    Where did it happen?

8      A.    There is an office across from the count

9  room where they actually take the physical count,

10  where the officers call in their buildings' count.

11     Q.    Okay.

12     A.    And he was in there.  The sergeants' filing

13  cabinets are in that office.  So he was at a desk

14  that would block the sergeants' cabinets.  So

15  that's...

16     Q.    So tell me how this happened -- how it

17  happened when he attempted to kiss your hand in that

18  office, please.

19     A.    Okay.  He was at the desk in a chair and I

20  said, excuse me, I've got to get something out of the

21  cabinet behind you.  So he backs the chair up so that

22  I could get towards the filing cabinet.  Opened the

23  filing cabinet, get what I needed out, closed the

24  filing cabinet, and then he grabbed at my hand and

25  started to pulling it in.  And I yanked my hand out

Ambur Hale
April 24, 2019

1  and he was like, I was just trying to look at your

2  nails.

3       Q.    Okay.   When he backed up first, did he give

4  you space to get to the file cabinet?

5       A.    Uh-huh.

6       Q.    It sounded to me like he needed to get out

7  of your way so that you could access the cabinet.

8  When he backed up a little, did he get out of your

9  way?

10      A.    For the most part.   There was a -- the desk

11  is like an L shape, and there was a wall behind the

12  desk.   So he moved far enough away where I didn't

13  feel uncomfort -- well, I didn't feel like it was

14  inappropriate.

15      Q.    I understand.   I understand, okay.

16            And then as you were shutting the door

17  or getting ready to complete your business and get

18  out of there, he grabbed your hand and attempted to

19  look at your nails -- or attempted to pull towards

20  you --

21      A.    No, he attempted to kiss my hand.   And when

22  I refused him, then he tried to use the excuse that

23  he was looking at my nails.

24      Q.    Did you have acrylic nails at that time?

25      A.    At that time I did.   And I was very upset

1    with myself that I -- I'm a nail biter, so I wear

2    acrylics to not bite my nails.

3        Q.    Understood, understood.

4                Okay.  Did you report that touching by

5    Major Eastep -- or was he major at this time?

6        A.    Yes.

7        Q.    Did you report that to anybody?

8        A.    No.

9        Q.    Why not?

10       A.    Because I know that it would have been a he

11   said/she said situation.

12       Q.    Did you say anything to him about that's

13   not appropriate?

14       A.    I said, you're gross.

15       Q.    What was his response?

16       A.    He laughed at me.

17       Q.    How did that make you feel?

18       A.    Irritated.

19       Q.    Irritated?

20       A.    Uh-huh.  And aware that I needed to keep

21   more distance.

22       Q.    Did you quit wearing acrylics after that?

23       A.    I did.

24       Q.    And was this while -- this is while you

25   were working in ad seg still?

1    A.    No.

2    Q.    You had moved to general population?

3    A.    Yes, sir.

4    Q.    I apologize if I got that confused.

5          Was there anything else about the

6    incident in the count room or across from the count

7    room in that office that I need to know about that

8    you feel is important for me to know?

9    A.    No, not in that situation, no.

10   Q.    Okay.  So then we have the situation now

11   where, where the major asks you about your toes, and

12   that act.  When did that occur, ma'am?

13   A.    That happened in his office.  The captain's

14   office and the major's office have a connecting door.

15   In the captain's office is where we do -- the

16   sergeants and lieutenants do our paperwork.

17   Q.    Okay.

18   A.    So I was in there doing my paperwork and he

19   called me into his office, I walked through the

20   doorway, and he made the comment about have I ever

21   had my toes sucked.  And I said, you're so

22   disgusting.  And I left.

23   Q.    Was there anybody else in the office when

24   he said this?  That you can recall.

25   A.    I don't believe so.

1    Q.    Okay.  When he said it to you, how did that

2  make you feel?

3    A.    Disgusted.

4    Q.    And your response was, you're gross?

5    A.    You're disgusting.

6    Q.    You're disgusting?

7    A.    Yes.

8    Q.    So you basically replied with exactly how

9  it made you feel?

10    A.    Yes.

11    Q.    Did you, did you report that to anybody?

12    A.    No, sir.

13    Q.    Had there been any lead up in that

14  conversation?  Were you talking about anything?

15    A.    No.

16    Q.    I'm trying to get context behind it.  He

17  just basically made this comment out of the blue,

18  then?

19    A.    Yes.

20    Q.    Okay.  You've also got in the petition --

21  well, is there anything else about that incident that

22  I need to be aware of, that's important?  You did not

23  report it to anybody; is that correct?

24    A.    Correct.

25    Q.    And, again, I have to ask.  Why not?

1    A.    He said/she said.

2    Q.    Same type situation?

3    A.    Yes.

4    Q.    But now you have two of them, two he

5  said/she said type situations?

6    A.    Uh-huh.

7    Q.    Okay.  Did you say anything to Major Eastep

8  after that incident other than, you're disgusting?

9  Did you give him any more notice to not do this

10 again?

11   A.    No, I did not.

12   Q.    Well, hold off a second.  I want to ask a

13 couple more questions, okay?

14         You also mentioned in your petition

15 that on multiple occasions he attempted to hug you?

16   A.    Yes.

17   Q.    Explain to me how -- if you could, please,

18 describe how the major would attempt to hug you.

19 Just give me an example of one of them, please.

20   A.    He would go for a full hug, and I would

21 turn my body.  And he would try to do the half hug

22 and I would try to shrug out of the half hug.

23 Sometimes I'd put my elbow up while shrugging out.

24 And that's where some of the other males that I

25 worked with would give him the hint that, hey, this

1  is not good, she doesn't like that.

2      Q.    How many occasions do you think he tried to

3  do that?

4      A.    Oh, maybe two or three.

5      Q.    All right.  And were they before these

6  other incidents, or is it all just kind of going

7  on --

8      A.    All in between.

9      Q.    The hugs that he would attempt to give, did

10 you ever see him attempt to hug any other officers or

11 any other people on the unit?

12     A.    Yes.

13     Q.    Males, females, both?

14     A.    Females.

15     Q.    You never saw him try to hug a male --

16     A.    No, sir.

17     Q.    -- in any way?  Like, you know, some men

18 will bear hug.

19     A.    No, sir.

20     Q.    Okay.  Did the major have a reputation

21 or -- strike that.

22            Have you ever met people who are known

23 as people who like to hug, huggers, when they greet

24 somebody, or anything like that?  Have you ever met

25 anyone like that?

1    A.    Yes.

2    Q.    Okay.  Would that be a description that

3    could be used for Major Eastep?

4    A.    No.

5    Q.    So it's your belief that when he was

6    hugging, it was for some sort of sexual-type

7    gratification on his behalf?

8    A.    Yes.

9    Q.    Okay.  And other than what you have

10   described to me in regards to his, his attempts to

11   hug you, do you have anything else to base that on,

12   that opinion on?

13   A.    That he was doing it for sexual

14   gratification?

15   Q.    Yes, ma'am.

16   A.    The appearance of the hugs.  They weren't

17   workplace appropriate.

18   Q.    And the hugs with you or the hugs you saw

19   him hug other people?

20   A.    Any of the attempts, a full-on hug would

21   never be workplace appropriate etiquette.  That's too

22   much body contact.

23   Q.    But what about the half hugs that you

24   actually -- or it seemed like you let him do to some

25   extent?

```
 1              MS. TAUSCH:  Object to the form.
 2        Q.    That he hugged you.  You do agree that he
 3   did hug you a few times -- attempted to do the half
 4   hug?
 5        A.    He did attempt to do the half hugs, yes.
 6        Q.    And did he actually make contact with you
 7   during those times?
 8        A.    Yes, sir.
 9        Q.    Okay.  And is it your testimony or you
10   believe that that was a sexual -- in his mind, that
11   was sexual?
12        A.    Yes, sir.
13        Q.    And, again, I'm going to ask, other than
14   your subjective belief, what else do you base that
15   upon?
16        A.    Societal norms.
17        Q.    Okay.  Did you report the hugs to anybody?
18        A.    No.
19        Q.    That you were uncomfortable or felt
20   uncomfortable in those?
21        A.    No.
22        Q.    I did notice that, yes, a couple of
23   officers did give statements regarding that you don't
24   like to be touched.
25        A.    Uh-huh.
```

1      Q.     When did that -- has that been something
2  that you've dealt with all your life?
3      A.     No.  It's in the workplace.
4      Q.     Okay.  So in the workplace you are
5  sensitive about touch; is that fair?
6      A.     I'm not sensitive about touch.  There's
7  appropriate and inappropriate.  We work in a very
8  dangerous setting and you need to be guarded.
9      Q.     Okay.  So basically it's your belief or
10  your feeling that any touching in -- essentially in a
11  workplace is inappropriate?
12      A.     Not any touching.  But we discuss proxemics
13  a lot.  The -- a range that a person should be in
14  your personal bubble, your personal space.  A hug,
15  especially a front hug, would violate someone's
16  personal space.
17      Q.     Okay.  Does every touch by an officer on a
18  coworker, at least to some extent, in your mind,
19  invade their personal space?
20      A.     It's possible, yes.
21      Q.     For example, you've seen the video, we
22  watched it earlier where the major puts his hand on
23  the shoulder of the nurse as they're walking through
24  the gurney.  Did you feel that that was inappropriate
25  in that situation?

1    A.    It could be, yes.

2    Q.    But if it could be, then it also could be

3  appropriate.

4    A.    It's possible.

5    Q.    Okay.  Did you see anything about that that

6  seemed inappropriate?

7    A.    I would have not liked him to touch my back

8  for an extended period of time.

9    Q.    I understand that you would not have liked

10 it.  But did you see anything about that that seemed

11 to be inappropriate in the short time that he touched

12 that nurse's shoulder?

13         MS. TAUSCH:  Objection, form.

14         Go ahead.

15   A.    Yes.

16   Q.    And that would just be that he touched her

17 at all?

18   A.    For an extended period of time.

19   Q.    What do you consider an extended period of

20 time?

21   A.    I couldn't give you an exact answer on

22 that.

23   Q.    More than five seconds?

24         MS. TAUSCH:  Object to the form.

25   Q.    Do you think that being touched for more

1  than five seconds is an extended period of time?

2      A.    I think anytime that is unwelcomed, no

3  matter how short it is.

4      Q.    Okay.  I'm asking you specifically about

5  that nurse.  Did anything about -- in that video, did

6  it appear she thought that was unwelcomed or looked

7  like that was unwelcomed?

8                  MS. TAUSCH:  Object to the form.

9      A.    I did not pay attention to her body

10  language.  But if you watch the EEO video, they use

11  that as an example of a possible sexual harassment

12  issue.

13      Q.    Okay.  And possible why?  Because it might

14  be an unwelcome touching; is that correct?

15      A.    Yes, sir.

16      Q.    Okay.  The touching of the nurse, with the

17  hand like that, if that had been a female major

18  touching the nurse, do you feel the same way?

19      A.    Does the female do it to everyone or just

20  to females?  Is she -- is it exclusive just to one

21  gender?

22      Q.    Well, sure.  Let's just go with that right

23  now.  It's exclusive to one gender.

24      A.    Is she homosexual or heterosexual?

25      Q.    No, she's not.  She's heterosexual.

Ambur Hale
April 24, 2019

1    A.    I feel like if you are doing something to

2    one gender and not the other, that it can be

3    construed as sexual harassment.

4    Q.    So by that same argument, if -- by that

5    same logic, if the major is also known to hug male

6    officers, would the same logic, then, hold true for

7    him on those situations?  That it's not necessarily

8    sexual with females, as well, if he treats males the

9    same way?

10   A.    To an extent, yes.

11   Q.    Fair enough.

12          The -- your feeling that you don't

13   like to be touched, your true feelings about that,

14   that -- I want to make sure you have clarified or

15   limited it to in the work space; is that correct?

16   A.    Yes, I hug people outside of work.

17   Q.    Okay.  That wasn't where I was going.

18   Where I was actually going is now you're a trainer;

19   is that correct?

20   A.    Yes, sir.

21   Q.    And before you were a trainer, you actually

22   went through training at TDCJ; is that correct?

23   A.    Yes, sir.

24   Q.    So would your testimony be that -- you've

25   had to go through use of force training?

```
 1      A.      Yes, sir.

 2      Q.      And defensive tactics?

 3      A.      (Nods head)

 4      Q.      Is that a "yes"?

 5      A.      Yes, sir.

 6      Q.      I'm sorry, she has to take it down.

 7      A.      Yes, sir.

 8      Q.      And in that, you've been touched; is that

 9   correct?

10      A.      Yes, sir.

11      Q.      And would I be correct, then, in inferring

12   from your testimony that that's appropriate because

13   we know it's coming and it's part of the job?

14      A.      Yes.

15      Q.      Okay.  So what you are talking about when

16   these other officers are relaying that you don't like

17   to be touched, is within the workplace when it's not

18   an appropriate place for you to be touched at work?

19      A.      Yes, in the scope of that job duty -- in

20   the scope of that job duty if that is appropriate and

21   it's professional, then it can be acceptable.  For

22   example, I do defensive tactics training, sometimes I

23   have to grapple with another female student which

24   would require some touching, some contact.  But they

25   are aware of what we're doing, we've discussed it,
```

1  and they are participating.  They're willing

2  participants.  It's not something that I forced on

3  them.

4      Q.    And I think you've just summed up what I'm

5  trying to say very well, which is if it's an expected

6  part of the job and we are doing a unit or something

7  of training that hand-on-hand contact or bodily

8  contact is needed, you don't have a problem with

9  that?

10     A.    No.

11     Q.    That is expected, that's part of the job

12  duties, and you can fulfill those with no problem?

13     A.    Yes.

14     Q.    It is the unexpected touches by

15  correctional staff or supervisors that you have a

16  problem with; is that fair?

17     A.    The unexpected or the unwelcomed, yes, sir.

18     Q.    I would agree with that.  I would put those

19  two a little bit to the same.

20     A.    Yes, sir.

21     Q.    Anything else -- any other interactions

22  with Mr. Eastep in this, you know, February, before

23  we get to June 15th, other than what we've talked

24  about now?

25     A.    Not to my knowledge.

1   and that keeps me out of a lot of, a lot of the

2   targets.

3       Q.    Now, I want to move forward a little bit to

4   the June 15th incident, okay?  And I think I can

5   cover this very quickly.  You've had a chance to read

6   some of that report -- or some of that interview.

7   Have you listened to the interview lately, at all,

8   since you've given it?

9       A.    No, sir.

10      Q.    Okay.  What you read there -- and I'm going

11  to go ahead --

12              MR. GARCIA:  Can we just refer to that

13  as an exhibit from the prior deposition?

14              MS. TAUSCH:  Sure.  What number was

15  it?

16              MR. GARCIA:  1.

17      Q.    Exhibit 1 from Mr. Burt's deposition.  Do

18  you stand by what you told Mr. Burt on that day?

19      A.    Yes.

20      Q.    Okay.  So the description and the typing

21  that's done in there of the words and the

22  conversation between Mr. Burt, you agree that that

23  seems fairly accurate?

24      A.    Yes.

25      Q.    Appears accurate.

1          And do you stand by the description

2     that you gave of the events to Mr. Burt regarding the

3     incident on the 16th?

4          A.     Yes.

5          Q.     Does that make sense?

6          A.     (Nods head)

7          Q.     Okay.  So I think I have a pretty good

8     description of what you did -- or what happened on

9     the 16th, I don't know that I need to cover very much

10    of that.  But I do want to ask a couple of questions

11    about that date and about the investigation.  All

12    right?

13          First, I believe I read somewhere that

14    the reason you were moving -- or you had been moving

15    an offender from safekeeping or into safekeeping, is

16    that correct, or a PREA report, is that --

17         A.     Yes.

18         Q.     Explain to me what was happening there.

19         A.     On B pod of 3 building, we keep a custody

20    level that is protected in their housing assignment.

21         Q.     Okay.

22         A.     They can be a myriad of things, from a

23    really young offender, really old offender, someone

24    with disabilities, homosexual, someone that might be

25    a bigger target for extortion or sexual assaults,

1    Q.    Okay.  Does that duty to do unannounced

2    rounds go up the chain of command, as well?

3        A.    Any supervisor can do unannounced rounds.

4            MR. GARCIA:  Do you mind if we take

5    about five minutes.

6            MS. TAUSCH:  Sure.

7            (Recess from 3:25 to 3:33)

8        Q.    Ms. Hale, a couple things about the June

9    15th incident, and then I want to move on from that

10   to the other stuff and we'll get out of here, okay?

11       A.    Okay.

12       Q.    When I listened to the interview with the

13   OIG investigator, and when I read it, there is a

14   conversation or an interaction between you and him in

15   which you mention that you told an officer on the

16   unit about the -- about the incident with the major.

17   Who was that officer?  Do you recall?

18       A.    It was Captain Miller.

19       Q.    Captain Miller at that time.

20            Okay.  So -- and what did he tell you

21   to do about that?

22       A.    He didn't give me any direction.

23       Q.    Okay.

24       A.    It was me more venting than asking his

25   advice.

Ambur Hale
April 24, 2019

1    Q.    Do you remember -- well, do you remember

2    when that conversation took place?

3    A.    The same day.

4    Q.    Was he a captain on your shift?

5    A.    Yes.

6    Q.    Okay.  So -- and was he a general

7    population captain at the time?

8    A.    Yes.

9    Q.    So he would have been in your direct chain

10   of command --

11   A.    Yes.

12   Q.    -- above you; is that correct?

13         Who was your lieutenant or lieutenants

14   who would have been directly above you at that time,

15   do you recall?

16   A.    I believe it was Lieutenant Dishman,

17   Lieutenant Flood and Lieutenant Sims.

18   Q.    Did you tell them -- or why didn't you

19   approach them?  That's a better question.

20   A.    Captain Miller is easier to talk to.

21   Q.    Okay.

22   A.    He understands the game, I guess.  Or how

23   things work.  So I felt comfortable venting to him.

24   Q.    Okay.  Do you recall how you described the

25   incident to Captain Miller?  Did you describe it the

1  basically explain it in a way that there would be no

2  blowback on you; is that fair?

3      A.   Yes.

4      Q.   Okay.  Gives me a very good description.

5  Thank you.

6               After the incident happened and you

7  spoke to Captain Miller about it, a couple days later

8  you filed an EEO complaint; is that correct?

9      A.   (Nods head)

10     Q.   I'm sorry, you have to answer out loud.

11     A.   Yes.

12     Q.   Okay.  And then you sent that EEO complaint

13  to EEO in Huntsville; is that correct?

14     A.   Yes.

15     Q.   Okay.  And I just -- why Huntsville instead

16  of the EEO on your unit?

17     A.   Because the head of HR was friends with

18  Major Eastep.  The wardens were friends with Major

19  Eastep.  And I felt like it would be suppressed if it

20  was on the unit.

21     Q.   Okay.  And by "suppressed," you mean the

22  whole incident would just be buried?

23     A.   Yes, it would be swept under the rug.

24     Q.   Okay.  Did you take any actions on your own

25  to make sure it wouldn't be swept under the rug?

1      A.     Yes.

2      Q.     What did you do?

3      A.     Well, I tested -- Captain Miller did talk

4  to Major Eastep and Major Eastep tried to hug me

5  anyway, and that was kind of the, "okay, I need to do

6  this" moment.

7      Q.     When did that happen?

8      A.     Later that afternoon.

9      Q.     The same day?

10     A.     Uh-huh.

11            MS. TAUSCH:  That's a "yes"?

12     A.     Yes, yes, I'm sorry.

13            MR. GARCIA:  Thank you.

14     A.     Yes.  So later that afternoon he went in

15  for a hug again, and I was like, this guy, right.  So

16  I thought about how I would do it, what would be my

17  best options.  The next day I put what is called an

18  I60 -- it's an offender request form.  It's a form

19  that offenders fill out.  I filled out two forms, one

20  to Warden Wathen and one to Warden Anders, as an

21  inmate, an anonymous inmate who wanted them to review

22  the cameras.  I was hoping and praying that one of

23  them would read that, look at the incident on the

24  film and then call me into the office and require me

25  to file it.  And so then, once again, it wouldn't be

1  talked to a lady over the phone and explained what

2  was going on and asked her what the process would be

3  if I filed a complaint.

4      Q.    Okay.

5      A.    It was a Friday, towards the end of the

6  day.  So I spent the weekend writing my letter and I

7  sent it in that Monday.

8      Q.    Okay.  Do you need to take a break,

9  Ms. Hale?

10     A.    No.  This whole situation gets me upset,

11 so --

12     Q.    Just plow through it, is that the best

13 thing?

14     A.    Yes.

15     Q.    Then I will respect your wishes and get

16 through this.  If you need to take a break, please

17 let us know.

18     A.    Okay.

19     Q.    160s didn't get it done, you spent the time

20 over the weekend, then you typed up the email and

21 sent it into HR -- and had the conversation, then

22 sent in the email; is that correct?

23     A.    Yes, sir.

24     Q.    Okay.  After you went through the EEO

25 process, you were assigned as a utility sergeant, is

1  that correct?  I saw that in the petition, that you

2  were made a utility sergeant.

3      A.    I was -- that was my rotation.

4      Q.    Okay.  So you weren't permanently assigned

5  as a utility sergeant?

6      A.    No.

7      Q.    There were just times through the rotation

8  that you were named the utility sergeant; is that

9  correct?

10     A.    Yes, sir.

11     Q.    Okay.  And during those times as the

12  utility sergeant, you had increased interaction with

13  Major Eastep?

14     A.    Yes, sir.

15     Q.    Okay.  How -- what was different about

16  being the utility sergeant versus being assigned to a

17  block that put you into more -- more in his circle, I

18  guess, so to speak?

19     A.    Well, you have to do more of the computer

20  and paperwork aspect and not the offender management

21  side.  The computers and paperwork is in the

22  captain's office, which is connected to the major's

23  office.

24     Q.    To the major's office.

25     A.    So I would constantly have to be right next

1   to him.

2        Q.      And when you say "constantly," I need to

3   know, were you being assigned as utility sergeant

4   more?

5        A.      No, it was my rotation.

6        Q.      Okay.

7        A.      They -- when I talked to the lady on the

8   phone for EEO, she made it very clear that I would be

9   moved to another department.  And they refused to

10  move me.  So after -- during the investigation and

11  after it was complete, they would not move me into

12  another department.  So when I would work utility,

13  the office space is very much like this and the

14  kitchen, this room and the kitchen.  So the -- but

15  the door is open.  So I had no way of not interacting

16  with him.

17       Q.      Okay.  Was there anything about those

18  interactions that -- other than being in proximity to

19  him that was -- that he did anything inappropriate,

20  said anything inappropriate at all?

21       A.      It was just very intimidating.  When they

22  dismissed everything, it became like I was a liar or

23  insensitive -- or overly sensitive, excuse me.  So

24  some of the other guys would kind of look at me funny

25  too, like I was kind of -- I wasn't out of the group,

1  but I was kind of -- they kind of put a little bit of

2  an arm out, like, she might be trouble, let's not

3  include her as much.  And that was the first time I

4  experienced that.  Because in all the time I was out

5  there, I had all the respect from all the males, even

6  males who didn't believe that females should work out

7  there.  And now I was looked at as a sensitive

8  crybaby, complainer that made up something.  That's

9  how it looked.

10          And then here he is, and I'm working

11  right next to him, right next to him.  And everything

12  I did, I felt like, was under a higher scrutiny.  I

13  had to be 100 percent perfect instead of just 98

14  percent perfect, because anything I could -- anything

15  I did could be analyzed that I was having a poor work

16  performance or -- it just was, it was much more

17  stress.

18      Q.    But you weren't assigned in there any more

19  than the rotation called for you to be in there?

20      A.    No, sir.

21      Q.    Okay.  And when you were assigned to

22  buildings, to work in the buildings during your

23  rotation, other than the time where he came down to

24  do the unannounced search the next day after one had

25  already been done, did you have any other negative

Ambur Hale
April 24, 2019

1  interactions with him?

2      A.    No.  I just knew that he has the --

3  surveillance videos come up on his -- in his office.

4      Q.    Okay.

5      A.    So at any point he could put my building on

6  his computer and watch everything that I do -- or any

7  of the administration could.  And so if I sat too

8  long or if I didn't walk around enough, if I wasn't

9  doing enough, they could say that was substandard

10 duty performance and write me up.  Or that I

11 wasn't -- that I just wasn't doing enough.  So it was

12 like -- I just never sat the whole time I was there,

13 because I was worried that something was going to

14 cause me to get written up.

15     Q.    Did anything cause you to get written up,

16 other than the use of force incident later that

17 summer?

18     A.    I just got the threat of the writeup for

19 the pigeon feathers.

20     Q.    Oh, the -- your housing area not being

21 clean -- or under your supervision not being cleaned?

22     A.    (Nods head)

23     Q.    Were those the only two incidents?

24     A.    Yes, sir.

25     Q.    Okay.  Were you disciplined for the pigeon

1  feathers?  Or was that just a -- what do they call

2  them?  A correction?  Or what's the term that they

3  use?

4      A.    I was verbally counseled and I was told

5  that I couldn't go to shift turnouts anymore.  I had

6  to go directly from the one building to my building

7  to make sure I was there to make sure the building

8  was clean.  I couldn't go to turnout.

9      Q.    Okay.  How long did that last?

10     A.    Until I got moved to ECB.

11     Q.    And how long do you think that was?

12     A.    Maybe a month.

13     Q.    Had you requested a transfer to ECB prior

14  to the June 16th incident -- or to another area, I'm

15  sorry.

16     A.    They -- I was being pressured to -- I

17  wouldn't say pressured.  They were really pushing for

18  me to go up for a lieutenant.

19     Q.    Okay.

20     A.    But I did not feel comfortable with the

21  promotion unless I got more exposure to uses of

22  force, like five-man team situations.

23     Q.    The cell extractions?

24     A.    Yes.

25     Q.    That type of situation?

Ambur Hale
April 24, 2019

1        A.      So I told them, if you're serious about me

2    going up, then I need to be moved to ECB or ad seg so

3    that I can be more exposed to that so when I become

4    in a position to supervise it, I'm not setting other

5    people up for failure by not knowing what to do.  But

6    that was not like an official request.  That was, if

7    y'all -- if this is what you want, then this is what

8    I need to have happen first.

9        Q.      You mentioned that after you made the

10   report, that there were changes in attitudes towards

11   you by other employees; is that correct?

12       A.      Yes.

13       Q.      Other than how you -- can you give me any

14   specific examples or any comments by anybody, or was

15   it just a general feeling you had that you're not in

16   the position you were before?

17       A.      I responded to a suicide attempt shortly

18   after all this happened, and Lieutenant Milborn

19   bumped into me and made the comment, that was an

20   accident, don't go report me.

21       Q.      Okay.

22       A.      So it was just little things like that.

23       Q.      How many more -- were there many of those,

24   or just one, two or three --

25       A.      No, I just felt like -- no.  It wasn't a

1     Q.    And that's just good penitentiary

2   management, isn't it?

3     A.    It could be.

4     Q.    Okay.  Because complacency is an issue,

5   isn't it?  In the prisons, it can be an issue with --

6     A.    It can be an issue, yes.

7     Q.    And routine is an issue in prisons, isn't

8   it, as well?

9     A.    Yes, sir.

10     Q.    Because the offenders, they study the

11   correctional staff, don't they?

12     A.    They do.

13     Q.    They look for the weaknesses.  And the

14   unannounced visits are a way to combat the routine;

15   is that fair?

16     A.    Yes, sir.

17     Q.    Okay.  So two visits by a major -- or a

18   visit by a warden one day and a visit by a major the

19   day after, in certain circumstances, that might be

20   perfectly appropriate for a supervisor to do, would

21   you agree with that?

22     A.    No.

23     Q.    No?

24     A.    No.

25     Q.    And is that because you've never seen it

1  done or because it happened to you?

2      A.     Because I have not seen it done unless they

3  were looking for something specific.

4      Q.     Okay.  Like a problem that they might have

5  seen the day before?

6      A.     Or a problem with a person.

7      Q.     Or a problem with something they've seen

8  the day before in that person's duty area?  Would you

9  agree with that?

10     A.     No, sir.

11     Q.     So you think the problem is with the person

12 themselves if they do it two times in a row, not the

13 person's job they're doing?

14     A.     Yes, sir.

15     Q.     So it's your testimony that if they come

16 back twice in a row to the same officer, checking on

17 whether or not they're doing their job, it's because

18 it's personal towards the officer, not to check on

19 whether the job duties are being reasonably done?

20     A.     In my experience, yes, sir.

21     Q.     Okay.  And your experience is based upon

22 what besides your incident?

23     A.     14 -- almost 14 years of observation.

24     Q.     How many other times have you seen them do

25 that towards an officer, that they're personal with

1  sent me some information, but most of it was blacked

2  out for the privacy of others.  So it was limited on

3  what I got.

4     Q.    Okay.  Backing up real quickly, when I

5  listened to the interview of you and Mr. Burt --

6  prior to you sitting down to sit with him and talk

7  with him, did you have a chance to review the video?

8     A.    Yes, I had seen it before.

9     Q.    Okay.  And was that as a result of the open

10 records request, or was that sitting with the EEO

11 that you would have seen it?

12    A.    That was with EEO.  They would not give it

13 to me for the open records request.

14    Q.    Okay.  Why did you approach the Wichita

15 Falls Police Department with the complaint?

16    A.    Because I felt like it was a violation.  I

17 reviewed some stuff online and thought it might meet

18 the elements of that violation, so I went and filed a

19 complaint.

20    Q.    And you were not aware that OIG handles

21 crimes, officer-on-officer crime that happens on a

22 state property at that time?

23    A.    No, sir.

24    Q.    Knowing that now, would you go to OIG or

25 would you go to Wichita Falls again, if you were in

1  Ms. Castillo was a very strong willed person and she

2  did not like, she did not like any advisement,

3  counsel, conversation.  She was very, she was very

4  hard to manage as a supervisor.  And the males were

5  afraid of confrontation with her, so it was on the

6  female staff, the female supervisors to try to rein

7  her in, per se.

8          So she felt very -- I'm sure she felt

9  very guarded, and I think if I wasn't a supervisor

10  and spoke with her, the message would have been

11  received differently.  But I can't take off my

12  supervisor pins in a situation like that.  I'm still

13  a supervisor.

14          MS. TAUSCH:  We'd like a copy of that

15  complaint.

16          MR. GARCIA:  No problem.  It's only

17  two pages.

18          MS. TAUSCH:  Okay.  We'd like a copy

19  of that complaint.

20          MR. GARCIA:  We'll get it for you.  No

21  problem.

22     Q.   Do you have the complaint in front of you?

23  Let's turn to the page -- let's go to the end.

24  Damages, that's page 12.

25          Now, Ms. Hale, it's my understanding

1    that as a result of this incident, you are claiming

2    that you began suffering hair loss or alopecia

3    areata; is that correct?

4         A.    Yes, sir.

5         Q.    Had you ever suffered from this before --

6         A.    No, sir.

7         Q.    -- in your life?

8              Has anybody in your family ever had

9    this type of alopecia areata, anything like that?

10        A.    No, sir.

11        Q.    Okay.  Have you ever had any issues with

12   mental illness or needed therapy for anything?

13        A.    I've been to therapy, yes.

14        Q.    And what did that concern?

15        A.    When I was in high school, I went to

16   therapy because my older sister, who was actually

17   later on diagnosed with mental illness, would start

18   fights with me.  And since I was always looked at as

19   more of the aggressor of us two, my parents thought

20   it was me that was having an issue.

21        Q.    Did you say she's your older sister?

22        A.    My older sister, yes.  So they sent me to a

23   counselor to discuss why I was having so many

24   physical outbursts with my older sister.  So I dealt

25   with that.

1              When I was going through my divorce, I

2   went to counseling to make sure that, that I didn't

3   mess up my son.  I wanted to make sure that I had

4   some guidance on how to be a good single parent.

5       Q.    Okay.  How long did that counseling take

6   place?

7       A.    Maybe two or three visits.

8       Q.    And after those two to three visits, you

9   felt okay and capable to move forward with that?

10      A.    Yes.

11      Q.    Any other issue -- any other visits to a

12  therapist or anything like that prior to 2016?

13      A.    Not that I can recall.

14      Q.    Okay.  And then in 2016 after this

15  incident, I believe you began seeking medical care

16  from several different individuals.  Is that correct?

17      A.    Yes, sir.

18      Q.    And you went and saw Susan Cardwell?

19      A.    Yes, sir.

20      Q.    She's a licensed professional counselor?

21      A.    Yes, sir.

22      Q.    How many times did you see Ms. Cardwell, do

23  you know?

24      A.    I don't know how many is on there.  I

25  started going back to her a few -- like six months

1   ago maybe.

2       Q.    As in six months ago this year?

3       A.    Yes.

4               MR. GARCIA:  Counsel, do we have those

5   records?

6               MS. TAUSCH:  I don't.  I will do my

7   best to get them and get them to you.  I don't have

8   anything other than what I've provided to you.  I

9   didn't know that until she just said that.

10              MR. GARCIA:  Okay.

11      Q.    So you went to see Ms. Cardwell how many

12  times in 2016 that you can recall?

13      A.    Two or maybe three times.

14      Q.    Okay.  And after you saw her during those

15  two to three times, did you feel capable enough to go

16  back to work?

17      A.    I never missed work.

18      Q.    Okay.  Did you see any other mental health

19  care providers during that time frame?

20      A.    No.

21      Q.    Are you seeing anyone else at this time

22  other than Ms. Cardwell?

23      A.    No, sir.  I did go -- the workers' comp.

24  But I never could get approved to go see one of their

25  counselors.  So that's why I started going back to

1    her.

2         Q.    Okay.  So you tried to make a claim on

3    workmen's comp for this incident?

4         A.    Yes.  They required me to file workers'

5    comp.

6         Q.    And was that claim denied?

7         A.    Yes, sir.

8         Q.    Okay.  Who required you to file that?

9         A.    TDCJ.

10        Q.    You also went and saw a Dr. Reinhardt?

11        A.    Yes, sir.

12        Q.    Linda Reinhardt.

13              Is she a dermatologist?

14        A.    Yes, sir.

15        Q.    And how many times do you think you saw

16    her?

17        A.    Two or three.

18        Q.    And she was treating the alopecia; is that

19    correct?

20        A.    Yes, sir.

21        Q.    And was that on a referral from your family

22    care physician?

23        A.    Yes, sir.

24        Q.    And just -- I'm trying to clear this up.

25    Was your family care physician Robert Smith?

```
 1        A.     Yes, sir.

 2        Q.     That helps me understand the records

 3   better.

 4               The reason I ask about the -- or asked

 5   about returning to work, is there is a patient status

 6   note on one of your records that was turned over by

 7   you, it's Ambur Hale disclosure 0017.  And there's a

 8   patient status, it says, return to regular duty on

 9   August 17th, 2018.  Would -- but you didn't take any

10   time off work as a result of this; is that accurate?

11        A.     Yes, that's accurate.

12        Q.     Okay.

13        A.     I didn't take any time.

14        Q.     I don't know why doctors put certain things

15   in.  But if your testimony is you worked, that's no

16   problem.

17               Are you aware of the discipline that

18   Mr. Eastep got after he left when he ran into his

19   troubles?  Do you know what happened to him?

20        A.     Just rumors.

21        Q.     Okay.  Well, you sat in his deposition --

22        A.     Uh-huh.

23        Q.     -- about a month ago and got to hear him

24   describe what he did.  Did you feel that the

25   discipline that happened to him was appropriate for
```

1   what he did later?

2       A.    As in?

3       Q.    With what happened with him and the parole

4   officer on the unit, and him lying to the

5   administration and then being -- and then coming the

6   next day and telling them that he lied, do you think

7   the discipline he received for that was appropriate?

8   And if you don't have an opinion, that's fine.

9       A.    I think that after I started to file all

10  this stuff and the outside was starting to look in,

11  with the new administration, he probably had a target

12  on his back.

13      Q.    Okay.  The alopecia areata, do you still

14  have the hair problems, or has it cleared up since

15  this time?

16      A.    It's cleared up.

17      Q.    How long, approximately, did it take to

18  clear up?

19      A.    When I did my follow-up appointment, you

20  could already see some hair growth.

21      Q.    Do you remember when that follow-up

22  appointment was, just generally, how many weeks?

23      A.    No, I don't recall.

24      Q.    Did you receive the injections or the

25  pills, the steroid pills to help stimulate the

1  growth?

2     A.    I received injections on my first

3  appointment and injections on my follow-up

4  appointment.

5     Q.    And you had good results from those

6  injections -- or have had good results as a result of

7  those injections?

8     A.    I'm not sure if it was just the injections

9  or if the environment change also affected it.

10    Q.    When you say "the environment change," what

11 do you mean by that?  How does that figure into it?

12    A.    Well, I noticed that I had this hair loss

13 during the summer shortly after I got my -- started

14 getting my treatments, I was in the training

15 department, or around that time.  So I was no

16 longer --

17    Q.    You got transferred out -- or moved?

18    A.    I had a lateral move, yes, sir --

19    Q.    Okay.

20    A.    -- into the training.  And I started to

21 feel a sense of pride and enjoyment in my job again.

22    Q.    And you've been in training since that

23 move, ever since; is that correct?

24    A.    Yes, sir.

25    Q.    Okay.  Is there an opportunity to promote

1    in the training section to like a lieutenant?

2        A.    No, sir.

3        Q.    And there are certain benefits to staying a

4    sergeant, aren't there, you get to work overtime,

5    don't you?

6        A.    No.   That's per warden, the overtime.

7    Technically, yes, I'm -- I have the authorization,

8    but I have to have the warden's approval.

9        Q.    Okay.

10       A.    So normally, no, I don't get to work

11   overtime.  But the hours are conducive to being a

12   single parent.

13       Q.    It's regular 8:00 to 5:00?  Or what are

14   your hours now?

15       A.    Currently I'm working what is considered H

16   card, which would be an 8:00 to 5:00.  But normally I

17   would work what is called a J card, which are

18   ten-hour days.  So that would be from 7:00 to 6:00.

19       Q.    Okay.  In terms of psychological damages,

20   you mentioned mental anguish as a damage.  That's

21   kind of a vague term.  Can you describe to me what

22   you mean by that or what you are going to tell the

23   jury what you mean by mental anguish.

24       A.    I believe that --

25       Q.    Is it the trips to the psychologist, the

1   pressure you've been talking about?

2       A.      Yes.

3       Q.      What else?

4       A.      The frustration, the grief, the depression,

5   the embarrassment.  All the emotions that it sparks

6   every time I think about this situation.

7       Q.      Were you ever on any antidepressant

8   medication?

9       A.      No, sir.

10      Q.      Were you ever clinically diagnosed with

11  depression -- or diagnosed with clinical depression

12  by anybody that you're aware of?

13      A.      I believe so, yes.

14      Q.      Would that have been Dr. -- the licensed

15  professional counselor we spoke about?

16      A.      I know she did document something.  But

17  when I went to the workers' comp doctor, he had

18  marked on my paperwork that I had depression, as

19  well.  And when I had him say that as an outsider,

20  that's when I decided I needed to start going back to

21  counseling.

22      Q.      I also see on your -- on the petition

23  you've got posttraumatic stress disorder.  Have you

24  been diagnosed with PTSD?

25      A.      From my knowledge, yes.  But I don't know

1  if, if a counselor has -- I don't know if that needs

2  to be done by a physician or if the counselor has

3  enough authority in the medical realm.  I don't, I

4  don't know.

5      Q.    And the extreme fear and the humiliation,

6  that's what you described earlier.  Is that accurate?

7      A.    Yes, sir.

8      Q.    Is there anything else I need to be aware

9  of or any other instances that happened that would

10 describe -- that could illustrate the extreme fear

11 you're talking about now?

12     A.    I think with this whole situation, it took

13 something from me.  He stripped me of my identity.

14 And I've suffered greatly with trying to reassume my

15 identity.

16          When I was assaulted by an offender

17 out there, it was embarrassing, and it was

18 frustrating, but the state held him accountable.  And

19 that made me feel better when I went to work.  And I

20 got over it.  But in this situation, he took

21 something from me and I -- and nobody stood up for

22 me.  And it was -- it's been very hard to -- it's

23 been hard to grapple with that in my mind, that I

24 could be so loyal and such a good worker, but I'm

25 disposable.  And that my dignity does not matter, and

1   the rules only apply to certain people.  So it's been

2   very difficult.  And it does -- it caused me a lot of

3   mental anguish and stress and anger.  And it --

4   sometimes it's hard for me to process my feelings

5   correctly.

6        Q.    And is the -- how often are you going to

7   therapy now?

8        A.    I go once a month to maintain my progress,

9   I guess you could say.  Because I'm in a much better

10  place than I was, say, a year or two years ago.

11       Q.    Have I -- have you told me about all of the

12  medical treatment you have received -- medical and

13  mental health treatment that you believe you received

14  over this -- as a result of this?

15       A.    I believe so.  I went to the clinic and

16  they tried to get me medicine to make sure that it

17  wasn't a rash or something of that nature.  An

18  antifungal cream.  And then after that wasn't

19  successful, then they referred me -- I don't -- I

20  think that's pretty much it.

21       Q.    Okay.  Other than the mental health

22  counseling that you're going to every month, do you

23  feel that there's any other treatment you might need

24  or you've been told you're going to need in the

25  future?  Medical or mental health.

1    A.    I'd like to continue to go to counseling.

2  With the alopecia, it's -- from my understanding, as

3  long as I can not get overwhelmed with stress, I

4  shouldn't have an issue.

5    Q.    Let me ask you:  Have you done any internet

6  research on alopecia?

7    A.    Yes, sir.

8    Q.    Have you seen any of the articles that say

9  that they basically don't tie it to stress anymore?

10              MS. TAUSCH:  Object to form.

11   Q.    Have you seen those articles, ma'am?

12              MS. TAUSCH:  Object to the form.

13   A.    I've seen contradictory information.  But

14  that's just about anywhere in any medical realm,

15  there will be contradictory information such as the

16  keto diet versus a high carb -- high protein diet,

17  there's a lot of contradiction in everything when it

18  comes to medical.

19   Q.    So you believe it's stress related?

20   A.    I know it's stress related.

21   Q.    And if the medical literature, the latest

22  contraindicates that, you still believe it's stress

23  related?

24              MS. TAUSCH:  Object to the form.

25   A.    I think each person is an individual.  And

1   so what might be for one person is not for the other.

2   Mine is stress related.

3       Q.     It states that your character and standing

4   in the community have been damaged from the

5   harassment.  How has your character been damaged in

6   the community?

7       A.     Well, in the correctional environment,

8   which extends outside of the prison, because it is

9   one of the more populous jobs in Wichita Falls, I'm

10  perceived -- I can be perceived as a tattletale, a

11  snitch, a crybaby.  You know, with this "me too"

12  movement, some people look at it as someone who just

13  jumps on the bandwagon.  So I have that issue, as

14  well.  Oh, she's just doing this to jump on the

15  bandwagon, that there's no merit behind it.

16      Q.     Is this just your feeling that it's been

17  damaged, or do you have actual examples where people

18  have come up to you in your community and said

19  something to you?

20      A.     I was doing a truck pull, where you pull a

21  truck for charity.

22      Q.     Sure.

23      A.     And a TDCJ officer standing behind me, and

24  I scooted over, he's like, don't worry, I won't do it

25  to you.

1   things.

2                  You were disciplined as a result of

3   the investigation done by Major West; is that

4   correct?

5       A.    Yes, sir.

6       Q.    Do you recall what that discipline was,

7   Sergeant Hale?

8       A.    I just remember that it was a newer, a

9   newer violation that they had added.  It was like

10  a --

11      Q.    Would you like to look at the document I

12  marked as Exhibit 2?

13      A.    Thank you.

14      Q.    And if that's not the one, please let me

15  know, but I think that is.

16      A.    Yeah, the level 2, 25F, F was newer.

17      Q.    Okay.  And that was the first charge they

18  leveled; is that right?  You were charged with a

19  level 2?

20      A.    I was charged with a level 2, 25F.

21      Q.    And then were you found guilty of the level

22  2?

23      A.    Warden Richardson dropped it to a lower

24  charge.

25      Q.    And did he find you not guilty on the level

1  2?

2      A.    Yes, sir.

3      Q.    And then did he find you guilty on the

4  level 4?

5      A.    Yes, sir.

6      Q.    Okay.  And just so the jury is clear, level

7  4 offense is a lower level than a level 1; is that

8  right?

9      A.    Yes, sir.

10     Q.    Okay.  What was the punishment or actions

11  taken against you as a result of the finding by the

12  warden, please?

13     A.    I was put on three months' probation.

14     Q.    Okay.  And what does that -- was that the

15  only sanction made against you, ma'am?

16     A.    Yes.

17     Q.    Okay.  During that three months, when you

18  were on probation, that means that you can't promote

19  during that time frame; is that correct?

20     A.    Yes, sir.

21     Q.    And you also can't get merit raises during

22  that time frame; is that correct?

23     A.    Yes, sir.

24     Q.    Were you denied any -- well, one, you

25  haven't tried for any promotions since you've made

1    Q.    So that on the date that it's supposed to

2  end, it dropped off like it's supposed to do?

3    A.    Yes, sir.

4    Q.    Okay.  Last, I want to show you the

5  video -- a video.  And then I want to show you

6  something that we have done to the video.

7               MR. GARCIA:  And I will forward this

8  to you, Ms. Tausch.

9    Q.    I want you to watch the normal one first.

10 And then I'm just going to ask you a question about

11 the next one.

12              (Video playing)

13   Q.    I don't know if there's a pause here.

14              Okay.  One quick question about the

15 video.  Where is the blood allegedly that he's

16 pointing to in this picture?  Is it behind the desk

17 or in front, in this area here?

18              MS. TAUSCH:  Object to the form.

19              Go ahead.

20   A.    There was no blood.

21   Q.    I'm sorry, the red mark he's talking about.

22 I didn't mean to put words -- I'm just wondering

23 where it's supposed to be.  Behind the desk or in

24 front, where you two were standing?

25              MS. TAUSCH:  Object to the form.

1  the questions as best as I was able to get them out

2  of my mouth today?

3      A.    Yes, sir.

4      Q.    Was I polite to you today?

5      A.    Overall, yes, sir.

6      Q.    Overall, I'll take that.  And thank you for

7  your time.

8                  MR. GARCIA:  Pass the witness.

9                  MS. TAUSCH:  I just have one question.

10                      EXAMINATION

11                        (5:08)

12      Q.    (BY MS. TAUSCH) During the time that this

13  incident took place, what were your shift hours?

14  Were they 6:00 to 6:00?  You said you worked a

15  12-hour shift.

16      A.    Yes, ma'am, we worked from 6:00 a.m. to

17  6:00 p.m.

18                  MS. TAUSCH:  We'll reserve the rest of

19  our questions.

20                  MR. GARCIA:  Nothing further.

21                  Thank you, ma'am.

22                  THE WITNESS:  Thank you.

23                  MS. TAUSCH:  We would like her to read

24  and sign, please.  So just send it to me.

25                  (Proceedings concluded at 5:08 p.m.)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

AMBUR HALE,                    )
                               )
                Plaintiff,     )
                               )
VS.                            )  CIVIL ACTION
                               )
TEXAS DEPARTMENT OF            )  NO. 7:18-CV-0097-M
CRIMINAL JUSTICE, and          )
MAJOR JONATHAN EASTEP,         )
                               )
                Defendants.    )

-----------------------------------

ORAL DEPOSITION OF

JONATHAN EASTEP

MARCH 14, 2019

-----------------------------------


     ORAL DEPOSITION OF JONATHAN EASTEP, produced as a

witness at the instance of the Plaintiff, and duly

sworn, was taken in the above-styled and numbered cause

on March 14, 2019, from 11:31 a.m. to 3:21 p.m., before

Julie A. Couvillion, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of Cooper

& Scully, PC, located at 900 Jackson Street, Suite 100,

in the City of Dallas, County of Dallas, State of Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

Plaintiff's App. 77

EXHIBIT B

1      Q.   All right, sir.  What is your current address?

2      A.   My current address?

3      Q.   Yes, sir.

4      A.   5102 Rock Point, two words, Street, Wichita

5  Falls, Texas, 76310.

6      Q.   And how long have you lived there

7  approximately?

8      A.   A year and a half.

9      Q.   Does anyone else live there with you?

10     A.   Yes, ma'am.

11     Q.   Who?

12     A.   My fiancee.

13     Q.   And her name?

14     A.   Kristin Foster, K-r-i-s-t-i-n.

15     Q.   Thank you.  Do you and Ms. Foster have any

16  children over the age of 18?

17     A.   I do.

18     Q.   Okay.  And I'll talk about that in just a

19  minute.  Just a minute.

20     A.   Okay.

21     Q.   Does Ms. Foster have any connection with the

22  Allred Unit?

23     A.   Presently, no.

24     Q.   Okay.  Has she worked at the Allred Unit?

25     A.   As a parole officer.

```
 1        Q.  Do you have any hobbies?
 2        A.  Spending time with my kids.
 3        Q.  When did your son -- did your son enlist in the
 4   Air Force?
 5        A.  Yes, ma'am.
 6        Q.  When did he enlist?
 7        A.  Well, he enlisted and then he had to wait to go
 8   to boot camp.  He went to boot camp I think in early
 9   December.  He graduated in February from boot camp.  I
10   don't remember the exact dates.
11        Q.  In February of this year?
12        A.  Yes, ma'am.
13        Q.  How are you currently employed?
14        A.  As a professional truck driver.
15        Q.  For whom?
16        A.  Western Dairy Transport.
17        Q.  How long have you worked for them?
18        A.  Since August.
19        Q.  Of 2018?
20        A.  Correct.
21        Q.  What's your rate of pay?
22        A.  I get paid by the trip.  It varies depending on
23   where we go.  We don't make a mile pay.  We get paid by
24   the load.
25        Q.  Is it less than what you were getting paid at
```

1   to late '90s.

2       Q.   What was your rate of pay at Home Depot?

3       A.   I think $11 an hour if I remember correctly.

4       Q.   When did you get your associate's degree?

5       A.   I don't recall.  It was -- I believe I finished

6   it in 2012 maybe.  I'm not --

7       Q.   That's fine.  When did you get your GED?

8       A.   I don't recall.

9       Q.   How old were you?

10      A.   I don't remember when it was.

11      Q.   Were you 18?

12      A.   I think I was -- I want to say I was 19 when I

13  got it.

14      Q.   Okay.

15      A.   But I'm not -- I mean, I don't recall.

16      Q.   That's a guess on your part?  When did you

17  first join the workforce?

18      A.   I grew up on a farm.  I worked all my life.

19      Q.   Okay.  When you left the farm, what did you

20  first start doing?

21      A.   Went to another ranch.

22      Q.   Okay.

23      A.   In '95.

24      Q.   Do you remember whose ranch it was?

25      A.   Uh-huh.

Jonathan Eastep
March 14, 2019

1      A.   No, ma'am.

2      Q.   What about Ms. Lacey?

3      A.   I don't know who Ms. Lacey is.

4      Q.   She's an employee at the Allred Unit.

5      A.   I don't know who that is.  I don't recall.

6      Q.   You never tried to kiss a lady named Ms. Lacey?

7      A.   No, ma'am.

8      Q.   Did you ever talk to Ms. Lacey or ask her to --

9   ask her if she wanted to have an affair?

10      A.   No, ma'am.

11      Q.   What about a lady in the mail room at the

12   Allred Unit?

13           MR. GARCIA:  Could you be more specific,

14   Counsel?

15      Q.   (BY MS. TAUSCH)  That's all Mr. Burt knows

16   about, the lady in the mail room.

17      A.   I have not --

18      Q.   Did you ever harass a lady in the mail room?

19      A.   No, ma'am.

20      Q.   How old were you when you started at TDCJ?

21      A.   Twenty-five, I believe.  I started in '99.

22      Q.   When you started working at TDCJ, were all the

23   COs men?

24      A.   No, ma'am.

25      Q.   Were all the ranking officers and higher up

 1   men?

 2        A.   No, ma'am.

 3        Q.   When you first started working at TDCJ, what

 4   unit were you at?

 5        A.   James V. Allred.

 6             MR. GARCIA:   Go ahead if you need to.

 7        Q.   (BY MS. TAUSCH)   Go ahead if you need to.

 8        A.   I went through training --

 9        Q.   Right.

10        A.   -- at -- there by the Garza Unit.   What is

11   that?  The training facility.

12        Q.   Just tell me where it is.

13        A.   In Beeville, Texas.

14        Q.   Okay.

15        A.   That's where I went through my training, but my

16   first unit of assignment --

17        Q.   Okay.

18        A.   -- was the James V. Allred.

19        Q.   Okay.  Were there any women working as COs at

20   the Allred Unit --

21        A.   Yes, ma'am.

22        Q.   -- when you first started?

23        A.   Yes, ma'am.

24        Q.   Do you know when females were first hired as

25   COs at any unit for TDCJ?

```
 1        A.   I don't know the dates, no, ma'am.

 2        Q.   Okay.  How long did you work for TDCJ?

 3        A.   Eighteen and a half years.

 4        Q.   The last unit you worked at?

 5        A.   The last unit?

 6        Q.   Yes, sir.

 7        A.   Was the Walker Sayle Unit.

 8        Q.   And that's in Breckenridge?

 9        A.   Yes, ma'am.

10        Q.   How long were you there?

11        A.   About five months.

12        Q.   Before that, you were at the Allred Unit?

13        A.   Yes, ma'am.

14        Q.   We're going to go through your history in a

15   minute, but -- so you didn't make 20 years?

16        A.   No.  Well, not day for day.

17        Q.   Were you transferred or did you ask to be moved

18   to the Walker Sayle?

19        A.   Transferred.

20        Q.   Why?

21        A.   I don't understand your --

22        Q.   Why were you transferred?

23        A.   Because the regional director transferred me.

24        Q.   Do you know why?

25        A.   Part of a disciplinary.
```

1     Q.   What was the disciplinary?  What was it for?

2     A.   Level 2 disciplinary for -- I forget the exact

3  term on it, but providing false information.

4     Q.   What was it about?  What did you provide false

5  information for?

6     A.   Alleged that I provided false information in

7  regards to my relationship with Ms. Foster.

8     Q.   So you were having a relationship with

9  Ms. Foster and you lied about it?  Let me ask -- let me

10  ask it this way.  Let me ask it this way.

11           Were you disciplined because you were

12  having a relationship with Ms. Foster or because you

13  lied about the relationship with Ms. Foster?

14     A.   It wasn't the relationship.  There was no

15  policy violation me having a relationship with her

16  whatsoever in TDCJ.  The official record of it is I was

17  untruthful to Warden Richardson during his

18  investigation.

19     Q.   Okay.  So initially you told him there was no

20  relationship and then you told him that there was,

21  correct?  I'll tell you that's what the disciplinary

22  form says.

23     A.   Yeah, I mean -- can I talk to my lawyer for a

24  moment?

25     Q.   I need you to answer the question.

```
 1              MR. GARCIA:  Go ahead and answer the
 2    question and then we can talk and take a break.
 3         A.   Ask the question again, please.
 4         Q.   (BY MS. TAUSCH)   Initially you told the warden
 5    that there was no relationship and then you told him
 6    that there was?
 7         A.   The official record, yes.
 8         Q.   Okay.  What's the unofficial record?
 9         A.   The unofficial record is there was a
10    conversation had that morning and then as stuff -- it
11    was changed.  And when I wrote my official statement, it
12    was different from the conversation we had that morning.
13    So, yes, I lied to the warden to answer the question.
14         Q.   So were you a scapegoat, Mr. Eastep?
15         A.   No, ma'am, no, ma'am.  Can I speak with my
16    lawyer?
17              MR. GARCIA:  Yeah, there's no question on
18    the table right now.  We can take a break.  He answered
19    your question, right?
20              MS. TAUSCH:  Okay.
21              (Break taken from 12:10 p.m. to 12:18 p.m.)
22         Q.   (BY MS. TAUSCH)   When you were transferred to
23    Walker Sayle, that's in Breckenridge?
24         A.   Yes, ma'am.
25         Q.   And was that an hour and a half away from you?
```

```
 1        A.   Ninety miles.

 2        Q.   Ninety miles.  Okay.  One way?

 3        A.   Yes, ma'am.

 4        Q.   Okay.  Now, let me show you what we've marked

 5   as --

 6                  (Exhibit 1 marked.)

 7        Q.   Let me show you what I'm going to mark as

 8   Exhibit 1.  Do you recognize that document?

 9                  MS. TAUSCH:  I'm sorry, I didn't know that

10   there was somebody else coming.

11        Q.   (BY MS. TAUSCH)  Do you recognize that

12   document?

13        A.   Yes, ma'am.

14        Q.   Is that your signature?

15        A.   Yes, ma'am.

16        Q.   And it's titled Voluntary Demotion

17   Acknowledgement?

18        A.   Yes, ma'am.

19        Q.   You were demoted from a major to a CO V?

20        A.   Incorrect.  I voluntarily demoted.

21        Q.   Okay.  Why would you demote from a major to a

22   CO V?  That's all the way down, isn't it?

23        A.   Not all the way down, but yes.

24        Q.   There are other levels of CO?

25        A.   Yes.
```

```
 1      A.  Yes, ma'am.

 2      Q.  It was two days later?

 3      A.  I don't recall the exact -- I mean --

 4      Q.  If the documents prove that out --

 5      A.  Yes.

 6      Q.  -- it would -- you don't have any reason to

 7  question that?

 8      A.  No.  I mean, if that's what the dates are on

 9  the documents, yes.

10      Q.  Okay.

11      A.  But I don't recall offhand whether it was

12  one day, two days or three days later.

13      Q.  Okay.  Okay.  What's the difference in pay

14  between a CO V and a major?

15      A.  I can't answer that offhand.

16      Q.  What were you making as a major?

17      A.  About rough estimate -- I don't recall with my

18  hazardous duty pay and all that, about 48 something.

19      Q.  And a CO V, is that somewhere in the two

20  thousands?

21      A.  Somewhere in that neighborhood, ma'am.  I

22  don't -- without looking at the numbers, I couldn't

23  answer that.

24      Q.  So you're telling this jury you cut your salary

25  in half because you didn't want to be a supervisor
```

1  anymore?  That's what you're telling this jury?

2      A.   I mean, I went through the disciplinary process

3  for the allegations against me.

4      Q.   Go ahead, sir.

5      A.   I cooperated with their investigation, the

6  disciplinary, all that, and then I demoted.

7      Q.   Are you talking about the allegations by

8  Ms. Hale?

9      A.   No.  Well, I cooperated with those as well,

10  but --

11      Q.   You're talking about the allegations in regard

12  to Ms. Foster?

13      A.   The disciplinary, yes.

14      Q.   Now, you just told me that you didn't want to

15  be a supervisor anymore.  That was the reason why you

16  demoted.  Isn't that what you just said?

17              MR. GARCIA:  Objection, mischaracterizes

18  his testimony.

19      Q.   (BY MS. TAUSCH)  Isn't that what you just said?

20      A.   I told you that as we -- as I went through this

21  disciplinary process, I made some decisions in my

22  personal life that TDCJ was not going in the direction

23  that I felt personally I agreed with.

24              I knew what time it was with this

25  disciplinary.  So I -- I mean, I talked to my family

1    Q.  Okay.

2    A.  I know there was one that involved an incident

3  in seg with a -- an offender got a case that was not

4  correct, and I don't remember exactly what the charge

5  was on it now.  That was a long time ago.

6                  (Exhibit 3 marked.)

7    Q.  One was for falsification of records; is that

8  right?

9    A.  Yes.

10    Q.  Let me give you what I've marked as Exhibit 3.

11  Do you recognize that?

12    A.  If I can have a moment to review it.

13    Q.  Yes, sir.  It's actually just the first page.

14    A.  Oh, okay.  Yes, ma'am.

15    Q.  What I've handed you in Exhibit 3 is a

16  three-page document and it has three different

17  reprimands; is that correct?

18    A.  It appears so, yes.

19    Q.  Okay.  And the first page is the one that I

20  want to talk about first.  It's dated March of 2002; is

21  that correct?

22    A.  I'm looking for the -- this says March --

23  March -- I guess March 7th is what you said?

24    Q.  I just said March 2002.

25    A.  Yeah.

1      Q.   Yeah.   Okay.   And this is for giving false

2  information or falsification of records; is that right?

3      A.   Correct.

4      Q.   And it says under the Explanation, officer

5  admits writing information on offender disciplinary case

6  and testifying to its accuracy in disciplinary hearing

7  when he knew it was false.   Did I read that correctly?

8      A.   It appears so, yes.   I'm having trouble

9  reading --

10      Q.   I understand.

11      A.   -- the handwriting, but yes.

12      Q.   Okay.   And is that what you did?

13      A.   Yes.

14      Q.   And you were given nine months probation for

15  that?

16      A.   That's what it says, yes.

17      Q.   You were a CO III at that point in time?

18      A.   That's what it says.

19      Q.   Okay.   The second page is dated April of 2009

20  and you were still at the Allred Unit; is that correct?

21      A.   Correct.

22      Q.   And you were disciplined for reckless

23  endangerment, hazing or horseplay without injury; is

24  that correct?

25      A.   That's what it says, yes, ma'am.

Jonathan Eastep
March 14, 2019

1       Q.   You were a lieutenant?

2       A.   Yes, ma'am.

3       Q.   And it says under Synopsis of Incident, on

4    February 16th, 2009, Lieutenant Eastep horseplayed with

5    an offender while exiting the officer's dining room.

6    Lieutenant Eastep was witnessed backhanding an offender

7    to the groin area in a playful manner.   Employees are

8    prohibited from participating in hazing or horseplay.

9    Did I read that correctly?

10      A.   Yes, ma'am.

11      Q.   And is that what you did?

12      A.   Yes, ma'am.

13      Q.   And you got three months probation for that?

14      A.   That's what it says, yes, ma'am.

15      Q.   Did you do that?   Did you do what it says that

16   you did?

17      A.   Yes, ma'am.

18      Q.   And then the last page is dated October of 2017

19   and that has to do with Ms. Foster, and we've already

20   talked about that, correct?

21      A.   I can't see the date on it.   It's got a line

22   through it, but yes.

23      Q.   Well, your signature date is October of 2017,

24   correct?

25      A.   Correct.

1      Q.   Okay.  And it was for violating Policy 32,

2  correct?

3      A.   That's what it says, yes.

4      Q.   Okay.  And you were given six months for that?

5      A.   Yes, ma'am.

6      Q.   So that would have gone through April 30th of

7  2018, correct?

8      A.   Correct.

9      Q.   But you did not stay at TDCJ that long?

10     A.   Correct.

11     Q.   Okay.  We talked about the Allred Unit.

12              Had you -- that first time that you were

13  there from '99 to 2010, were you ever accused of

14  harassment?

15     A.   Not that I can recall offhand.

16     Q.   All right.  Then you went to the Formby Unit

17  and how long were you there?

18     A.   From December 1 of '10 until I want to say

19  September of '11.  I can't remember exactly when I

20  moved.

21     Q.   That's fine.

22     A.   But it was August, September area, along in

23  there.

24     Q.   Okay.  And you were a captain at the Formby

25  Unit?

1    that's what that means.

2                    And then is your salary correct as far as

3    you know to the right?

4         A.   I would assume.  I don't --

5         Q.   Okay.  You don't have any reason to quarrel

6    with that, do you?

7         A.   No, ma'am.

8         Q.   And then it just says Paid.

9         A.   Yes, ma'am.

10         Q.   Okay.  And you don't have any reason to quarrel

11    with that?

12         A.   No, ma'am.

13         Q.   Okay.

14         A.   I mean, I've never seen this document before.

15         Q.   Sure.

16         A.   And I did -- a lot of it I don't understand it,

17    but --

18         Q.   That's fair.

19         A.   -- I think what we just discussed would be

20    pretty accurate as far as I could tell at this time.

21         Q.   Fair enough.  Now, the second time you went

22    back to the Allred Unit sometime in 2011, fall of

23    2011 --

24         A.   Uh-huh.

25         Q.   -- you started off as a captain, correct?

1      A.   Correct.

2      Q.   At some point in time, you would have moved up

3 to a major, I'm assuming?

4      A.   Correct.

5      Q.   When was that?

6      A.   March of '14.

7      Q.   Do you have to have people that support your

8 promotion other than the warden?

9      A.   You do an interview process.

10     Q.   Okay.

11     A.   The same as any other position up to major.

12     Q.   Okay.

13     A.   You go to an interview --

14     Q.   Okay.

15     A.   -- and then they make a selection from there.

16     Q.   Is it a multi-person interview?

17     A.   Yes.

18     Q.   And who did you interview with?

19     A.   It would have been the regional director and

20 the senior warden from the unit.

21     Q.   Who was the senior warden?

22     A.   Warden Wathen.

23     Q.   At some point in time, were you and Warden

24 Wathen roommates?

25     A.   No, ma'am.

```
 1   Unit?  Is it two or three?
 2        A.   Two -- I mean, like day shift and night shift.
 3        Q.   There's just two?
 4        A.   Yeah, but then there's -- I mean, they got
 5   multiple different cards and --
 6        Q.   No, I understand that.  I understand that.
 7        A.   They work 12-hour shifts as far -- they did
 8   when I worked there.  I don't know now.
 9        Q.   And that's all -- that's all I need to know in
10   2016 specifically.  Okay.  So they worked 12-hour
11   shifts?
12        A.   Yes.
13        Q.   Okay.  Now, give me the hierarchy.  Is it
14   warden, assistant warden and then you go down from
15   there?
16        A.   On the unit level, yes, ma'am.
17        Q.   Okay.  And that's what I need to know.
18             So you have warden, assistant warden?
19        A.   Then major, captain, lieutenant, sergeant, COs.
20        Q.   Okay.  And are there five levels of CO?
21        A.   I believe there is now, yes, ma'am.
22        Q.   Okay.  Are there --
23        A.   It was when I left.
24        Q.   Okay.  All right.  How many majors were at the
25   Allred Unit in 2016?  That's what I'm concentrating on.
```

1     Q.   Okay.  Do they have different areas --

2     A.   Yes, ma'am.

3     Q.   -- that they cover?

4     A.   (Witness nods.)

5     Q.   Okay.  And was Anders over you?

6     A.   Yes, ma'am.

7     Q.   Okay.

8     A.   He was a GP warden.

9     Q.   There's one other reprimand I wanted to ask you

10    about and see if you remember.  You were a lieutenant

11    and it happened in March of 2008.  Let me read this to

12    you.  I'm sorry, I don't have a copy.  Let me read this

13    to you and see if you remember this occurring.

14              On March 8th, 2008 Lieutenant Eastep

15    reviewed the -- Lieutenant Eastep reviewed the video

16    documentation for a use of force.  Lieutenant Eastep

17    then completed the UOF -- what is that?

18    A.   Use of force.

19    Q.   Use of force 6, supervisor's summary and

20    submitted the use of force documentation as complete.  A

21    review of the video documentation on 3/25/08 revealed

22    two officers striking the offender with closed fists.

23    The strikes were not documented in any of the officers'

24    written statements or the supervisor's summary of the

25    use of force.  Do you remember that occurring?

1      A.   Does it say who wrote that disciplinary?

2      Q.   Let me scroll down.  Tommy Norwood, assistant

3  warden on April 15th, 2008.

4           You would have been at the Allred Unit the

5  first time; is that correct?

6      A.   In 2008?  Yes, ma'am.  I don't remember

7  offhand, but --

8      Q.   It says here -- under Justification, it says,

9  Lieutenant Eastep admits failure to ensure that he

10 doesn't miss any obvious staff in UOF, let me show it to

11 you, situations.  There it is right there.  And I

12 believe that's your signature.  Is that your signature?

13 It's on page Bates stamped 210.

14     A.   Can you scroll up?

15     Q.   Yes, sir.  Is that far enough?  You can scroll

16 it up a little bit more right there with the page up.

17 Did I read that correctly?

18     A.   I'm reading it right now, ma'am.

19     Q.   Okay.

20     A.   Okay.

21     Q.   Do you remember it?

22     A.   I kind of believe I do.  I wish I knew it said

23 where this location -- where the location was of the

24 alleged incident.

25     Q.   It doesn't say anywhere on there, does it?

1    A.   Huh-uh.

2    Q.   Okay.  Now, that was in 2011.  Were there any

3    other sexual harassment complaints that you're aware of

4    before that?

5    A.   Offhand, I can't recall.

6    Q.   Okay.  When Ms. Escamilla's complaint was being

7    investigated, you had been transferred; is that correct?

8    A.   I believe so, but I'm not sure when she filed

9    it.

10   Q.   Okay.  Had you been transferred to the Formby

11   Unit or were you being transferred to the Allred Unit?

12   A.   Again, I went to the Formby Unit in December of

13   '10 and I left sometime in the fall of '11.

14   Q.   Okay.  All right.  At some point in time during

15   the investigation, Ms. Escamilla was no longer working

16   at TDCJ; is that correct?

17   A.   Correct.

18   Q.   Now, Ms. -- strike that.

19             Many people at the Allred Unit knew about

20   Ms. Hale's dislike for being touched; is that correct?

21             MR. GARCIA:  Objection, speculation.

22   Q.   (BY MS. TAUSCH)  Is that correct?

23   A.   Not that I'm aware of.

24   Q.   Okay.  You know who Captain Miller is, right?

25   A.   First name?

 1      Q.   Cody.

 2      A.   Yes, ma'am.

 3           (Exhibit 5 marked.)

 4      Q.   Let me show you what I've marked as Exhibit 5.

 5  I'll let you read it.  Have you seen that before today?

 6      A.   No, ma'am, not that I recall.

 7      Q.   Okay.  Do you remember Captain Miller talking

 8  to you telling you that Sergeant Hale didn't like for

 9  people to touch her?

10      A.   No, ma'am.

11      Q.   So when Captain Miller wrote this statement on

12  July 7th, 2016 and says, I later -- let me start at the

13  beginning.

14           I did see Major Eastep greet Sergeant Hale

15  once by extending his warm to one side as if he was

16  going to pat her on the shoulder or half hug her.  I

17  later told him as an FYI that Sergeant Hale didn't like

18  for people to touch her.  I only saw this happen one

19  time.  It was two to three months ago.

20           When he wrote that statement out on

21  July 7th, 2016, he was lying?

22      A.   I'm not saying that.  I'm saying I don't recall

23  if he told me that.

24      Q.   So he may have told you that.  You just don't

25  remember as we sit here today?

1    question, I guess.

2        Q.   If you performed the act that you just did on

3    Mr. Garcia on Sergeant Hale and Sergeant Hale does not

4    like to be touched, you would have touched her without

5    her consent; is that correct?

6        A.   I guess, yeah, I mean, if I -- if I'm

7    understanding what you're asking me.

8        Q.   Okay.

9             MR. GARCIA:   Ms. Tausch?

10            MS. TAUSCH:   Yes.

11            MR. GARCIA:   Are we at a good breaking

12   point?

13            MS. TAUSCH:   Sure.

14            (Break taken from 1:18 p.m. to 1:26 p.m.)

15            (Exhibit 7 marked.)

16       Q.   (BY MS. TAUSCH)   Mr. Eastep, let me show you

17   what I've marked as Exhibit 7.   Have you seen that

18   before?

19       A.   No, ma'am.

20       Q.   Okay.

21       A.   Not that I recall.

22       Q.   All right.   This is a document that I received

23   in discovery response and it says Probation History By

24   Employee and it purports to be your probation history;

25   is that correct?

1      A.   I believe it's every year now.

2      Q.   Okay.

3      A.   Or it was there when I left.

4      Q.   Okay.  Well, let me show you what I'll --

5                (Exhibit 8 stop

6      Q.   What I have marked as Exhibit 8.  And I will

7  tell you I did not do that highlighting.  And it

8  purports to be the training history for you; is that

9  correct?

10      A.   It appears so, yes.

11      Q.   Okay.  And do you see the highlighted portions?

12      A.   Yes, ma'am.

13      Q.   And they appear to be EEO and sexual harassment

14  training for supervisors, correct?

15      A.   I suppose so, yes.

16      Q.   Okay.

17      A.   I'm trying to understand and read this thing.

18      Q.   Sure.  That's what the highlighted ones say.

19      A.   Okay.

20      Q.   And then it also has EX DIR Statement

21  Discrimination/EEO/Ethics.  Those are also highlighted;

22  is that right?

23      A.   Yes, ma'am.

24      Q.   Okay.  And those are highlighted for 2004,

25  2006, 2010, 2012, 2014, 2016 and 2018; is that right?

1      A.   It appears so, yes.

2      Q.   Okay.  Which is about every other year?

3      A.   But here -- I mean, if I may.

4      Q.   Sure, definitely.

5      A.   The highlighted ones on the copy you provided

6   me is 2006, there's a 2004 highlighted, a 2007, '10,

7   '12, '14, '16 and '18.  So there was '6 and '7 both.

8      Q.   Okay.  Fair enough.

9      A.   I mean --

10     Q.   Okay.

11     A.   -- I don't know -- again, I don't -- where

12   these documents are generated, I'm not sure.

13     Q.   Okay.  That's fair.  All right.

14          All the ones that are highlighted are the

15   ones where you received harassment training, correct?

16     A.   Yes, it appears so.

17     Q.   Did you receive any other harassment training

18   that's not listed on here?

19     A.   I believe we did some unit training, yes.

20     Q.   Where would I find that?

21     A.   I can't answer that.

22     Q.   Who would have kept up with that?

23     A.   HR.

24     Q.   At the unit?

25     A.   Yes, ma'am.

1    Q.   Do you know what it would be titled?

2    A.   I can't recall offhand, but it seems to me, if

3  my memory serves, that we did some other trainings, too,

4  but I'm not sure.  We did a lot of training as you can

5  see by this document.

6    Q.   So you know what sexual harassment is, right?

7    A.   Correct.

8    Q.   What is it?

9    A.   Ongoing -- I can't give you the state

10  definition of it, but ongoing harassment of someone of a

11  sexual nature.

12    Q.   Does it have to be ongoing?

13    A.   I mean, again, that's an opinionated deal to

14  me.

15    Q.   Sir, you've received a bunch of training --

16    A.   And I can't recall that, ma'am.

17    Q.   Let me -- let me finish my question.

18         You've received a bunch of training as an

19  officer of TDCJ, correct?

20    A.   Yes, I mean, multiple trainings for a lot of

21  things.

22    Q.   Okay.  And you've received training at the unit

23  for harassment, correct?

24    A.   I believe so.

25    Q.   And you're trained to know what harassment is

1    at the unit, correct?

2         A.   Correct.

3         Q.   You're trained to recognize what harassment is,

4    correct?

5         A.   Correct.

6         Q.   And you're trained to stop it if you see it,

7    correct?

8         A.   Correct.

9         Q.   Or you're trained to report it, correct?

10        A.   Correct.

11        Q.   So I'm asking you, if you were trained to know

12   what harassment is, to stop it or to report it, I want

13   to know what you know about harassment.  Okay?  Is that

14   fair?

15        A.   I guess I'm -- I'm processing the question

16   you're asking me.

17        Q.   Okay.  So you told me harassment is ongoing --

18   sexual harassment is ongoing harassment of a sexual

19   nature.  That's what you told me, correct?

20        A.   I believe the way the policy was written, yes.

21        Q.   Okay.  Does it have to be ongoing?  That's my

22   question.

23        A.   Again, I can't recall the wording in the

24   policy.  There's a policy that governs that for TDCJ.  I

25   haven't been at TDCJ for a while.  I don't recall

1  exactly how it's worded, ma'am.  I mean, I don't know

2  how else to answer that question.  I don't recall how

3  the wording is.

4      Q.  Okay.  And I'm not asking you about the wording

5  of the policy that TDCJ puts out.

6              I'm asking you based on your training over

7  almost 18 years -- no, '4 to '18.  Yeah, '4 to '18.

8  Fourteen years.

9              As an officer for TDCJ, not counting the

10 harassment training that you received on the unit, what

11 did you know was sexual harassment?

12     A.  I knew if an employee reported to me that they

13 felt like they had been harassed, it was reported.  I

14 would take the steps to report it.  It didn't matter

15 whether it was one time, 10 times, 50 times.  It didn't

16 matter.  So one time was enough.  If you as an officer

17 came to me and said you felt like you had been harassed,

18 I immediately reported it to the EEO.

19     Q.  Okay.  So one time was enough?

20     A.  For me, yes, ma'am.

21     Q.  Okay.

22     A.  But, again, I'm cautious in my answer because

23 there's two different policies on it and they're worded

24 differently.

25     Q.  Okay.

1  a broad question you just asked.

2      Q.  (BY MS. TAUSCH)  Was there a policy on how to

3  perform counselings of a subordinate?

4      A.  Not that I recall.

5      Q.  Were you trained on how to perform counselings?

6      A.  Not that I recall.

7      Q.  Did you ever ask any of your mentors how to

8  perform a counseling?

9      A.  I mean, to recall that I asked Mr. Garcia how

10  to do it?  No.  I mean, was it discussed over the years?

11  Yeah.  Counsel in private, praise in public.

12      Q.  Did anyone ever tell you that it would be

13  proper to trap a female against a fence and whisper in

14  her hear to counsel her?

15      A.  No, ma'am.

16      Q.  No one ever condoned trapping a female employee

17  against a fence, did they?

18      A.  No, no, ma'am.

19      Q.  As a major, part of your job duties were to

20  enforce policies, correct?

21      A.  Correct.

22      Q.  And to answer questions if subordinates had

23  questions about the policies?

24      A.  Correct.

25      Q.  And make sure everyone knew the policies and

1      A.   I mean, when you say employees, I look at all
2  employees.
3      Q.   Right.
4      A.   Whether it's security or non-security.
5      Q.   Correct.
6      A.   And, I mean, I don't remember -- I don't know
7  the ratio, but there was a fair number of both.
8      Q.   Okay.
9      A.   I mean, to say that there was more males than
10  females or more females than males, I can't answer that.
11      Q.   What about at Formby Unit?  What's the ratio?
12      A.   I have no idea, ma'am.  I mean, I don't know.
13  I mean, there was a fair number of both.
14      Q.   And so as we sit here today, your testimony is
15  you never saw or heard harassment of any kind of any
16  employee of TDCJ?
17      A.   I'm telling you I can't recall an incident
18  offhand.  Now, to say that I did or didn't, I can't
19  remember any.  I mean, there's nothing that jumps out in
20  my mind that says, oh, yeah, I remember that incident.
21      Q.   And that's true for sexual harassment as well?
22      A.   Yes, ma'am.  Again, there's not an incident
23  that jumps out in my mind that says -- that I say, yeah,
24  I remember this incident, I mean, I remember this day.
25  I don't remember.

1    Q.  Okay.  Mr. Eastep, I've received copies of

2  complaints at the Allred Unit.  There are 28 complaints

3  dating from September 5th, 2014 through September 21st,

4  2018.

5             Are you telling me and the jury that none

6  of them happened in front of you or under your command?

7    A.  No, ma'am, I'm not saying that.  Under my

8  command is very broad.

9    Q.  Okay.  Okay.  Okay.  Let me change my question.

10            Are you telling me and the jury that none

11  of them happened in front of you?

12    A.  I don't -- I'm telling you I don't recall.  I'm

13  not saying they didn't.  I don't recall an incident.

14  There's nothing that sticks out in my mind that I

15  recall.

16    Q.  All right.  Were you ever harassed by an

17  employee while working for TDCJ?

18    A.  Yes.

19    Q.  By who?

20    A.  And I'd like to take a break.  I need to go to

21  the restroom.

22    Q.  Okay.

23    A.  I answered your question.  May I go to the

24  restroom, please?

25    Q.  Yes, sir.

1     Q.   Do you agree with me that the higher rank you

2  hold, part of your job is to discipline employees who

3  don't follow policy and procedure?

4     A.   Yes, ma'am.

5     Q.   Do you agree with me that the higher rank you

6  hold, TDCJ requires you to have the ability to supervise

7  employees?

8     A.   Yes, ma'am.

9     Q.   That's because the higher rank you hold, the

10  more supervisory tasks you take on, correct?

11     A.   Yes, ma'am.

12     Q.   Do you agree with me that the higher rank you

13  hold, the more people you supervise?

14     A.   Yes, ma'am.

15     Q.   Do you agree with me that as a major with TDCJ,

16  part of your job was to supervise, instruct, train and

17  ensure the safety of assigned employees?

18     A.   Yes, ma'am.

19              (Exhibit 10 marked.)

20     Q.   Let me show you what I've marked as Exhibit 10,

21  and I will tell you that this is part of the policy that

22  says up at the top PD-13; is that correct?

23     A.   That's what it says.

24     Q.   Okay.  And if you look under close to the

25  bottom, it says Supervisor.  Do you see that?

1      A.  Yes, ma'am.

2      Q.  And it says, supervisor is an employee whose

3  job duties include, expressly or implicitly, directing

4  the job performance of an employee or group of

5  employees, correct?

6      A.  Yes, ma'am.

7      Q.  Ensuring TDCJ policies are carried out,

8  correct?

9      A.  Yes, ma'am.

10     Q.  And ensuring all applicable state and federal

11  employment related laws are observed; is that right?

12     A.  Yes, ma'am.

13     Q.  Okay.  And we've already talked about the

14  special training that supervisors have, correct?

15     A.  Yes, ma'am.

16     Q.  And your attendance at that training in regard

17  to sexual harassment?

18     A.  Yes, ma'am.

19     Q.  All right.  Do you agree with me that you had

20  the authority to mete out discipline to Ms. Hale

21  including counselings?

22     A.  Can you repeat the question?

23     Q.  Sure.  Do you agree with me that you had the

24  authority to mete out discipline to Ms. Hale including

25  counselings?

 1     Q.   Okay.

 2     A.   I had the authority to.

 3     Q.   Okay.

 4     A.   I reviewed them.

 5     Q.   Okay.  Fair enough.

 6     A.   I could make comments if I chose to.

 7     Q.   All right.  All right.

 8              Mr. Eastep, you have never come up behind a

 9  man and trapped him against a fence, have you?

10     A.   I wouldn't say no or I wouldn't say yes.  That

11  I can recall, no.

12     Q.   As we sit here, you don't recall doing that --

13     A.   No, ma'am.

14     Q.   -- to a man, do you?

15     A.   No, ma'am.

16     Q.   Okay.  Have you ever hugged Ms. Hale?

17     A.   Other than the -- when we discussed earlier,

18  the --

19     Q.   Half hug?

20     A.   Maybe, yeah.  I don't recall.  I don't recall

21  doing that specifically, but to say I didn't, I wouldn't

22  say that because I did it to a lot of people.  It was

23  kind of my way, hey, you're doing a good job, appreciate

24  you, can I do anything for you.

25     Q.   Have you ever kissed Ms. Hale's hand?

1    A.   No, ma'am.

2    Q.   Have you ever attempted to kiss her hand?

3    A.   No, ma'am.

4    Q.   Have you ever asked Ms. Hale if she likes to

5  have her toes sucked?

6    A.   No, ma'am.

7    Q.   When were you transferred after June 20th,

8  2016?   Strike that.

9         When you were transferred after June 20th,

10  2016, that was not your original plan, was it?

11   A.   I don't know what you're speaking of.

12   Q.   Okay.   You intended to work out 20 years and

13  then retire, wasn't it?

14   A.   When I started with TDCJ in 1999, that was my

15  plan, yeah.

16   Q.   Okay.

17   A.   Yes, ma'am.

18   Q.   Okay.

19   A.   But as we all know, things change in life, you

20  know.

21   Q.   You had -- in June of 2016, you had been back

22  at the Allred Unit since 2011?

23   A.   Yes, ma'am, fall time.

24   Q.   Okay.   Were you married or divorced or going

25  through a divorce then?   Did I get that wrong?

1     A.   Yes, ma'am.

2     Q.   Okay.

3          MR. COGBURN:  Are you talking about this

4  keyboard on the laptop?

5          MS. TAUSCH:  Yes, the keyboard on the

6  laptop.

7          MR. GARCIA:  Good point.

8     Q.   (BY MS. TAUSCH)  Were you disciplined or

9  counseled or reprimanded in any way about the June 20th

10  incident?

11     A.   The June 20th incident.

12     Q.   With Ms. Hale.

13     A.   I think the best that I can remember, when the

14  initial complaint was filed, the EEO officer

15  investigated it, and then at some extended amount of

16  time, I don't remember how long, Warden Wathen, who was

17  the senior warden at the time, I asked him if anything

18  ever come of it and he said no is what I recall.  I

19  don't recall anything other than that.  I mean, beyond

20  that.

21     Q.   So you don't recall being reprimanded,

22  counselled or disciplined in any way?

23     A.   I wasn't disciplined.  I did -- the term

24  counseling is -- I don't recall any formal reprimand or

25  counseling.

1              Did your voluntary demotion have anything

2     to do with the June 15th, 2016 incident with Ms. Hale?

3          A.  No, ma'am.

4          Q.  All right.  Did your transfer have anything to

5     do with the June 15th, 2016 incident with Ms. Hale?

6          A.  No, ma'am.

7          Q.  All right.  When the investigation began, you

8     were told not to have any contact with Ms. Hale unless

9     there was another ranking officer present; is that

10    correct?

11         A.  Do you know who allegedly told me that or --

12         Q.  I'm going to show you a document.

13         A.  Because, I mean -- that seems logical, but I

14    don't recall it.

15              (Exhibit 12 marked.)

16         Q.  Let me show you what I've marked as Exhibit 12.

17    Do you recognize that document?

18         A.  I'm looking at it, ma'am.

19         Q.  Okay.

20         A.  If you'll allow me a moment.  Okay.

21         Q.  Is that your signature on that document?

22         A.  It is.

23         Q.  And it's dated June 30th, 2016; is that

24    correct?

25         A.  Yes, ma'am.

Jonathan Eastep
March 14, 2019

1      Q.   And it's to you from Richard Wathen; is that
2   correct?
3      A.   Richard Wathen, yes, ma'am.
4      Q.   Wathen.  Excuse me.  And he was the warden at
5   the time?
6      A.   Yes, ma'am.
7      Q.   And it says that it's a Notification of EEO
8   Investigation and Interim Remedial Actions.  That's what
9   it's titled.
10      A.   Okay.
11      Q.   Is that correct?
12      A.   That's what it says.
13      Q.   And it says -- about the middle of the page,
14   there's an X and it says, to take the following interim
15   remedial action, respondent will not have any contact
16   with complainant unless in the presence of another
17   ranking officer.  Is that what it says?
18      A.   Yes, ma'am.
19      Q.   So were you told that by Warden Wathen?
20      A.   According to this, yes, ma'am.
21      Q.   Do you remember that?
22      A.   I don't remember that, but yes, ma'am.
23      Q.   So you don't remember anybody telling you not
24   to have any contact with Ms. Hale --
25      A.   As I stated earlier --

1    Q.   -- unless there's somebody else present?

2    A.   As I stated earlier, I don't recall that

3  conversation, but obviously it did.

4    Q.   Okay.  You don't remember being called into the

5  warden's office and told that?

6    A.   No, ma'am, I don't.

7    Q.   Okay.

8    A.   But I'm not disputing that it happened.

9    Q.   That's fine.  Were you told to act

10 professionally towards her?

11   A.   I don't remember what the conversation

12 entailed.  I don't remember going -- that's what I'm

13 saying.

14   Q.   Okay.  So basically what this says is that if

15 there were any dealings between you and Ms. Hale, she

16 would be in front of two supervising officers?

17   A.   According to that paper, yes, ma'am.

18   Q.   Okay.  Now, those instructions were never

19 rescinded before you were transferred, were they?

20   A.   Transferred, what do you mean?

21   Q.   Transferred to the --

22   A.   Walker Sayle Unit?

23   Q.   Yes.

24   A.   I mean, I guess not.  I don't -- I mean -- I

25 don't know how to answer.

1      Q.   Okay.  All right.

2      A.   Supervisor rounds.  I'm not sure what term

3   you're --

4      Q.   But you understand what I'm talking about?

5      A.   Yes, ma'am.

6      Q.   All right.  And those are usually done between

7   1:00 and 2:00 p.m., correct?

8      A.   No, ma'am.

9      Q.   When are they usually done?

10      A.   Random times throughout the day.

11      Q.   It's not done at 6:00 a.m. when shift change

12   happens, correct?

13      A.   It can be, yes, ma'am.

14      Q.   Okay.  When shift change happens, all of the

15   COs and the officers, the low officers, the sergeants,

16   are talking about what's happened and what needs to

17   happen; is that correct?

18      A.   I mean, they -- they attend a turnout briefing

19   and then they go in the building and they should

20   exchange -- if I may, if I'm swapping with you, you and

21   I -- you should -- if I'm relieving you --

22      Q.   Right.

23      A.   -- you should tell me, hey, this is what

24   happened last night or during the day --

25      Q.   Right.

```
 1        A.   -- and I should do the -- have the same
 2   courtesy to you.
 3        Q.   Right.  And so we're talking at shift change,
 4   correct?
 5        A.   Should be, yes, ma'am.
 6        Q.   Right.  And so that's not when the security
 7   rounds should be happening, correct?
 8             MR. GARCIA:  Objection, speculation.
 9        Q.   (BY MS. TAUSCH)  Correct?
10        A.   That's incorrect, ma'am, because when -- and
11   maybe I'm misunderstanding what you're talking about.
12        Q.   Right.
13        A.   I'm understanding what you're asking me as a
14   security round is done by the captain or the major --
15        Q.   Right.
16        A.   -- or the assistant warden.
17        Q.   Right.
18        A.   Yes.  They're not involved in those back and
19   forth between the two employees or when they're getting
20   relieved.
21        Q.   Right.
22        A.   The captains and the majors or wardens can walk
23   around whenever they choose.
24        Q.   It's not usually done on the same building two
25   days in a row, is it?
```

1   had to write on the bottom of it when they do their

2   rounds and on the back of it as well, seg and high

3   security or expansion cell block.

4       Q.   Are you aware that Warden Anders wrote Ms. Hale

5   up in June or July for a feather that was found on the

6   floor?

7       A.   No, ma'am.  I don't recall that.

8       Q.   Is that policy?

9       A.   Cleanliness is, yes.

10      Q.   For pigeon feathers on a walkway --

11              MR. GARCIA:  Objection, argumentative.

12      Q.   (BY MS. TAUSCH) -- someone would be -- somebody

13  would be written up for that?

14      A.   I mean, could they be?  Yes.  It's part of

15  cleanliness, sanitation and cleanliness.  I mean, would

16  I?  No.  But could they?

17      Q.   Do you know anything about the investigation of

18  Ms. Hale by Major West in July of 2016?

19      A.   Very little to none.  I wasn't involved in it.

20      Q.   When you say very little, what do you know?

21      A.   I mean, I recall there was an incident on the

22  building, but the details of it, I don't know.

23      Q.   What incident?  Do you know anything about it?

24      A.   I believe it was a use of force.  When were

25  you -- wait a minute.

1  was escorted out of the pod, I followed.  And then the

2  next statement says that's when you noticed it.

3      A.  Well, if -- I mean, that is a mis -- typo on my

4  part because I noticed it when I walked in.

5      Q.  Okay.  So what you wrote to Gary McClendon on

6  July 1st, you see that it's different --

7      A.  It has a typo.

8      Q.  -- than what you wrote to him on July 6th?

9      A.  It has a typo, yes, ma'am.  I would agree with

10 that.

11     Q.  Well, it's not a typo.  It's a different

12 statement.  Do you see that?

13     A.  It's not a different statement.  I don't agree

14 with that.  It's an interpretation, how you want to

15 interpret it.

16     Q.  Okay.  You see Question 1, it says, as I

17 entered 3 Building, I noticed something on the floor as

18 I walked by the fenced-in desk area.  Do you see that?

19     A.  Yes, ma'am.

20     Q.  Show me that on Page 1.

21     A.  Page 1, it says, I noticed blood on the floor.

22     Q.  Okay.  You think those are the two -- those are

23 the same?

24     A.  If I mistyped that -- I noticed the blood when

25 I walked in.  How it's worded here -- where is it at?

1  It should be I had noticed.  I mean, I noticed it when I

2  walked in.

3       Q.  Okay.  Are ICSs emergencies?

4       A.  Yes, ma'am.

5       Q.  Are you running to them?

6       A.  No, ma'am.

7       Q.  You don't run to them?

8       A.  I don't.

9       Q.  Okay.  They're not that much of an emergency?

10       A.  Yes, ma'am.

11       Q.  Okay.

12       A.  But based on the radio traffic, I knew the

13  situation was under control.  There was no eminent

14  danger.  So I didn't run.

15       Q.  Why did you go then?

16       A.  To make sure everything was done right.  I

17  responded to -- I'm not going to say I respond to every

18  one of them, but the vast majority of them I did,

19  whether I was needed or not.

20       Q.  Okay.  It says, the offender was unresponsive

21  in his assigned cell.  That's not an emergency?

22       A.  Yes, it is.  That's the reason ICS was called.

23  The offender was receiving all possible care at that

24  point.  I wasn't running to give CPR if you follow me.

25  He was already getting all the treatment he was getting.

1       Q.   Okay.   On the second page, Page 1937 -- no, no,

2   no.   Yeah, you're there.   On Question Number 3, you say,

3   I have no idea where the blood came from due to the fact

4   that Sergeant Hale did not provide an answer to me when

5   I asked her about the blood.   Do you see that?

6       A.   Yes, ma'am.

7       Q.   Did you ever ask Mr. Page about the spot on the

8   floor?

9       A.   No, ma'am, not that I recall.

10       Q.   Okay.   Did you ever follow up to find out what

11   had happened with the spot on the floor?

12       A.   I believe that I talked to the lieutenant and I

13   don't remember -- I mean, there's nothing formal, but I

14   believe I did question the lieutenant about it later

15   that day.

16       Q.   What lieutenant?

17       A.   I can't recall who was working.   I mean, if

18   there was anything done, I would ask the lieutenant,

19   hey, what was the deal with all that?   Did you follow up

20   with it?   But I gave the instruction to clean it up and

21   I didn't really give it much thought after that because

22   I never had no reason to.   Whenever Sergeant Hale was

23   given a directive, she usually took care of it.   So I

24   had no reason to doubt whether it had or not.   So I

25   didn't give it a second thought to be honest.

```
 1   it cleaned up now, and I walked off.
 2       Q.  When you approached -- how did you approach
 3   her?
 4       A.  I walked up to the fence and leaned on the
 5   fence, and as privately as possible in the setting we
 6   were in, because there's offenders, as I stated, down --
 7   when you walk in the door, down that left hallway,
 8   there's offenders and there's offenders in the corner
 9   that's close by the -- I can't recall on 3 whether it's
10   a mailbox on the right.
11              As you walk in the door, there's -- as I
12   told you earlier, there's mailboxes on one side and a
13   book drop box on the other.  You recall me telling you
14   that.  There's offenders in that corner to the right
15   right there.
16       Q.  You put a hand on either side of her head and
17   grabbed the fence; is that right?
18       A.  Yes, I did.
19       Q.  And then you -- you leaned in; is that correct?
20       A.  No, ma'am.  I don't --
21       Q.  How tall are you, sir?
22       A.  How tall am I?  I'm about 5' 10".
23       Q.  How much did you weigh in --
24       A.  I don't recall.
25       Q.  -- June of 2016?
```

1   A.  I don't recall.

2   Q.  How much do you weigh now?

3   A.  I don't know.  I don't weigh myself.

4   Q.  Do you weigh more than Ms. Hale?

5   A.  I can't answer that.  One would assume so, but

6   I don't know what Sergeant Hale weighs.

7   Q.  Are you taller than she is?

8   A.  I think so, but I don't know.  I mean, I've

9   never measured ourselves that I can recall.

10   Q.  Did you at any point point to the floor?

11   A.  I'm looking at the floor.  I don't think I

12   pointed to the floor, but I'm looking at it as she's

13   looking at it and I'm asking her why there's blood on

14   the floor between that fence and the desk, and she -- as

15   the video clearly shows, the whole interaction is

16   seconds, correct?

17   Q.  You whispered in her ear; is that right?

18   A.  No, ma'am, I don't feel like I whispered in her

19   ear.  Did I talk in a quiet tone where the offenders

20   couldn't hear what I was talking about?  Yes, I did.

21   Q.  Why didn't you walk up next to her and whisper

22   to her?

23   A.  I can't answer that.  I don't know.

24   Q.  No one has trained you to perform a counseling

25   in the way that you did; isn't that true?

1    A.   True.

2    Q.   Did you ever follow up to see if it was cleaned

3    up?

4    A.   I believe I talked to the lieutenant that was

5    on duty, as I stated earlier, but I can't recall who it

6    was.  But I had no reason to worry.  At that time, I had

7    no reason to worry because Sergeant Hale was the type of

8    employee that if you gave her a directive, you could

9    pretty well guarantee it got taken care of if she didn't

10   come back and tell you, hey, I had a problem with this,

11   I haven't finished it, or I ran into an issue here.

12   Q.   Why did you think it was necessary to stand

13   behind Hale and grab the fence on either side of her?

14   A.   I don't know.  I just walked up there to the

15   fence.  I mean, it was common practice to lean on the

16   fence.  I walked up there and leaned on the fence and

17   asked her why there was blood on the floor.

18   Q.   Who is the nurse that's standing beside you

19   that you're walking out?

20   A.   I can't see her.

21   Q.   I'm going to show her to you in just one

22   second.  You have your arm on her back; is that correct?

23   A.   I don't know that I'm touching her, but my hand

24   is behind her, yes.

25   Q.   Why would you have your arm up just not

1     Q.   Not by your belly?

2     A.   By my what?

3     Q.   By your belly.

4     A.   No, ma'am.

5     Q.   Not by your legs?

6     A.   No, ma'am.

7     Q.   Okay.  She tried to turn around and she finally

8  gets out; is that right?

9     A.   No, ma'am.

10    Q.   She doesn't?

11    A.   Not the way you said it, no, ma'am.

12    Q.   You don't like the way I describe it?

13    A.   That's not what I said, ma'am.  I said the way

14  you stated it is not what happened.

15    Q.   Okay.  You don't like the way I describe it?

16    A.   I didn't say that.

17    Q.   Okay.  You don't believe Ms. Hale was trapped?

18    A.   No, ma'am.

19    Q.   When Ms. Hale gets out from underneath your

20  arm, what does she say?  What did she say to you?

21    A.   I don't recall her saying anything.

22    Q.   Okay.  Let me show you.  When she twists around

23  and gets out from underneath your arm right here, does

24  she say something to you?

25    A.   I don't recall.

Jonathan Eastep
March 14, 2019

1        Q.  And at that point in time, which is 115837292,
2   is when it looks like you first point to something; is
3   that right?
4        A.  I mean, I don't -- I hadn't broke the video
5   down to that see exactly what millisecond was the first
6   time I pointed to it.
7        Q.  Okay.  Let me back up.  I want to be -- I want
8   to be specific with this.
9        A.  I'm not debating what you're telling me.  I'm
10  just saying I haven't broke the video down to that
11  level.
12       Q.  Well, that's the time right there.
13       A.  I understand that.
14       Q.  Okay.  I want to be specific with this.
15       A.  Okay.
16       Q.  Did you see yourself point to the floor --
17       A.  I wasn't --
18       Q.  -- at any point before that?
19       A.  I wasn't paying attention to it that close.
20       Q.  I want you to look at it.
21       A.  Okay.
22       Q.  Okay?  And we'll back it up.  You tell me when
23  you see yourself point to the floor.  Is it there?
24       A.  I don't know that I ever point to the floor.  I
25  don't see me pointing to the floor period.

```
 1        Q.  Okay.  All right.

 2        A.  I mean, you're asking me a question and I don't

 3   see my finger pointing to the floor.

 4        Q.  Fair enough.  Fair enough.

 5            After you walk out, does Ms. Hale appear to

 6   be upset or can you tell?

 7        A.  I don't recall.  I don't remember.

 8        Q.  Well, you walked out.  I'm asking you about

 9   what the video shows.

10        A.  On the video it doesn't appear to me.  She's

11   holding the radio in her hand.  She's talking to an

12   offender.  I see no visible signs of her being upset.

13        Q.  All right.

14            MS. TAUSCH:  Let's take a break.

15            (Break taken from 3:12 p.m. to 3:19 p.m.)

16        Q.  (BY MS. TAUSCH)  Mr. Eastep, how big was this

17   spot on the floor?

18        A.  About the size of a softball or a little bit

19   bigger maybe.

20        Q.  The diameter of a softball?

21        A.  Yeah, something like that, four or five inches

22   maybe.  I don't know exactly.

23        Q.  That's fair.  I just wanted an idea.

24            And did any part of your come in contact

25   with Ms. Hale?
```

```
 1        A.   Not that I recall, no, ma'am.

 2        Q.   No part of your belly, no part of your leg, no

 3   part of --

 4        A.   I don't recall, no, ma'am.

 5        Q.   -- your genitals, nothing?

 6        A.   No, ma'am.

 7             MR. GARCIA:  Let her finish.

 8             THE WITNESS:  Oh, I thought she was.  I'm

 9   sorry.  I was answering each one as she asked.

10        Q.   (BY MS. TAUSCH)  I'm sorry.

11        A.   I apologize.

12        Q.   Okay.  So as we sit here today, your testimony

13   is no part of your body came in contact with any part of

14   Ms. Hale on this -- on this video?

15        A.   That I recall, no, ma'am.

16        Q.   And when you demoted to a CO V, what were your

17   days and hours that you were working at the Walker --

18        A.   Sayle Unit?

19        Q.   Uh-huh.

20        A.   I worked -- well, I worked H-Card for the first

21   couple of weeks doing their training.

22        Q.   And that's 8:00 to 5:00, Monday through Friday?

23        A.   Yes.

24        Q.   Okay.

25        A.   For a week or 10 days, whatever it was, doing
```

Job No. 3250892

1
UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

2
WICHITA FALLS DIVISION

3

AMBUR HALE,                         §

4
                                    §

    Plaintiff,                      §

5
                                    §

v.                                  § CIVIL ACTION NO.

6
                                    § 7:18-CV-0097-M

TEXAS DEPARTMENT OF                 §

7
CRIMINAL JUSTICE, and               §

MAJOR JONATHAN EASTEP,              §

8
                                    §

    Defendants.                     §

9

10
         *****************************************

11
                    ORAL DEPOSITION OF

12
                  CYNTHIA RENEE BARNES

13
                    MARCH 18, 2019

14
         *****************************************

15

16
    ORAL DEPOSITION of CYNTHIA RENEE BARNES, produced as

17
a witness at the instance of the Plaintiff, and duly

18
sworn, was taken in the above-styled and numbered cause

19
on March 18, 2019, from 10:05 a.m. to 11:38 a.m., before

20
Kerrienne L. Bond, CSR in and for the State of Texas,

21
reported by machine shorthand, at the offices of Park &

22
Durham, One Financial Plaza, Suite 530, Huntsville,

23
Texas, pursuant to the Federal Rules of Civil Procedure

24
and stipulations of counsel as set out herein or

25
attached hereto.

                                              Page 1

EXHIBIT C

**Plaintiff's App.  130**

```
 1        A.    Yes, ma'am.

 2        Q.    Is he in Huntsville?

 3        A.    Not any longer.  I believe he's retired now.

 4        Q.    When you were working for him, was he in

 5   Huntsville?

 6        A.    Yes, ma'am.

 7        Q.    All right.  Any other type of work?

 8        A.    Yes, ma'am.  I worked for Knight's

 9   Sandblasting Paint and Body Shop.

10        Q.    Did that ever take you to the Wichita Falls

11   area?

12        A.    Not that I recall.

13        Q.    Okay.  Any other type of work?

14        A.    No, ma'am.  That's my history.

15        Q.    Okay.  What is your position with TDCJ?

16        A.    I'm a Human Resources Specialist 4.

17        Q.    As a Human Resources Specialist 4 for TDCJ,

18   what do you do for them?

19        A.    I'm an initial reviewer for complaints,

20   grievances, if we have calls about people who have

21   suicidal ideations, that sort of thing.

22        Q.    How long have you worked for TDCJ?

23        A.    I went to work for TDCJ in '98.  I was RIF'd

24   in 2011.  I came back in 2012.

25        Q.    How many levels of HR specialist are there?
```

                                              Page 11

```
 1        Q.    Have you ever been a witness of harassment by
 2   any staff member at TDCJ?
 3        A.    No, ma'am, not that I would -- not that I
 4   recall.
 5        Q.    You've never seen it or heard it?
 6        A.    Well, in my job, I hear it.
 7        Q.    No.  I mean directly.
 8        A.    Oh.  No, ma'am, not that I can recall.
 9        Q.    Have you ever witnessed sexual harassment at
10   work?
11        A.    Not to my knowledge.
12        Q.    Have you ever been harassed by an employee
13   while working for TDCJ?
14        A.    Not that I remember.
15        Q.    Have you ever been harassed by a third party
16   while working for TDCJ?
17        A.    Not that I recall.
18        Q.    Would you agree with me that an employee of
19   TDCJ has the right to expect to work in a
20   harassment-free workplace?
21        A.    I agree.
22        Q.    Would you agree with me that if an employee of
23   TDCJ believed that he or she has been harassed, he or
24   she has the right to report that harassment?
25        A.    I agree.
```

Page 14

**Plaintiff's App. 132**

```
 1         Q.   And you would agree with me that during the
 2   investigation, the warden should not treat a sergeant
 3   who has filed a complaint differently than a major whom
 4   the complaint is filed against?
 5         A.   I agree.
 6         Q.   So if, in Ms. Hale's case, the warden called
 7   Ms. Hale into his office and told her that she had to
 8   conduct business with Jonathan Eastep in the presence of
 9   another supervisor and to remain professional in her
10   dealings with him, and there is a memo recording that
11   meeting and there is no such memo regarding calling
12   Major Eastep in, that he treated Ms. Hale differently
13   than Mr. Eastep?
14              MR. GARCIA:   Objection.   Compound
15   question, speculation.
16              Answer as --
17         A.   I don't know.
18         Q.   (BY MS. TAUSCH)  All right.  Fair enough.
19              In regard to the notification of the EEOC
20   investigation, there is a memo from Warden Wathen to the
21   investigator, Gary McClendon, stating that the warden
22   called Sergeant Hale into his office to tell her that
23   when she had to conduct business with Major Eastep, it
24   should be in the presence of another supervisor and to
25   remain professional in her dealings with him.  There is
```

Page 27

```
 1   attend, those are -- that's when they schedule us.
 2        Q.   Okay.  Do you go off premises to attend
 3   training?
 4        A.   No, ma'am.  We do it at the office.
 5        Q.   Okay.  Did you ever do the training for COs or
 6   ranking officers or any other employees of TDCJ
 7   regarding harassment?
 8        A.   I'm sorry.  Can you ask that again?  I didn't
 9   hear you.
10        Q.   Certainly.  Did you ever present the training
11   of COs or ranking officers or any other employees
12   regarding harassment?
13        A.   I don't believe I've ever done any training on
14   that.
15        Q.   Okay.  You know what sexual harassment is.  Is
16   that correct?
17        A.   Yes, ma'am.
18        Q.   What is it?
19        A.   Quid pro quo.
20        Q.   Is that the only kind of sexual harassment?
21        A.   No.  There are all types of sexual harassment.
22        Q.   What else is there?
23        A.   I don't know how to put it in words.  Anytime
24   someone asks for sexual favors or demonstrates --
25   demonstrates something sexual in nature, that sort of
```

                                                    Page 29

```
 1    human resources supervisor's training.  They call it

 2    HRTS.  I think that might be part of that.

 3         Q.   Okay.

 4         A.   And it might be part of sergeant's and

 5    lieutenant's school.  I'm not sure.

 6         Q.   You said it might be part of HRTS.  How do you

 7    spell that?

 8         A.   It's a -- it's an acronym for human resources

 9    supervisor training, HRTS.

10         Q.   Okay.  Do all ranking officers get the HRTS

11    training?

12         A.   I can't remember what level you have to be to

13    get HRTS training.  I think it's -- any supervisor is

14    supposed to, but I don't -- I can't tell you that for

15    sure.

16         Q.   Okay.  Would trapping a female employee

17    against a fence to counsel her be inappropriate

18    behavior?

19         A.   I think so.

20         Q.   On a unit, high-ranking officers, including

21    majors, are responsible for knowing TDCJ policies,

22    correct?

23         A.   To the best of my knowledge, yes, ma'am.

24         Q.   And enforcing TDCJ policies, correct?

25         A.   To the best of my knowledge, yes, ma'am.
```

Page 31

```
 1        Q.   All right.  And as far as you know, majors are

 2    the third-ranking officers on a unit.  Is that right?

 3        A.   Yes, ma'am, as far as I know, that's correct.

 4        Q.   Okay.

 5             MS. TAUSCH:  Madam Court Reporter, the

 6    documents that I sent to you, the first set of Bates

 7    stamped documents is 1082 through 1150.  Do you see

 8    that?

 9             THE REPORTER:  Yes.

10             MS. TAUSCH:  Would you please hand that

11    to the witness?

12             THE REPORTER:  Yes.

13             (Marked Barnes Exhibit No. 1.)

14        Q.   (BY MS. TAUSCH)  Ms. Barnes, the court

15    reporter has handed you a document entitled "PD-13,

16    'Sexual Harassment and Discourteous Conduct of a Sexual

17    Nature.'"  Is that right?

18        A.   Yes, ma'am.

19        Q.   All right.  Would you please turn to

20    Page 1087?  It's Bates-stamped at the bottom.

21        A.   Yes, ma'am.

22        Q.   There is a definition of sexual harassment on

23    that page.  Is that correct?

24        A.   Yes, ma'am.

25        Q.   And that's what you're employed to prevent or
```

Page 32

1    Q.   All right.  Do you agree with me that if a
2    female officer is harassed and it is reported, she
3    should not be retaliated against?
4    A.   Yes, ma'am.
5    Q.   Do you agree with me that the higher rank you
6    hold, you should know the policies of TDCJ?
7    A.   Yes, ma'am.
8    Q.   Do you agree with me that the higher rank you
9    hold, part of your job is to enforce the policies of
10   TDCJ?
11   A.   Yes, ma'am.
12   Q.   Do you agree with me that the higher rank you
13   hold, part of your job is to discipline employees who
14   don't follow policy and procedure?
15   A.   Yes, ma'am.
16   Q.   Do you agree with me that the higher rank you
17   hold, TDCJ requires you to have the ability to supervise
18   employees?
19   A.   Can you ask that again?  I'm sorry.
20   Q.   Yes, ma'am.  Do you agree with me that the
21   higher rank you hold, TDCJ requires you to have the
22   ability to supervise employees?
23   A.   Yes, ma'am.
24   Q.   That's because the higher rank you hold, the
25   more supervisory tasks you take on, correct?

Page 34

**Plaintiff's App.  137**

1    and some of it's done on the units.  It just depends, I

2    think, on what the training is.

3        Q.   Okay.

4             MS. TAUSCH:  Madam Court Reporter, if you

5    would look at the third set of documents Bates-stamped

6    2944 through 2953 and hand those to the witness, please.

7             (Marked Barnes Exhibit No. 2.)

8        Q.   (BY MS. TAUSCH)  Ms. Barnes, there was a

9    complaint in November 2014 by Sue Pearson against Joel

10   Bausell.  Do you recall that?

11       A.   No, ma'am.

12       Q.   The complaint was for discourteous conduct of

13   a sexual nature in which Ms. Pearson initially

14   complained that Mr. Bausell asked her to do a him favor.

15   She said she didn't do favors.  He grabbed his belt and

16   said, "Oh, you can do me a favor."  Ms. Pearson believed

17   the comments were sexual innuendo.  Does that ring a

18   bell?

19       A.   No, ma'am.

20       Q.   If you would, look at Page 2952, please.

21       A.   Yes, ma'am.

22       Q.   I'm sorry, Ms. Barnes.  Just a second.

23       A.   Okay.

24       Q.   Do you see, on Page 2952, the date is towards

25   the top, Thursday, December 4th, 2014, 9:00 a.m.?

Page 37

**Plaintiff's App. 138**

1        Q.   Okay.  If an investigation was done, would it

2   be included with those documents, or should it be?

3        A.   I think --

4        Q.   Do you understand my question?

5        A.   Yes, ma'am.  I think that file is a separate

6   file.

7        Q.   The IFF file is separate from the complaint

8   file?

9        A.   I'm not sure how they file those.

10        Q.   Okay.  That's fair enough.

11             You've been handed another set of

12   documents.  There was a complaint in February 2015 by

13   Amanda Womack for discourteous conduct of a sexual

14   nature in which Ms. Womack complained that Sergeant Levi

15   Whitaker said several things.  If you will turn to

16   Page 3056 at the bottom, the first paragraph is your

17   typed-up version of the events.  Is that correct?

18        A.   Yes, ma'am.

19        Q.   Would you please read that first paragraph?

20        A.    "Complainant submitted an EEO Complaint Form,

21   dated 02/12/2015, marked Discourteous Conduct of a

22   Sexual Nature (Female) and Other (I have been informed

23   on multiple occasions that Sgt. Whitaker is speaking

24   badly about me).  Complainant states Complainant said,

25   to Respondent, 'hurry up' to which Respondent replied,

                                        Page 41

1    to Complainant, 'suck my dick.'  Complainant states

2    Respondent said, to Officer Price about Complainant, 'we

3    need to get that bitch fired.  She was caught sucking an

4    inmate's dick.  If everyone stopped talking to her then

5    maybe she would get the hint and quit.'"

6         Q.   The next paragraph contains your opinion of

7    why there needs to be a statement from Officer Price,

8    whom, I believe, witnessed this incident.  Is that

9    right?  Go ahead and read that second paragraph out

10   loud.

11        A.   Okay.  "The context in which Respondent said

12   'suck my dick' should be taken into account.  While it

13   is crude and highly unprofessional, I don't believe it

14   to be sexual in nature.  It is a phrase that is used

15   frequently in society to mean the same thing as:

16   'whatever,' 'leave me alone,' etc.  People also say:

17   'screw you,' 'fuck you,' 'kiss my ass' and do not mean

18   it in a sexual manner.  I believe this is the manner in

19   which Respondent said 'suck my dick.'  The allegation

20   Respondent told another officer 'we need to get that

21   bitch fired.  She was caught...' is inappropriate.  I

22   recommend requesting a statement from Officer Price

23   regarding the allegation before making a decision

24   whether this case should move to IFF for investigation."

25        Q.   Now, if you would, turn to Page 3063.

Page 42

Plaintiff's App.  140

1  Complainant states, on 04/04/2015, Respondent said 'next

2  time we work together when we switch out she's going to

3  grab my dick.'  Complainant states, on 04/09/2015.

4  Respondent said 'she wanted to lick my ass and fuck my

5  face.'"

6       Q.   And you recommended this one for an IFF.  Is

7  that correct?

8       A.   Yes, ma'am.

9       Q.   And for possible violation of agency EEO

10  policies for the statements that were allegedly made,

11  correct?

12       A.   Yes, ma'am.

13       Q.   Because, in your mind, these statements are

14  clearly sexual in nature.  Is that right?

15       A.   Yes, ma'am.

16       Q.   But you do not separate the officers.  Is that

17  right?

18       A.   I don't know.  I'd have to -- let's see.

19       Q.   If you look under "For Your Action."

20       A.   Right.  I was reading that.  Yes, ma'am.  "The

21  Complainant and the Respondent will not be separated and

22  line of supervision will not be changed."  They "will

23  remain on the same shift and card but will work in

24  different areas."

25       Q.   And then in Ms. Permon's complaint against

Page 46

Plaintiff's App. 141

1      Mr. Ervin, if you look on Page 3127 --

2          A.    Yes, ma'am.

3          Q.    You're faster than I am.  Let me get there.

4          A.    Okay.

5          Q.    Please read the allegation.

6          A.    "Complainant submitted an EEO Complaint Form,

7      dated 05/04/2015, marked Discourteous Conduct of a

8      Sexual Nature (Female) and Sexual Harassment (Female).

9      Complainant states Respondent made 'numerous personal

10     calls of a sexual nature.'  Complainant states

11     Respondent said, to Respondent's girlfriend, 'eat dick

12     and die.'"

13         Q.    And your disposition was:  "The allegations,

14     as reported, do not support opening an EEO

15     investigation.  This complaint is referred to Unit

16     Administration for action deemed appropriate and closed

17     with no further action taken by this office."  Is that

18     correct?

19         A.    Yes, ma'am.

20         Q.    Now, it says:  "A response to the Intake

21     Office is not requested."  Is that right?

22         A.    Yes, ma'am, because this occurred away from

23     work.

24         Q.    Okay.  Where does it say that?

25         A.    "The numerous personal calls of a sexual

                                        Page 47

1    A.   No, ma'am.

2    Q.   Okay.  Please follow along with me as I read

3    that first paragraph.

4         "After viewing the recording of the

5    incident, Respondent does step behind Complainant and

6    place both" -- and you put "hands" above the "and."  Is

7    that correct?

8    A.   Yes, ma'am.

9    Q.   "And placed both hands on the fencing on each

10   side of Complainant's body and it appears Complainant is

11   'blocked'" -- and you put "blocked" in quotation marks.

12   Is that right?

13   A.   Yes, ma'am.

14   Q.   Why?

15   A.   Just to draw attention to it.

16   Q.   I'm sorry?

17   A.   To draw attention to it.

18   Q.   Okay.  "And it appears Complainant is

19   'blocked' in by Respondent's stance and body."

20        That's what you wrote as a description of

21   what's going on in the video.  Is that right?

22   A.   Yes, ma'am.

23   Q.   So when you viewed it, you saw -- excuse me.

24   "Respondent appears to bend his knee moving his groin

25   area toward Complainant's buttocks."  Is that right?

Page 52

```
 1        A.    That's what I've written, yes, ma'am.

 2        Q.    That's what you saw on the video?

 3        A.    Yes, ma'am.

 4        Q.    "On the recording, Complainant appears to be

 5   very upset and turns and says something to Respondent."

 6   Is that correct?

 7        A.    Yes, ma'am.

 8        Q.    Now, this is just a video.  It is not an audio

 9   recording, correct?

10        A.    That's correct.

11        Q.    So you couldn't hear what Ms. Hale said to

12   Mr. Eastep, could you?

13        A.    No, ma'am.

14        Q.    So when you viewed this video, you saw Eastep

15   bend or shift his knee that moved his groin area toward

16   Ms. Hale's buttocks.  Is that correct?

17        A.    It appeared to.

18        Q.    And you could tell that Ms. Hale was very

19   upset?

20        A.    It appeared to.

21        Q.    And she wiggled out from under his arms and

22   said something to him.  Is that right?

23        A.    I don't remember the wiggling out part.  I

24   just can only recall what I've written here.

25        Q.    Okay.  That's fine.  Did you ever find out
```

Page 53

**Plaintiff's App. 144**

```
 1    what she said to him?

 2         A.    No, ma'am, I don't think so.

 3         Q.    Please follow along with me as I read the

 4    second paragraph.  And the second paragraph is by you,

 5    as well.  Is that right?

 6         A.    Yes, ma'am.

 7         Q.    "Due to the angle of the camera, it is not

 8    possible to say whether physical contact is made but

 9    Complainant's reaction appears to indicate physical

10    contact was made."

11              That's what you believe from reviewing the

12    video.  Is that correct?

13         A.    Yes, ma'am.

14         Q.    "I recommend this matter go to IFF for

15    investigation of Respondent's behavior."

16              So you referred to it IFF?

17         A.    I did -- I recommended.  Sorry.

18         Q.    Okay.  "Even though there are several layers

19    of rank between Complainant (sergeant) and Respondent

20    (major), I recommend Respondent limit all contact with

21    Complainant immediately."

22              Is that what you wrote?

23         A.    Yes, ma'am.

24         Q.    Okay.  Now, have you ever had a recommendation

25    to IFF be, in essence, overturned and your manager say,
```

Page 54

```
 1        Q.    Okay.  There is nowhere at the unit that a

 2   major cannot go.  Isn't that true?

 3        A.    To the best of my knowledge.

 4        Q.    Okay.  Was it your recommendation -- hold on

 5   just one second.  Turn to Page 1952.

 6        A.    Yes, ma'am.

 7        Q.    And it says -- this is from you to Richard

 8   Wathen, who is the -- who was the warden.  Is that

 9   correct?

10        A.    Yes, ma'am.

11        Q.    And it says -- in the middle of the page, it's

12   got two stars, and it says:  "Warden:  The Complainant

13   and Respondent should sign the attached Notification of

14   Interim Remedial Actions forms."  Is that right?

15        A.    Yes, ma'am.

16        Q.    And if you turn to the next page, it's the

17   Notification of EEO Investigation and Interim Remedial

18   Actions.  Did you prepare that?

19        A.    Yes, ma'am, I did.

20        Q.    And in the middle of the page, there's an "X,"

21   and it says:  "to take the following interim remedial

22   action:  Respondent will not have any contact with

23   Complainant unless in the presence of another ranking

24   officer," correct?

25        A.    Yes, ma'am.
```

Page 56

```
 1        Q.    So what you recommended is that Sergeant Hale

 2   should have to deal with two superiors instead of one if

 3   she had to handle something with Mr. Eastep.  Is that

 4   right?

 5        A.    Well, I was trying to protect the complainant.

 6        Q.    Well, the best way to protect the complainant

 7   is to have no contact, correct?

 8        A.    Yes, ma'am.

 9        Q.    And the best way to have no contact is to

10   separate them completely, correct?

11        A.    Yes, ma'am.

12        Q.    During the intake part of the investigation of

13   Ms. Hale's claim, did you know that Mr. Eastep had never

14   come up behind a man and trapped him against a fence?

15        A.    No, ma'am.  I only knew what I was reviewing.

16        Q.    Fair enough.

17              Looking back at this recommendation, that

18   was not really fair to Sergeant Hale, was it?

19              MR. GARCIA:  Objection.  Argumentative,

20   vague, confusing.

21              Answer.

22        A.    The hard thing is going back to where you are

23   at that exact moment, making that decision.  It's

24   impossible for me to say, you know, what all of my

25   thought processes were at that time.
```

Page 57

**Plaintiff's App. 147**

```
1          Q.    (BY MS. TAUSCH)   On Page 1955, you notified
2     Ms. Garcia and Ms. Shelly of what -- of Ms. Hale's
3     complaint, correct?
4          A.    Let's see.  Yes, ma'am, it appears I sent an
5     e-mail.
6          Q.    And on Page 1956, in the middle of the page,
7     it says "Video Surveillance Incident Request."
8                Do you see that?
9          A.    Yes, ma'am.
10         Q.    Was that a request by you, or do you know?
11         A.    No, ma'am.  It looks like it's part of
12    Sergeant Hale's e-mail or letter.
13         Q.    I got you.
14               And at the bottom of the page is your
15    review of the video that we just -- that I just read?
16         A.    Yes, ma'am.
17         Q.    Do you know that Mr. Eastep was not
18    disciplined or counseled or reprimanded about the June
19    15th incident in any way?
20         A.    No, ma'am.  I generally don't know what the
21    outcome of my recommendations are when they go to IFF.
22    I generally don't go back and look.
23         Q.    Okay.  Did you know that Eastep signed a
24    voluntary demote form from major to CO-5 in October of
25    2017?
```

Page 58

**Plaintiff's App. 148**

```
1      A.    No, ma'am, I didn't.

2      Q.    Have you seen that happen before?

3      A.    Yes, ma'am.

4      Q.    Under what circumstances?

5      A.    I don't know.  It's just that you normally

6  hear about it later, and I don't know what the

7  circumstances are.

8      Q.    Okay.  Were you ever told what Eastep claimed

9  he was doing when he trapped Hale against the fence?

10     A.    Not that I recall.  I don't believe I had

11 anything at all to do with him.

12     Q.    Okay.  Is anyone trained to do a counseling

13 that way?

14     A.    I would think not, no, ma'am.

15     Q.    If they are, it's not proper, is it?

16     A.    I would think not, no, ma'am.

17     Q.    When you watched the video, did you see any

18 spot between the fence and the desk?

19     A.    I don't recall.

20     Q.    If you had, you would have put it on your

21 report of what happened, wouldn't you?

22     A.    I -- I don't understand the question.

23     Q.    If you had seen a spot between the fence and

24 the desk that was about the size of a softball, you

25 would have reported that, wouldn't you?
```

Page 59

**Plaintiff's App.  149**

1        A.    Yes, ma'am, I guess.  I would have reported

2    what I saw, yes, ma'am.

3        Q.    Do you know of anyone that saw that on the

4    video?

5        A.    No, ma'am.

6        Q.    Okay.  Is it apparent from the video that's

7    Eastep is taller than Ms. Hale?

8        A.    If I remember correctly, yes, ma'am.

9        Q.    Is it apparent from the video that Eastep

10   weighs more than Ms. Hale?

11       A.    If I remember correctly, yes, ma'am.

12             MS. TAUSCH:  Okay.  Let's take a break.

13   I'll be right back.

14             MR. GARCIA:  Okay.

15             (Break from 11:33 a.m. to 11:36 a.m.)

16       Q.    (BY MS. TAUSCH)  Ms. Barnes, if a major

17   trapped a subordinate, like in the video that you saw,

18   and pushed his genitalia against her, do you believe

19   that that's a PD-13 violation?

20       A.    Yes, ma'am.

21       Q.    Do you believe that's sexual harassment,

22   according to the definition of -- in the TDCJ policy?

23       A.    Yes, ma'am.

24       Q.    If a major asks a sergeant if she wants her

25   toes sucked, do you believe that's a PD-13 violation?

                                          Page 60

1          A.    Possibly.

2          Q.    Do you believe that's a violation of the

3    sexual harassment policy by TDCJ?

4          A.    Possibly.

5          Q.    Okay.  What makes you hesitate on that?

6          A.    Whenever someone claims sexual harassment or

7    discourteous conduct of a sexual nature, a toe in and of

8    itself is not sexual, so they're going to need to

9    explain to me why it is sexual.  So it's going to depend

10   on what the context is and what her -- her feelings are.

11   That's what makes me hesitate.

12         Q.    So it if a major asks a subordinate if she

13   wants her toes sucked, that's not sexual in nature?

14         A.    It's highly inappropriate, but they're going

15   to need to explain to me why it's sexual in nature to

16   them.

17         Q.    If a major asks or attempts to kiss a

18   subordinate's hand, do you believe that's a PD-13

19   violation?

20         A.    Again, that depends on what the context is and

21   what that person's feelings are about it and how they

22   explain it.

23         Q.    If the subordinate does not like to be

24   touched, do you believe that's sexual harassment?

25         A.    Yes, ma'am.  Then it can go to an internal

                                        Page 61

Plaintiff's App.  151

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

AMBUR HALE,            )
     Plaintiff,    )
                 )
                 )
vs.                    )    CIVIL ACTION NO.
                 )    7:18-CV-0097-M
TEXAS DEPARTMENT OF    )
CRIMINAL JUSTICE, AND  )    JURY DEMAND
MAJOR JONATHAN EASTEP  )
     Defendants.    )


\* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION

GREG BURT

April 24, 2019

\* \* \* \* \* \* \* \* \* \* \*


    ORAL DEPOSITION OF GREG BURT, produced as a

witness at the instance of the Plaintiff and duly

sworn, was taken in the above-styled and numbered

cause on April 24, 2019, from 11:20 a.m. to 12:38

p.m., before Cheryl Duncan, CSR, in and for the State

of Texas, reported by computerized stenotype machine

at the Law Office of Cooper & Scully, PC, 900 Jackson

Street, Suite 100, Dallas, Texas, pursuant to the

Federal Rules of Civil Procedure.

EXHIBIT D

```
 1      A.     Yes.

 2      Q.     Why?

 3      A.     I went back into law enforcement and into

 4  this job.

 5      Q.     And "this job" being OIG?

 6      A.     Yes, ma'am.

 7      Q.     That stands for what?

 8      A.     Office of the Inspector General.

 9      Q.     And you've been with them since --

10      A.     August the 14th.

11      Q.     And what is your current position with OIG?

12      A.     Investigator.

13      Q.     Has that been your position the entire time

14  you've been with OIG?

15      A.     Yes.

16      Q.     Who is your supervisor?

17      A.     Tim English.

18      Q.     Who is David Gregory Mayo?  Do you know who

19  that is?

20      A.     Yes, I do.  That is the regional commander

21  for OIG.

22      Q.     Is he above Mr. English?

23      A.     Yes.

24      Q.     Okay.  What is Mr. English's position?

25      A.     Lieutenant.
```

1    A.    Yes, I did.  I spoke with an EEO

2  investigator.  I don't remember his name.

3    Q.    Gary Mclendon?  Does that sound familiar?

4    A.    As a matter of fact, it does.

5    Q.    Okay.  Anybody else?

6    A.    I interviewed an officer who was working at

7  the desk at the time.  Senior moment.

8    Q.    That's okay.  I can't remember his name

9  either.

10    A.    And so I interviewed Eastep.  I don't

11  believe I interviewed anybody else, based on what I

12  saw on video and what they could possibly have seen

13  or heard.  I excluded them as a witness.  I didn't

14  visit with anyone else.

15    Q.    Okay.  Is your interview of the officer at

16  the desk recorded?

17    A.    No.

18    Q.    Why not?

19    A.    I read what he wrote for EEO, which was

20  that he didn't see or hear anything.  And I

21  reconfirmed with him that was, in fact, what his

22  statement was, he didn't see or hear anything.  I

23  don't usually record things like that.

24    Q.    Okay.  Is your interview with Eastep

25  recorded?

1      A.      I don't recall.

2      Q.      Okay.  Would you normally record that?

3      A.      Maybe not.  I'm not sure that I would

4  normally record an interview with him to see what he

5  had to say about that.

6      Q.      So you're telling the judge and jury that

7  you would not normally record an interview with the

8  person who's been accused of sexually assaulting

9  another officer?  That's your testimony?

10     A.      Well, that's a simplistic view of it, yes.

11     Q.      If you had recorded it, would it be kept

12  with the OIG file?

13     A.      Yes.

14     Q.      Would it be kept with the recording of

15  Ms. Hale's?

16     A.      Yes.

17     Q.      Okay.  Now, the person that contacted

18  you -- I'm sorry, did you tell me who that was?

19     A.      Yes.

20     Q.      David Mayo?

21     A.      Yes, ma'am.

22     Q.      They said that it was -- there was a

23  newspaper article?

24     A.      I think he said he saw it on the news.

25     Q.      Oh, saw it on the news.

1      A.     I believe that's what he said.

2      Q.     So there was never a newspaper article?  Or

3  do you know?

4      A.     I don't know.

5      Q.     Okay.  Okay.  We're going to get to your

6  report in a minute.  In your report, you say, I was

7  made aware of a Times and Record News article.  Which

8  indicates to me it was written down.

9      A.     Well, and that may be the case.

10     Q.     Okay.  Did you ever get a copy of that

11 newspaper article?

12     A.     I don't believe so.

13     Q.     Okay.  That too would be with your OIG

14 report?

15     A.     I don't believe I ever included a newspaper

16 article in any report I've ever done.

17     Q.     Okay.  Would it be with your file?

18     A.     Ma'am, I don't have a file.

19     Q.     Would it be with the OIG file?

20     A.     Again, I don't think I've ever included a

21 newspaper report about anything with any case I've

22 ever done.

23     Q.     Okay.  Fair enough.

24            Now, you recorded the interview with

25 Ms. Hale; is that right?

1      A.      Yes.

2      Q.      We have prepared a transcript of that.

3                      MS. TAUSCH:   And we have a copy for

4  you.

5                      MR. GARCIA:   Was it done by a court

6  reporter?

7                      MS. TAUSCH:   No, it actually was done

8  by our legal assistant.  It's been done three times

9  to make sure that we got everything.  And we're going

10  to use it today just for these purposes.  Because I

11  don't have the recording with me.

12                      MR. GARCIA:   No problem.  Just for the

13  record, I'm going to go ahead and have this

14  transcribed.

15                      MS. TAUSCH:   That's fine.

16                      MR. GARCIA:   If you don't mind, I'll

17  send them this as a script.

18                      MS. TAUSCH:   That will be great.

19                      MR. GARCIA:   They might want the --

20                      MR. COGBURN:   Are you going to have it

21  done by --

22                      MR. GARCIA:   A court reporter.

23                      MS. TAUSCH:   Oh, that will be great.

24                      MR. COGBURN:   If you want to do that

25  and compare, that's fine.

1   two-thirds of the way down.

2              Do you remember Ms. Hale telling you

3   about those other incidents?

4       A.    Yes.

5       Q.    Did you ever do any follow-up to see if

6   those incidents had occurred?

7       A.    No.

8       Q.    Okay.  Did you ever report those incidents

9   to the EEO, to do any kind of investigation to

10  determine if those incidents had occurred?

11      A.    No.

12      Q.    Okay.  Did you tell anybody else about

13  those incidents that had the authority to do

14  something about them or to find out if they had

15  occurred?

16      A.    I don't believe so.

17      Q.    Okay.  Now, if you'll look on page 12,

18  right -- it's about a third of the way down, it's the

19  second paragraph.  And you say, and so there was

20  something specific I saw at one time that raised an

21  eyebrow with me, and it's been a while back, and I

22  thought, I'm going to file that away in my memory,

23  and I'm thinking about somebody in the mailroom that

24  he might have been involved with at some point.  Do

25  you know anything about that?  And you were asking

1    Ms. Hale if she knew anything about that.  And you

2    were talking about Mr. Eastep at that point in time.

3    Do you remember saying that?

4         A.    It seems familiar, yes.

5         Q.    Okay.  So does that refresh your memory a

6    little bit about having some information tucked away

7    about Major Eastep?

8         A.    Not really, no.

9         Q.    Okay.  As we sit here today, had you heard

10   something about Major Eastep having either an affair

11   or having a relationship with somebody in the

12   mailroom?

13        A.    Not that I recall, no.

14        Q.    Had you ever investigated Major Eastep

15   about -- for having an affair or a relationship with

16   somebody in the mailroom?

17        A.    No.

18        Q.    Had you ever been asked to do that by

19   anyone, to investigate that?

20        A.    No.

21        Q.    Had you ever asked anybody to investigate

22   that?

23        A.    No.

24        Q.    Had you ever heard any talk about that?

25        A.    It may be that I read something somewhere,

1    an anonymous letter that came in making allegations,

2    but nothing that seemed to have a specific enough to

3    start writing a case on it.

4         Q.    Okay.  So if an -- strike that.

5                   Would an anonymous letter have come to

6    OIG, or do you remember?

7         A.    I don't remember where it came from.

8         Q.    Okay.  Is that one of those -- strike that.

9    There's too many pronouns in that.

10                  If an anonymous letter had come to OIG

11   with a snippet -- I think that's what you used --

12   about Major Eastep having a relationship or an affair

13   with somebody in the mailroom, is that one of those

14   administrative procedures that OIG would have

15   handled, or would you have turned it over to EEO with

16   TDCJ?

17        A.    It seems to me that if there was an affair

18   going on with somebody and it was consensual, that we

19   probably wouldn't be involved with it in any way,

20   shape or form.

21        Q.    How can you determine if it's consensual if

22   you don't do an investigation?

23        A.    Well, for instance, in this case, nobody

24   complained.  So that's where we launched our

25   investigation from.

1    Q.    Okay.  Now, as we sit here today, do you

2   remember hearing anything else about Mr. Eastep?

3   Other than Ms. Hale's complaint and about this one

4   that you vaguely remember?

5    A.    Not really, I don't.

6    Q.    Okay.  Now, you prepared a report -- we're

7   going to come back to this in a minute.  But you

8   prepared a report of your investigation; is that

9   correct?

10    A.    Yes.

11    Q.    Okay.  And in it, you recount what you saw

12   on the video.  Let's mark that as Exhibit 1.  I'm

13   sorry.  And we'll come back to that in a minute.

14              (Exhibits 1 - 2 marked)

15    Q.    Let me show you what's been marked as

16   Exhibit 2.  Is that a copy -- looks to be a copy of

17   your report.

18    A.    It does.

19    Q.    Okay.  I believe all the pages are there.

20   I hope we've copied all the pages.  But it doesn't

21   have the exhibits -- or the attachments, correct?

22    A.    That's correct.

23    Q.    Okay.  If you would turn to page 1863 --

24   they're Bates stamped down at the bottom.  And you

25   recounted, like you said, as close to second by

1   second, maybe, I don't know, millisecond.

2       A.    Some of them were very close.

3       Q.    Right.  Some of the events that occurred on

4   the video, correct?

5       A.    Yes.

6       Q.    Okay.  Now, your report includes that

7   Mr. Eastep put his left arm up on the shoulder of a

8   medical personnel to his left.  Is that correct?  And

9   that's at the bottom of 11:58:17.245.  It's the last

10  sentence.

11      A.    Yes.

12      Q.    Okay.  And in your review of the video, did

13  you see any reason for him to do that?  You didn't

14  document it anywhere?

15      A.    No, ma'am.

16      Q.    Okay.  I mean, he's not helping her to walk

17  or guide the gurney or anything like that, is he?

18      A.    No.

19      Q.    Okay.  You didn't document that when Eastep

20  puts his hands up and takes hold of the fence, he

21  looks to be directly behind or almost directly behind

22  Sergeant Hale.  Do you remember that occurring in the

23  video?  And we've got the video.  We can show it to

24  you.  Do you want to just read over that real fast?

25      A.    Let me just review for a second.

1      Q.    Sure.

2      A.    And, again, you were asking?

3      Q.    Okay.  My question was, you didn't document

4   that when Eastep puts his hands up and takes hold of

5   the fence, he looks to be directly behind or almost

6   directly behind Sergeant Hale.  But that's a true

7   statement, isn't it?

8      A.    It is, yes.

9      Q.    Okay.  Now, you also didn't document that

10  when he stops behind Sergeant Hale and puts his hands

11  up to take hold of the fence, he bends his right knee

12  forward a little bit.  Did you see that in the video?

13     A.    I don't believe I did.

14     Q.    Okay.  We're going to get the video out and

15  show that to you.

16              Did you see, did you see Cynthia

17  Barnes' deposition?

18     A.    I don't guess I know who that is.

19     Q.    She's with the EEO -- TDCJ/EEO office.  She

20  was the intake officer.

21     A.    I don't recall that one.

22     Q.    Okay.  Did you see her writeup?

23     A.    I don't remember whose documentation from

24  EEO I read.

25     Q.    Okay.  Now, you don't document that you see

1    any blood on the floor, correct?

2         A.    That's correct.

3         Q.    All right.  And on the video, you cannot

4    see a spot of blood the size of a softball, can you?

5         A.    I could not see anything like that, no.

6         Q.    Okay.  Now, if there were a spot of blood

7    the size of a softball on the floor, you should be

8    able to see it on the video, correct?

9                   MR. GARCIA:  Objection, speculation.

10        Q.    Go ahead.

11        A.    I wouldn't have any idea.

12        Q.    Okay.  But you couldn't see any blood on

13   the floor on the video, correct?

14        A.    That's correct.

15        Q.    Okay.  At the time this incident occurred,

16   were there more videos of what happened or just this

17   one video?

18        A.    As in multiple disks of the same event

19   or --

20        Q.    Well, multiple perspectives.

21        A.    This is the only one that I know exists.

22        Q.    Okay.  And I understand your answer.  In

23   the spot where this incident occurred, were there

24   cameras that would have videoed what happened other

25   than just this one?

1          MS. TAUSCH:   Back it up.   When he

2     first grabs hold of it.   Back it up.   Right there.

3          Q.     You can't see -- okay, before she starts

4     turning around, you couldn't see his stomach and you

5     couldn't see her buttocks, correct?

6          A.     That is true.

7          Q.     Okay.   So in your report, you chose not to

8     believe Ms. Hale when she said that Eastep's stomach

9     was pressing against her back, forcing her buttocks

10    against his penis; isn't that true?

11         A.     That is true.

12         Q.     You then reviewed the policy and stated

13    that, in the realm of reasonableness, no one other

14    than Ms. Hale would find these events offensive.

15         A.     (Nods head)

16                     That's what I wrote.

17         Q.     You had information that Eastep knew

18    Ms. Hale did not like to be touched --

19         A.     That's true.

20         Q.     -- in the attachments.

21                     There was a statement by Captain Cody

22    Miller -- do you remember him?

23         A.     I do.

24         Q.     He said that there was an incident where

25    Eastep went to half hug Ms. Hale or pat her on her

1   shoulder, much like he did with the medical personnel

2   in this video, and Captain Miller told Eastep that

3   she did not like to be touched.  You have that

4   statement by Captain Miller?

5       A.    Yes.

6       Q.    And you still found that only Ms. Hale

7   would find that it was offensive, no one else.

8       A.    That was my finding, yes.

9       Q.    Who is -- is GMC with TDCJ HR, Gary

10  Mclendon?

11      A.    I think he works for EEO.  I'm not real

12  sure.

13      Q.    Okay.  I thought those were the two -- I

14  thought they were the same.

15      A.    I don't know that.

16      Q.    Okay.  That's fine.

17            But he's with TDCJ?

18      A.    I don't --

19      Q.    You don't know how -- the intricacies of

20  what's what?

21      A.    I don't.

22      Q.    So you believe Gary Mclendon is with EEO?

23      A.    I believe that.

24      Q.    Okay.  That's fine.  Have you ever read his

25  notes or report?

```
 1   Ms. Cynthia Barnes' report of her viewing of the
 2   video; is that correct?
 3        A.    That's correct.
 4        Q.    And you haven't reviewed her deposition?
 5        A.    No.
 6        Q.    Okay.  Did you review what Eve Shelly wrote
 7   in regard to this incident?
 8        A.    I don't remember that name.
 9        Q.    Oh, you don't know who she is?
10        A.    I don't -- I don't remember who that is
11   right offhand.
12        Q.    Okay.  That's fine.
13              Do you remember -- let's look at the
14   investigation interview again.  That's Exhibit 1.  On
15   page 9.  When you were interviewing Ms. Hale, it's
16   about two thirds of the way down.  You say, I don't
17   question that that is inappropriate behavior.  That
18   is not a question, all right?  That is not a question
19   in my mind.  I know that's inappropriate.
20              You told Ms. Hale that, correct?
21        A.    Yes.
22        Q.    Okay.  You further stated on page 12 --
23   it's almost right in the middle of the page -- well,
24   in looking at this, everybody is absolutely certain
25   that this was inappropriate behavior.
```

1          You told Ms. Hale that?

2     A.    I did.

3     Q.    And you believed that, didn't you?

4     A.    No.

5     Q.    So you lied to Ms. Hale when you were

6  interviewing her?

7     A.    That's fair.

8     Q.    Had you talked to everybody about it being

9  inappropriate behavior?

10    A.    No.

11    Q.    On page 13, about a third of the way down,

12  in discussing the policy, PD13, you told Ms. Hale --

13          MR. WEST:   Hang on a minute.

14    Q.    I'm sorry.  About a third of the way down.

15    A.    All right.

16    Q.    You're discussing the policy.  And you say,

17  and that's reasonable that you would find that

18  offensive, isn't it?

19          That's what you said to Ms. Hale

20  during that investigation interview?

21    A.    Uh-huh, that is what I said.

22    Q.    Okay.  And then on page 15 in the first

23  really big paragraph, you say, well, let me share

24  with you that I think what you are saying is true.  I

25  think that there is a PD13 violation there.  I

1  believe you.  I don't know if it helps or not.  I

2  don't know what I can do with it, but that's what I

3  believe.  I believe that's accurate.

4              That's what you told Ms. Hale during

5  that interview; isn't that true?

6      A.    It is.

7      Q.    And then the next paragraph you say, do you

8  understand what I'm trying to visit with you about

9  right there, okay?  And I don't know why the EEO

10  people couldn't under -- couldn't see that there was

11  something there based on what the PD13 says.  I don't

12  understand that.  I certainly intend to visit with

13  them at length to see if I can't find out what their

14  point of view is on that is, and to help them to help

15  us all understand where they are on that.

16              You told Ms. Hale that?

17      A.    Yes.

18      Q.    But you didn't do that, did you?

19      A.    Didn't --

20      Q.    You didn't visit with the EEOC people, did

21  you?

22      A.    I certainly corresponded with them and got

23  their documentation.

24      Q.    But you didn't visit with them to find out

25  what was going on and why they didn't base -- why

1   they didn't find a PD 13 violation, did you?  In

2   fact, you wrote your report and closed your file.

3   Isn't that true?

4       A.     Eventually I did write a report and close

5   the file, yes.

6       Q.     And on page 17, about -- right before the

7   big paragraph, you say, it was wrong, I mean, that's

8   the bottom line, it was wrong.

9              That's what you told Ms. Hale during

10  that interview; is that right?

11      A.     Yes.

12      Q.     And then you say, on page 24, that big

13  paragraph, it's an issue for a lot of reasons based

14  on what I read in the PD13 you showed me, that's an

15  issue.  That someone hasn't already taken care of it,

16  that's an issue.

17             That's what you told Ms. Hale; is that

18  right?

19      A.     It is.

20      Q.     Okay.

21             MS. TAUSCH:  Let's take a break.

22             (Recess from 12:31 to 12:35)

23      Q.     Where did you interview Mr. Eastep?

24      A.     I believe it was in my office on the unit

25  at the Allred.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

AMBUR HALE,                          §
     Plaintiff,                    §
                      §
v.                                   §      CIVIL ACTION NO. 7:18-cv-0097-M
                      §      JURY DEMAND
TEXAS DEPARTMENT OF                  §
CRIMINAL JUSTICE, and                §
MAJOR JONATHAN EASTEP                §
     Defendants.                   §

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

**EXHIBIT E
AUDIO RECORDING OF OIG'S INTERROGATION OF AMBUR HALE**

---

Per instructions from the District Clerk's Office, the audio recording
was mailed to
    U.S. District Court, Clerk of Court
    1000 Lamar Street, Room 203
    Wichita Falls, TX 76301

**Plaintiff's App.  171**

EXHIBIT E

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | |
|---|---|
| **AMBUR HALE,** § | |
| **Plaintiff,** § | |
| § | |
| **v.** § | **CIVIL ACTION NO. 7:18-CV-0097-M** |
| § | **JURY DEMAND** |
| **TEXAS DEPARTMENT OF** § | |
| **CRIMINAL JUSTICE, and** § | |
| **MAJOR JONATHAN EASTEP** § | |
| **Defendants.** § | |

**OIG INVESTIGATION INTERVIEW OF AMBUR HALE**

Burt:      Today's date is August18th, it's a Thursday at 1:06 p.m., my name is Greg Burt with the Office of the Inspector General and with me is Investigator Nicki Archer, and now tell me your name please?

Hale:      Ambur N. Hale.

Burt:      Alright, Ambur you're – a Sgt. at the Allred Unit at TDCJ, is that right?

Hale:      Yes sir.

Burt:      The purpose of our visit this afternoon is about a report you made on Tuesday, August 16th, you went to the Wichita Falls Police Dept. and reported a sexual assault. Now then, I don't wanna…

Hale:      I filed an assault, but I feel like it is sexual in nature. So I don't know what it falls under.

Burt:      I see, uhh, and so you went to the front desk at the police department and it says at 10:35 in the morning on Tuesday, is that right?

Hale:      Mmm hmm.

Burt:      Ok, and what it says is you told them that on June 15th at about noon that you were trapped between a fence and Major Eastep and that Major Eastep then pressed his penis up against your buttock as if engaging in a sexual act. You told them that when you tried to move away, Major Eastep followed you and refused to let you move.

**Plaintiff's App. 172**

EXHIBIT F

| | |
|---|---|
| Hale: | He shifted and so I pretty much I had to turn facing him and then go underneath his arm. |
| Burt: | They, they say he followed you and refused to let you move. |
| Hale: | No, not follow. He, he shifted, like uhh, he was holding the fence and so I was between his body and the fence. |
| Burt: | Yeah ok. |
| Hale: | And when I tried to adjust, he adjusted with me and so when I turned, I dipped ya know and went under his arm because he wasn't moving. |
| Burt: | Then what did you do at that point. |
| Hale: | Uh, well I was, I made the statement "what are you doing?" and then uhh we had several people, because it was during an ICS and they were walking passed, so I stopped because I didn't want to bring more attention to what was going on because it was really embarrassing, and I was trying to play it off. So, you know, he was like "what's that on the floor?" and I was like looking at the floor like… |
| Burt: | And what was on the floor? |
| Hale: | Nothing that I could see umm… When he |
| Burt: | What did you think was on the floor? |
| Hale: | …pushed me into the fence, he had made the statement "what is that?", but he didn't use his normal voice, he used like a lower tone voice, more of a whisper, and umm after I moved and made the statement "what are you doing?" then he was like "no seriously, what is that, and he was like is that blood or paint?" And, like I said, everybody was moving so I just kinda, I was like I don't know and then he was like "why is Rhodes standing over there?" and I was like uhh cause… |
| Burt: | And who is Rhodes? |
| Hale: | Offender Rhodes, uhh sorry, the whole situation keeps making me emotional. |
| Burt: | Sure. |
| Hale: | Offender Rhodes was at the desk because he was alleging that an offender came in to the shower and groped him and I had responded out of the pod for that and I was enroute to taking him to safe prisons when an ICS was initiated on the same pod, B pod, for an offender who fell out because he was exercising in his cell and passed out, I went down there for that and that's why all the medical staff and officers and stuff were there was because everyone was responding to the ICS and I had went when medical thought it might be heat related I went to the desk before everybody else to try to get a rag soaked in ice water for the offender because that's one of the |

**Plaintiff's App. 173**

things they want us to do when they are having heat issues and that's why I was at the fence and then he came out of the sally port and that's when all that other stuff happened and I was facing the fence and he came up behind me and didn't make any noises like he normally does or anything like that and pressed me against the fence and with his stomach being the size that it is and my height, it pushed my back, ya know, forward, so which made my rear come out and then that's when he made the comment "uhh, what is that?" and then I tried to move because I didn't know who it was at first and he moved, like I said, with me....

Burt:     So he moved with you...

Hale:     Yeah, he kind of like shadowed me so then he kind of adjusted, and then so like I ducked down and turned around and went underneath his arm and uh, anyways.  I reported it to the Unit.

Burt:     Who at the Unit did you report it to?

Hale:     Uh, I reported it, I wrote a letter to Huntsville and reported it as an EEO.

Burt:     Ok. But who at the unit did you report it to?

Hale:     Uhhh, I don't really want to say because it's not...it wasn't on camera and...

Burt:     Well, let me stop you there, it was on camera.

Hale:     Well, but me reporting it wasn't, and so it's just gonna, I didn't officially report it, I just made a comment to somebody and everybody knows that I don't like to be hugged or touched, so they had made a comment to that person that she doesn't like to be touched and this is not something new, everybody knows that about me, like they know don't hug Sgt. Hale, don't touch Sgt. Hale, like some people normally hand shake, they will actually... (gesture) do like that... you know like as a joke, you know keep their fingers from touching like ya know, anyways, uhhh, they determined that he was counseling me on building cleanliness...

Burt:     Who is they?

Hale:     Huntsville.

Burt:     Ok.

Hale:     and they dismissed my uh claims and refused to reevaluate it and so I've been looking at what I can do and I've been on the internet and um typed in my scenario and I figure if maybe, it said like it might be like a misdemeanor, , I don't care, he shouldn't do that and whether it's a $200 fine, I don't care, he needs to know that it's not ok and that people shouldn't have to deal with that out there. Like, I've been out there 10 years and I've never had anybody violate me like that, like I shouldn't have to worry about the officers, like you know and at the time like I don't know

**Plaintiff's App.  174**

who you are you know and like after I saw his uniform of course, I knew it wasn't an inmate, but you don't get to do that, like that's not funny, it's not a joke. I don't feel like he was trying to be funny or make a joke, I feel like he was trying to be sexual with it and he just didn't realize or he got so complacent with his behavior that that he just did it and then after the fact, he was like, oh, I forgot that was Sgt. Hale and like she isn't going to tolerate it ya know and anyways so…

Burt:       Well lets, well I hate to knit pick but when it comes to specific details…

Hale:       I understand

Burt:       …I've got to be very accurate on things.  And so you told the folks at the police department that uh, the Major pressed his penis up against your buttock as if though he were engaging in a sexual act and there's a slight difference in what we're hearing and what you're telling me is that his belly pushed your back forward which made your buttocks come back and…

Hale:       Yeah, it was like we were in a sexual act, like we were in doggie style up against the fence, standing up in a sexual or it felt like I was in a dirty movie up against the walls standing up with him pressed up against me.

Burt:       Ok, now then, let's visit about how long the video is kept at the unit. Do you know how long that is?

Hale:       It's 21 days, but they had to get it for the EEO Complaint and so they do have it and I have requested it through open records but I haven't received a response or a copy of it yet.

Burt:       Well, and I have a copy of it.

Hale:       Ok.

Burt:        And I have watched it.  I have watched it in slow motion and in fast motion and some of the things you say are accurate and some of the things aren't quite accurate.

Hale:       Ok.

Burt:       And so I'm going to ask you about some of those things, because again, I gotta weed out what is and what isn't.

Hale:       That's right…

Burt:       So you were very specific that when you tried to move away that he, he moved with you to try to prevent you from moving away.

Hale:       Mm-hmm

**Plaintiff's App.  175**

Burt:      ..that's what you're telling me...

Hale:      Mm-hmm..

Burt:      Umm, and you told the people at the police department that he followed you and refused to let you.

Hale:      No, I just told you that she sat on the other side of the window and wrote down, I didn't say followed, I said that he moved with me.

Burt:      Umm ok, and so you're adamant that he moved with you to keep you from...

Hale:      Yeah, he never let go of the fence, never got out of the way, he never backed up, he stuck with me, he shadowed me

Burt:      And shadowed means moved with...

Hale:      Yes, he moved with me.

Burt:      Ok. Alright. Well I understand what you're saying, but I want you to understand that what I'm seeing is not that.

Hale:      ok

Burt:      ok, uh, it does seem inappropriate to me what he did,

Hale:      Mm-hmm.

Burt:      but what he did and what you're saying is not the same. And I wondered what your impression was that caused you to think that he moved with you. Because if I can, if I can figure that...

Hale:      Because I tried to move and I was pinned, I could not, could not get released from the area.

Burt:      Yeah, you couldn't turn around, you couldn't move, you were just pushed up against the fence?

Hale:      Yes. He's a larger man and with a larger body and him holding onto the fence, I couldn't move and I wasn't expecting him to be there so my, my movement was limited

Burt:      Ok. you couldn't turn around there at all?

Hale:      I couldn't, I did turn around and you can probably see on video where he had to kinda move because I'm trying to push him off of me.

**Plaintiff's App. 176**

Burt:     Well, and, you know I watched the video several times and I've broken it down frame by frame and...

Hale:     Ok, well he assaulted me and I had fear and you don't get to put your hands on anybody that you want to, you can't do that.

Burt:     Yeah, and that is a problem, but you understand that yesterday when I got called about this, about a sexual assault that happened at the unit involving two non-offenders and it didn't come to us to begin with....

Hale:     I didn't know that y'all were an option, I thought that y'all were for maintaining officers and offender assaults, I didn't know that y'all were open to us and seeing that Huntsville had no issue with what he did I wasn't extremely comfortable with coming in there and being like hey, do I have a case, is this an issue, what can I do?.  So I got on the internet because it's anonymous there and I can find out information without it being linked back to me.

Burt:     Sure, so what did you find out, what do you think?

Hale:     Like I said, it, they, on what I saw for Texas law that when someone touches you and it is unwelcomed and that it can be seen as obscene or provocative or offensive to others that it can be deemed as a misdemeanor.  And so I was like ok, well maybe I could go to the police and I could do something with this, and I was waiting for my video to come in but seeing that  it's probably not ever gonna happen, I was like, well they probably would have a better chance at getting the video than I would.  So I'm just gonna go ahead and go with this.

Burt:     You've been there for 10 years have you ever seen any other law enforcement agency beside OIG investigate any offenses on that unit or any other unit.  Have you ever heard of that?

Hale:     Well if someone gets their car hit in the parking lot they can call their the police and..

Burt:     And let's talk about criminal offenses not traffic accidents, let's talk about

Hale:     I'm just saying...

Burt:     that's what I'm saying let's separate criminal offenses from wrecks.  Ok?
          Have you ever seen any outside law enforcement agency besides OIG investigate any criminal offense that happened at Allred, either between offenders or between officers?

Hale:     I know that OIG is responsible for taking care of situations between officers on offenders or offenders on offenders, I did not know that their jurisdiction was officer on officer complaints.

**Plaintiff's App.  177**

Burt:      Ok.

Hale:      I didn't know that if an officer got into a fight in the parking lot with another officer that OIG would be the one to deal with that. No I didn't

Burt:      You don't know about us arresting people that have done that?

Hale:      No, I don't honestly.

Burt:      Um k. And I'll tell you that it's happened and so…

Hale:      Well that's good information

Burt:      So a non-officer, you know a boyfriend of an officer, brought an officer to a unit one time to drop her off only he assaulted her in the parking lot and it happened on state property and OIG made that arrest.

Hale:      Oh, I didn't know that.

Burt:      Ok. And so, I asked you a question and and you know I'd really like an answer. Have you ever seen any law enforcement agency besides OIG investigate any offense, any criminal offense that happened at Allred?

Hale:      Not to my knowledge, no sir.

Burt:      Ok. And so, I mean have you ever seen an officer from any police department ever at Allred that wasn't escorted by OIG so that they can visit with the offenders about things that happen in the world?

Hale:      Well, we're talking about officers though, not offenders?

Burt:      I know, I know. But I'm just asking…

Hale:      But I said my knowledge was based on, I know that y'all are for the offender on offender and officer on offender. I did not know that y'all were for officer-officer, and so..

Burt:      Ok, so well let me make sure that you understand. We are a Texas Law Enforcement Agency, we are police officers, we are responsible for everything that happens in TDCJ, whether it happens in the parole office, at the unit, or involving people from the unit. This is our, this is our place. Have you ever had a problem with anyone at OIG in the past?

Hale:      No

Burt:      Ok. Upset with anybody at OIG over anything that's ever happened??

Hale:      No.

**Plaintiff's App. 178**

Burt:      Any interactions with OIG in the past?

Hale:      Y'all did an officer on offender thing with me because I was assaulted by an offender out there.

Burt:      Ok.

Hale:      That's the most of it. I mean, I've signed a statement for evidence that I've collected or something of that nature, but no.

Burt:      Ok. Have you seen the video?

Hale:      Mmm hmm

Burt:      When did you see the video?

Hale:      When I did the EEO investigation. He went frame by frame and wanted me to explain everything to him.

Burt:      Ok. So when you saw that, you know when you said he trapped you against the fence and said that you couldn't move, I'm watching you turn around…

Hale:      I told you that I turned around and ducked under his arm.

Burt:      But I listened to you also say that you couldn't move he had you pinned up against the fence.

Hale:      Yeah, he did, I tried to move to one direction and he wouldn't let me…and I didn't want to stay there

Burt:      When you say he moved with you, would you mind coming over here on this side with us and let's watch that. I'm missing that somehow. Ok? Let's do this, let's watch it in real time first.

Hale:      Ok.

Burt:      The only time he moved was to move away from you. Did you see that? Is that fair.

Hale:      Yeah, in your opinion.

Burt:      No, I'm not asking opinion. I'm asking matter of fact. Let's let's look at it again. Let's look at it again.
            I don't work with opinions, I only work with what is.

Hale:      Ok.

**Plaintiff's App. 179**

Burt:       It's not about how I feel about this man, it's not about anything else other than what actually is. Alright, and if I file a Class C Misdemeanor on him which is a ticket it's the same as running a stop sign, I've got to be able to prove this.

Hale:       Ok.

Burt:       Alright, and I'm gonna ask you again, you tell me when he moves with you.

Hale:       Why would he have to shift?

Burt:       He moved away from you. Did you see that?

Hale:       Because I was moving away from him…..

Burt:       You were moving away from him, but what your words were he moved with you, he shadowed you and in fact he separated from you as you moved away from him. It's the only time he moved after he put his hands on the fence, so he did not shadow you, is that fair?
            Let's do it again, you seem to have some questions about that. I've got to have this answer, got to have this answer. If I want to fire him, I've got to have that answer.

            Now let's move it back forward again. I see you turn, I see you step and duck under him, and at the same time I see him move away from you, but I never saw him move with you.

Hale:       I moved away from him and then he was like oh crap and moved himself

Burt:       I'm asking you, when did he shadow you?

Hale:       Go back

Burt:       You gotta help me with that.

Burt:       I don't question that that is inappropriate behavior. That is not a question. Alright? That is not a question in my mind, I know that's inappropriate. The question I have is when did he do, that shadow movement that prevents you from going? That keep you there movement, I've got to see it. I gotta know what you're talking about. The only time he moves was after you ducked under him and he moved away is that fair?

Hale:       His body was too big.

Burt:       For what?

Hale:       That if I hadn't of ducked under him I don't feel like he would have ever moved.

**Plaintiff's App.  180**

Burt:      ok, but you understand that's different than, that he "shadowed you" and kept you
           from...now evolves into he is now pressing on you?

Hale:      yeah, his body was on my body

Burt:      And moved with you?

Hale:      Yeah,

Burt:      But he didn't move.

Hale:      Have you ever played sports?

Burt:      Yes, I have, Listen to me, I'm more concerned...

Hale:      Have you ever played sports, I'm asking you...

Burt:      And the answer is, Yes I have

Hale:      if someone is leaned on you, then they are shadowing you, when you move they
           are going to move with you,

Burt:      But he didn't move.  I'm asking you.

Hale:       He was leaning on me.  I'm not going to change my position.  He was leaning on
           me.

Burt:      I know he was.

Hale:      And when I tried to move, he would not allow me and so I ducked under his arm.

Burt:      Ok.  And so, you understand that the difference in what you are saying, what we're
           listening to and what you're saying, when "he shadowed you" has evolved into he's
           pressing on you?

Hale:      I stated that in the first place.  I stated that in my original statement that he is pressed
           on me. I've never deferred from that.

Burt:      I see that, but the question is when you say he wouldn't let you move, that he
           shadowed you and moved with you, in fact he didn't move with you.

Hale:      He was on me.

Burt:      But we've got to peel out this part where you say that he moved with you.  Did he
           move with you?

Hale:     Yes, he was on me. He was making physical contact with my body and when I tried to move he was on me.

Burt:     He was on you, but where did he move with you? Do you understand what I'm saying? You said he moved with you and prevented you from

Hale:     Maybe there is just a difference of words. Because when I played sports when someone is leaning (?) on your body, they can't, they move when you move because they're on you. Their body is pressed upon you.

Burt:     But where did he move with you, when did he move? I'm looking at the video and you know

Hale:     Well maybe his body is so fat that every body part of me could feel it on me. Maybe that's where the shadowing came in was that all of his body, his fat was all over my back side and I couldn't feel anything else.

Burt:     And there's what I needed, there's what I needed, you know, I'm just trying to separate, because if we go to court on this…

Hale:     I'm sorry for yelling, I'm just (inaudible) this is so frustrating, you know I really feel if he was just an officer, that it would be taken more seriously, but since he is the Major, and it's inconvenient for him to have this kind of problem that it's just getting shoveled under, like, he violated policy, he violated me, he doesn't he doesn't get to touch people that don't want to be touched. I'm wearing a sweater in June, I wear a hoodie year round because I don't want any extra me showing, I wear long sleeves, I wear only Class A uniforms for a reason, I'm covered for a reason.

Burt:     I understand.

Hale:     I don't send out any, any signs that I'm interested at all, there is no blurring of the lines when it comes to me at work.

Burt:     Let me ask you if you know of he's come across this way towards any of the other ladies at work? And the reason I ask...

Hale:     Has he been inappropriate with any other people?

Burt:     That's what I'm looking for.

Hale:     …I have not been told first hand. It's always rumor. It's always just rumor

Burt:     Give me a lead. Give me a place that I can go something that….

Hale:     I heard that he has sent dirty pictures to Ms. Bennett, who is now Sgt. Bennett. That he pulled out his penis in front of her in his office. I heard that Ms. Lacy, who is a new officer, that he pulled her in the office and asked her if she would be interested

**Plaintiff's App.  182**

in having sex with him. Um, I heard that there were people in the count room that he tried to kiss....

Burt:    Who specifically in the count room?

Hale:    I don't know, it's just people saying he's like getting out of control. He's doing this and for years I was always so proud that I never had those experiences because I made it adamantly clear what my intentions were at work. And I don't have that anymore.

Burt:    I understand that you feel violated. I certainly do. You know, I caught a sniff of something awhile back involving him and because you hear things from time to time and apparently people confide in you, is that fair? You know, sometimes they do.

         And so, there was something specific I saw at one time that raised an eyebrow with me and it's been awhile back and I thought I'm going to file that away in my memory. And I'm thinking about somebody in the mail room that he might have been involved with at some point.. Do you know anything about that? Anything that you can give me a snippet of that I can add to what I've seen and run with?

Hale:    No, but I bet I could find out pretty quickly. I have a friend that everyone seems to tell him everything. But that's why it's not always first hand to me. Uhhh, I'm just frustrated with this whole....

Burt:    Well in looking at this, everybody is absolutely certain that this was inappropriate behavior.

Hale:    They don't act like it. I don't know how familiar you are with the pleading, I mean the directive....

Burt:    And I'm really not that familiar with it, you know, I just got this last night. I've been so. ..I mean I've got 9 things going like everybody always does and that's not an excuse, it's just an explanation as to why I'm not in as deep into this as you are and you've brought a lot of paper work with you so, so tell me about the Directive, I bet you have a copy of it there, is that right?.

Hale:    I do.

Burt:    Would you, would you just tell me about that?

Hale:    It has a lesser, a lesser charge of discourteous conduct and they are refusing to even give him that.

Burt:    And that's in the PD22?

Hale:    Yes, It's a PD13.

**Plaintiff's App.  183**

Burt:       PD13?  Ok.

Burt:       And tell me where in the PD13 that is

Hale:       On Page 4 –

Burt:       Does it got a specific, specific numbered item on it?

Hale:       Yes, it's um..... page 4, b and c and.... (inaudible)

Burt:       And now I'm gonna give this back to you because I've certainly got one in the office I go to.

Hale:       It says that discourteous conduct of a sexual nature may rise to the level of sexual harassment and it says that it can be of anything that a reasonable person would find offensive

Burt:       And that's reasonable that you would find that offensive isn't it?

Hale:       I feel like any female would find it offensive or any husband of a female out there would find it offensive and they, they sent me an IOC____

Burt:       Who's they?

Hale:       Huntsville

Burt:       And that's from your EEOC complaint?  That's what they sent you, and I assume...

Hale:       Yeah, the IOC is 3 sentences long, which is like, really? ya know.

            I heard that Mora Teya also, he tried to kiss her in medical before,

Burt:       Who's that?

Hale:       Mora Teya, in medical that he tried to kiss her but I haven't heard that directly from her ya know.   Anyway, this is what they sent me back.

Burt:       So, it's dated July 27th but you probably didn't get it for a few days did ya?

Hale:       Yeah, they mailed it to me.

Burt:       Yeah, ok.

Hale:       And when I wrote them originally...

**Plaintiff's App.  184**

Burt:   Well, it says the recommendation's been forwarded to the appropriate authority, what recommendation did they make and to who? Do you have any ideas? ?

Hale:   They can't tell me the recommendation and it would be on the head Warden to decide if they felt like that was reasonable or not. So that was another request I did through open records to find out what disciplinary he received, if he received any, and um, I haven't gotten a response from that either. But, what I find interesting about this is she put the "investigation of your complaint alleging sexual harassment" and when I made my complaint I said that there was a violation of PD13. The reason why I did that is because if you read the elements, sexual harassment has to be an ongoing thing not an isolated incident, so I knew it wasn't gonna be sexual harassment, it wasn't gonna make, it wasn't gonna make it ya know anyways, so, after I got that I wrote her another letter and the lady had made copies, I don't know if y'all got copies of all this stuff...

Burt:   No, I don't have anything on that. I'm not even sure if they would share that even if I asked them.

Hale:   well, it's, this is a letter that I wrote about how I wanted them to evaluate the violation of discourteous conduct because I had called Ms. Eve Shelly and she had said that the sexual, sexual harassment and the discourteous conduct of a sexual nature were the same difference, and they are not the same difference, they are separate charges with separate elements. So, I asked her if she could review it and make a determination on that because it says examples of such acts include intentional touching, jabbing, pinching, grabbing, rubbing, pressing or brushing against a person's body and those, it would fit any of, fit that.

Burt:   It certainly does, doesn't it? And so did she respond to that letter?

Hale:   She sent me an email to that

Burt:   Can I see the letter that you sent, do you mind?

Hale:   This is the, the one, my original complaint and this is the follow up letter.

Burt:   Ok. So one is to Ms. Herring and one is to Ms. Shelley?

Hale:   Ms. Herring was the, um, intake officer.

Burt:   Yeah. And have you gone anywhere else with these complaints of this nature? Is there anything else that, that, besides these?

Hale:   I can go with a Federal EEO...

Burt:   No, have you? Have you done anything else? Have you contacted anybody else?

Hale:   I sent a courtesy copy of that to the Executive Director,

**Plaintiff's App.  185**

Burt:       Tell me, remind me who that is.

Hale:       Bill Collier, the one who,(inaudible), over the sexual harassment in the work place. But I didn't get a response from him, I just got a response from her and she pretty much stated that she wasn't gonna reopen it. That they did a thorough investigation and it was closed.

Burt:       Yeah. Have you ever contacted Jason Heath at Region 5?

Hale:       No.

Burt:       In any shape, way, or form or any kind at all?

Hale:       No.

Burt:       Not at all?

Hale:       No.

Burt:       Ok.

Hale:       But, I'm not stopping

Burt:       No, no. I understand that.

Hale:       (inaudible) in Texas until someone cares.

Burt:       Yep. Well, let me share with you that I think what you are saying is true. I think that there is a PD13 violation there. I believe you. I don't know if it helps any or not. I don't know what I can do with it, but that's what I believe. I believe that's accurate. But I want to caution you, that when you tell the story you don't say something that physically can't be supported by the video, okay. And for instance when you say that he shadowed you and moved with you to prevent you from coming out from between where you had that fence in front of you or what have you, that's not ever going to look ok. When you say that in front of a hundred people, at least 99 of them are gonna say I didn't see that, is that fair?

Hale:       Mm hmm.

Burt:       ok, so let me caution you right there to make sure that  that when you tell the story, and I feel like you are gonna tell a story, and that you are accurate in that. Do you understand what I'm trying to visit with you about right there, ok, and um, I don't why the EEOC people couldn't see that there was something there based on what the PD13 says. I don't understand that.  I certainly intend to visit with them at length to see if I can't find out what their point of view is on that is and to help them to help us all understand where they are on that.

**Plaintiff's App.  186**

Uh, ok. Tell me when you did your research on the, on the internet about the violations involved and that it was a misdemeanor offense and that you know which degree offense, what degree misdemeanor we're talking about... tell me in your words what you think that is.

Hale:  ok, from what I understand, it's a C violation

Burt:  Yeah, ok, and so, for instance if, if for some reason I were to do that to my partner, you know, because we are officers we would probably be in a lot more trouble than just a ticket that's common, you understand? And so we're all on board there. Tell me when you first came to know that information?

Hale:  This week, um, I've been off.

Burt:  Ok, prior to making your report to the police department?

Hale:  Yeah, I stayed up pretty late. I don't have a lap top, and um my boyfriend, I used his computer so I could look up some stuff. ,

Burt:  So when you made your report to the police department, you knew you were talking to them about a Class C Misdemeanor offense?

Hale:  I told her that I had looked it up because I didn't know, I didn't know what I could do and I went to the Sheriff's Dept. and I went to the Police Dept. umm, I don't really, I mean, no one is just gonna tell you these are things that you can, these are your options nobody is going to tell you your options are because if they want it to go away, there not gonna give you more information, they're just gonna hope that you get discouraged and quit and so I started looking up stuff to see if ...I put in what I felt happened and pulled up, it's sort of like lawyer and law sites.

Burt:  Yeah, it's gonna be more than you can probably read in a month of Sundays, isn't it?

Hale:  Well that's what I said I took off. I hardly ever take off I took off this week for my birthday and so I had time to look at stuff. Time to run errands and all that, because I usually do a lot of overtime.

Burt:  Sure. Uh, So you understand based on what they reported, says in the police report, what we talked about, there's a difference in he pressed his big fat belly against my back and made my butt stick out and that was a sex offense, that's what we've talked about today and what you told them was that he pressed his penis up against you, your buttocks as if he were engaging in a sexual act.
And you understand that we are splitting hairs here but when we get to a place of prosecution, the hairs have to already be split, alright, and so there's a difference in that, would you agree?

**Plaintiff's App. 187**

Hale:       Right, and I tried to give her a visual, I guess it, I mean it was the dispatch lady on the other side of me, she was just writing what I said, she had given (inaudible)

Burt:       So there's that one difference and the difference about the shadowing that nobody else is going to see, so those two things we're going to have to leave out of everything that we do on our investigation.  Is that fair?  I mean when you read what you told, or what they wrote at the police department, it sounds like he did some action towards you, that you brought up a position while ago and when I think about that and most people think about it, they are going to see some man with some movement of his hips… doing something but actually.

Hale:       There was no question I know that, you have to take into account I didn't see any of this.  I felt it all.  This is based on me against the fence, me feeling and me being like, what's going on, I'm in a prison and I have somebody on my backside and like, you have to take into account that like it…

Burt:       No, I do understand what you felt

Hale:       I'm sorry.

Burt:       I'm just trying to, I'm mentally preparing for when we sit down and confront what is and what isn't and what we can show and what we cannot show, alright.  So if I sound like I'm playing devil's advocate here, well I really am.  And so...

Hale:        He wasn't looking at a spot over my shoulder, it's like this is just so preposterous, even, I'm soooo….

Burt:       It was wrong, I mean, that's the bottom line, it was wrong.  Let's talk about some things for a moment.  Um
            When do you think you got the letter?  It was dated the 27th and they mailed to ya, so probably 4 days out,  4 or 5 days out…

Hale:       I think I got it on...Probably the 2nd, and I wrote, I called her office um the 3rd and she wasn't available to speak and then they put me in with the original investigator and he was, you know, doing like, "oh well, I don't really know and it's not up to me and I gotta find out" and you know I asked if how I would be able to do open records, like how ya know what's the procedure or is there a form I have to fill  out or what the number ... and he said he wasn't sure and that he would get with me the next day and call me back, but he didn't call me back, so I called them she was in a meeting and she couldn't talk to me and so I finally got ahold of her on the 5th and that's when she made the comment about it that it was the same difference and um that it wasn't sexual, that they, sorry, so, it wasn't sexual so they're not going to do anything with it.
            And I said it was offensive, and she was like but it wasn't sexual, and I was like but it doesn't have to be sexual as long as someone finds it, a reasonable person finds it offensive and she was like, well I don't know where you're getting your information from, but if it's not sexual  and I was like, I'm getting it from the same

policy that y'all are supposed to be instituting ya know and she was going on about like, you know, I don't think you, ya'll have no idea how difficult this decision was and then y'all aren't even taking it seriously like, you know, I was like I have all of this pressure now to be perfect all the time because, you know, they're going to evaluate everything I do and see if there is anything that they can knit pick and she was like oh, so you feel like you're gonna be retaliated against? No, I'm not saying that because I don't have any proof of retaliation, I just, I've been out there long enough to know how this works, like, whenever you make a complaint then everybody else bashes you until either you quit or you get fired, like that's how it goes every time no matter what it is, ya know, it doesn't even have to be a sexual harassment thing, just in general. Once you've made the wrong person mad, they just keep hounding you until you either quit or you get fired, one of the two.

Burt:   And so when was your last conversation, the last correspondence, with them of any kind. With HR...

Hale:   The other day when I wrote them this one on the 15th by, I sent it by email and then uh yesterday around 3:00 I got a response back through an email, but I don't have my phone with me right now.

Burt:   And you sent them a letter on the 15th?

Hale:   I sent it as an email, I emailed it to her and then I did a courtesy copy to the um Bill, Brian Collier the director and like I said, he didn't respond, but she did and she pretty much just said that she was sorry she, that I wasn't able to get to her on the phone and they did a thorough investigation and found no wrong doing and that was pretty much it, you know

Burt:   Ok, so she sent you the email on, what date?

Hale:   I think I've got it. Yesterday at 3:00.

Burt:   yesterday at 3:00? All right and so yesterday would have been the 17th is that right.

Hale:   Mmm hmm.
Burt:   I want you to help me understand why, what prompted you to go to the police department on the day you went, what was the final thing that said today's the day?

Hale:   Well, I was off for one. Um, I did some research and so I felt, I guess, rejuvenated? Like (inaudible), a form of hope, like. I kept telling my boyfriend, like how can I feel like this is so wrong and nobody else feels like it is wrong with me, so I was getting discouraged and I was off and so I was trying to channel my energy into maybe, I don't know... I have a friend and she was trying to find me an EEO lawyer to see if there is anything there that I, you know, could pursue 'cuz I can't talk to my parents about this, this would be really upsetting

Burt:     ...really hard.  A dad would want to go do something about this.  The mother would terribly upset, I know.

Hale:     So, and they're like really, my dad is really, I wouldn't say powerful or anything, but he just has a lot of connections, and so I knew if I asked him, he'd be able to find me someone real quick, you know, but. (Inaudible) I'm left to my, you know, myself and I'm looking, like I said, on the internet or trying to find, trying to think outside the box, of, Okay... Because I didn't know there was a federal EEO, you know, I didn't know there was the Workman's Workforce Commission has an office that will investigate.  I didn't know all of this, so I've been trying to find out what all the deadlines are, and you know, because I still have a life and I still have a child, my son is very active and stuff, and so I was trying to, you know, trying to do all of this and still try to be normal.  Nothing super (inaudible) me, like I was just on and I saw that and the thing that I was, the stuff was report it as soon as you can and the longer you wait til a court date, the worse it looks and I was like well it happened in June, so you know I'm off tomorrow, let me just go down there tomorrow and take care of this ya know, so that's why, it was because I was off and I could, that's pretty much it,  I mean yeah, I've gotten a disciplinary since all of this but that doesn't deter me,  they're not gonna, I guess they could make it stick, but if they made it stick, they would just make it worse on them because I didn't do anything wrong in that situation ya know, they are just trying to find something so...

Burt:     So what were they alleging in the disciplinary?

Hale:     Well, I have the thing right here also about the actual disciplinary, but .the IOC that went with the disciplinary um it's from July 9 a "use of force" on July 9th and supposedly they concluded their investigation on July 26th but I was informed about the disciplinary umm, I don't have a calendar, but on my last day last week, I want to say it was Thursday of last week was when I was informed I was getting disciplinary (inaudible).

Burt:     Was there a time that they hand you something and you signed that?

Hale:     I signed it um actually on Monday, but it was later in the afternoon, and I came in, I came in on Friday to try to sign it and Cpt. Milburn said he didn't have it and he was like that's alright, we'll just do it next week and I was like I'm off next week, I'd really like to get this signed  because  I don't want the administration to see these dates and think I that was trying to dodge my write up ya know, that's how it would look if I was supposed to sign it on this date but I signed it a week and a half later, you know, so he was like well maybe you can come back on Monday and I was like you know, Tuesday was my actual, Tuesday was when I signed it. Tuesday was when I was to come back to work, I came in there and with HR and, he had to bring it over to HR for me to sign it.  But, um. (inaudible)

Burt:     What time of the day was that?  I think I saw you in there, you were in plain clothes, didn't I?...

**Plaintiff's App.  190**

Hale:        Yeah, probably, it was around around noon, around 11:00 or noon.

Burt:        Yeah, I think maybe I was going out as you were coming in or something. You were walking with somebody, talking, having a conversation, seems like; I don't exactly remember where we passed, but somewhere in there.

Hale:        Yeah, I went in there with Milburn and signed it. Um I think they are really just trying, it's really more defamation than anything, the way they make you sign it's like I'm super lazy, like I was hiding out while an officer was being assaulted, but like whatever….but um anyways, I'm not really worried about that, like I feel like that's just the way for them to try and get me to stop and I'm not going to stop.

Burt:        Ok.  Well, through the course of this conversation we have brought up a lot of information, I've asked you a lot things.  Is there anything that I haven't asked you that you're wondering why not?

Hale:        How did you get picked to do this? Were you the one that was…?

Burt:        My boss's  boss's boss called me last night and said we have  a report of sexual assault at the Allred Unit and some other agency has that and that's not ok and that's how I got picked. This is ahh, the Regional Commander, and by Regional I mean he has half the State and it came to his attention and he said do you know about this and I said no, he said you will, you will know, you will go and you will run with this and you will make this right. And that was my marching order last night.

Hale:        I'm sorry, I wasn't trying to get anyone in trouble

Burt:        No I'm not in trouble.  I want you to understand that no one here is in any kind of trouble, oaky, but when my Regional Commander gets information that something like this happened and some other agency is working it, he wasn't ok with me not being in that loop. So that's uh, shortly after that is when they sent me a copy of the report and that's when I called you last night to make arrangements to visit with me today.
              So that's a good question, I appreciate you know that you're thinking about what's going on. Is there any other questions, I mean there aren't any bad questions except for the ones you don't ask, all right?

Hale:        I don't really have any questions, I'm just tired of crying, this has like consumed me and I know that probably people are looking at it like why is it such a big deal, but it is a big deal to me..

Burt:        And that's all that matters, that is all that matters.
              Is there anything that I haven't asked you that you are wondering why I don't? Something in your mind that makes you wonder is he missing something and why hasn't he said?

**Plaintiff's App.  191**

Hale:        No, I'm suspect of everybody really, (inaudible) so no I don't have any questions really.  (Inaudible)

Burt:        Anything Nicki?

Archer:     No.

Burt:        I think we touched on things we needed to.  Fleshed out everything that had to be applied to the surface?  I feel like we've hammered it out the best we can.

Archer:     Well the best as we can.  No.  You seemed whenever Investigator Burt talked about how he wound up with the case like you got exceptionally emotional, can I ask why?

Hale:        I just feel, I don't know, I guess I like, I keep being, I keep feeling like I guess I internalize a lot of stuff like how could I have done this better, how could I have made this better, what would have been the best way and I'm running out of like, ideas, like ya know, I felt like I did it the right way.  I didn't go thru the unit, you know,  so that kind of pissed people off that I didn't go to the Warden and talk to him but, I mean, Warden Wathen never really seemed to like me in the first place and he was about to be out the door so it wouldn't be a big deal to him.  Warden Anders has a picture of Major Eastep in his office and Warden Serrani he's brand new, you know, so he wouldn't really have like any, any understanding. All I would look like is just a complaining female, you know, like – and not that's all he knows me, you know, come in there complaining to him about how I feel like I was wronged or something, you know.  So I went to, I went to, though Huntsville and I called several times and talked to them anonymously, 'cuz I wasn't sure, because once you ring the bell, you've done it ya know and like this is like one of those like, Oh, well now she's (inaudible) call the police on me, like it's not, it's too late to go back, you know, so.  I just feel like and like I don't want to piss you off, I don't want y'all to get in trouble I just didn't,  I didn't know that y'all did that stuff.

Burt:        Listen, we're not in trouble, none of us in this room, the three of us, none of us are in trouble, ok? My boss's boss's boss point is to make sure that we are handling our business and when somebody else looks like they are handling our business it's not ok with him and so

Hale:        I didn't know that y'all did it.

Burt:        I don't mind those phone calls at night and we all jump and run when we have to and last night was not necessarily a jump and run, it was just a jump, and I appreciate that you took my phone call last night, It was, it had to have been at least 8 o'clock, wasn't it; it was pretty late, and it was nice of you to at least visit with me last night and also nice of you to come in and talk to us today.  But, uh, we're all good.

Archer:      You mentioned about making an anonymous report. Have you and do you feel comfortable sharing with us about anything else so that we're all on the same page and nothing, there's no surprises?

Hale:        When this first happened, I thought about going to the Allred unit and telling them what happened, but I didn't know if it would work or not, so I wrote two I60's with my left hand in the bathroom and delivered them to the mailbox about what happened and what time it happened and where it happened and sent them to Warden Wathen's office and Warden Anders' office and after a few days of them not ever calling me in to the office or saying anything to me, that's when I was like ok, I just need to go ahead and ….

Burt:        What did you say in them?

Hale:        I just put something like, just like inmate, said something like Sgt. Hale needs help like, Eastep did something bad, I put like , you know, like the time, and the location, you know, and I said to check your cameras…something they usually put real short…

Burt:        Typical I60 from an inmate…

Hale:        Like a snitchogram, real vague, but uh-oh let me look and see on the camera, you know, And like I said nobody ever said anything so I was like but then I don't remember what day it was, but I was working the rapid scan, and um Warden Anders came in first and this was before I filed and like I thought it could be coincidental but then Warden Anders came in first and then he hung out up there and I thought that was weird and then I kinda, I asked him "what's going on" and he said "oh, I'm just waiting on Eastep to get here" and I was like oh, ok, and then it was like he kind of watched our interaction, I guess, you know and then they went in together and I was like, I don't know, I was just stuck in my mind, like maybe he was trying to see if he was gonna saying anything flirtatious or do anything, you know..

Burt:        So he was setting Eastep up by just standing there watching?

Hale:        I think he knew, I think by then he had already watched the video or whatever, and um so he was kind of like well if she's not going to say anything then I'm not going to say nothing, that's how I felt. I felt like if … I was hoping and I didn't tell the other investigator that, but I was hoping that if they saw it then they would have to report it and then it was going to be like one of those oh well, since you had to report it, I might as well go ahead and tell you everything, ya know like then it wouldn't be on me that it wouldn't be my fault that he was getting called out for it, , but then it turned when they were like oh, well, he didn't do anything wrong so it was just like, huhhh, it refocused my energy to like well no one is gonna be on my side, so I've got to be on my side. You know, I'm not trying to be vindictive or, cause that's not me.

**Plaintiff's App. 193**

Burt:       You just want it to be right don't ya..

Hale:       Yeah, I feel like if you do wrong you should admit you're wrong and accept the
            penalties for it, I have to do it all the time, like I have to do it with my own son
            …like oh, that was my mistake, I'm sorry, this is what we will do to fix it, that's
            like what you're supposed to do as an adult, especially when you did this but you're
            gonna use it as I was counseling her like it, it frustrates me, like and then for them
            to be like, okay that sounds reasonable, that's how we counsel people now….

Burt:       Well we have an enormous amount of work to do and I'll just, I'll just tell you this
            is going to be as transparent as I can make it.  This is going to be as open and as
            free exchange of information as I can get.  There are so many parts to this that has
            come up at this point. In fact, I was almost late today because somebody handed
            me a letter and said I need you to look at this, it was an anonymous letter and they
            want me to look at this and the only thing I can do with it is send samples of other
            writings that other people done and have an expert analyze whether the phrases and
            the patterns are the same or not and make an educated guess on that. I hate asking
            questions that I don't know the answer to.
            I asked you earlier and I'm going to ask again, I need you to be open and honest
            with me, have you ever sent a letter to anybody about things like this but not this
            specific; did you ever send it to anybody?

Hale:       No, this is the first time

Burt:       Ok.

Hale:       And uh, I was doing it kind of as a test to see if it was worth me complaining at the
            unit or if I should I take it directly to Huntsville and when I didn't get any kind of
            anything, then I was like I need go to Huntsville because I think this is just is going
            to be mis-handled here. So that's why I went to Huntsville which of course made
            people upset because I was going over their head and why are we getting a call
            from the Regional Director and ya know kinda thing… But I just didn't feel like it
            would have made a difference.

Burt:       So you sent the original I60's that you wrote left handed to Wathen and Anders?

Hale:       Yes, and like it's hard to read, you know because I wanted to make sure, I guess I
            watch too many shows or something, I just didn't want it to be linked back to me if
            they did file. You know, I just wanted it to be a straight possible inmate that did
            this ya know

Burt:       Here, look at this, and you come to me. And here's what I said, you wanted them
            to come to you.

Hale:       Yeah.  It would have been better....  I thought it would be easier for me to handle
            all of this. If they were like "Oh, this is wrong and where do we report this."
            (Inaudible) ....no this is wrong....

**Plaintiff's App. 194**

Archer:     Do you have any knowledge of anybody sending an anonymous letter to....?

Hale:       No, no, but you caught my interest... but No.  I hope other people say something...'cuz I know....

Burt:       The problem with anonymous letters, you understand, is that they don't necessarily carry a lot of weight.

Hale:       Yeah.

Burt:       And if you stood up and put your name on this, that carries a fair amount of weight, doesn't it?

Hale:       Yeah.

Burt:       It does, and so you shared that with us.  And we hope we're able to put a shoulder on (??) your burden and help you with it.  All right, that's my goal is to see this, I mean, it's never gonna have not happened, you understand.  But from here on out, I wish you would trust us and come visit with us as you need to, is that fair?

Hale:       Ok.

Burt:       I'm good – you good?  You know how to get ahold of me right, you have that cell phone number that I called you with last night, you know how to find me in the unit.  I'll remind you that it doesn't work very well on the unit at all, alright...

Hale:       Ok.  Can I ask, do y'all feel like this is an issue?

Burt:       It's an issue for a lot of reasons, based on what I read in the PD 13 you showed me, that's an issue.  That someone hasn't already taken care of it, that's an issue.  Am I going to write the Major a ticket for a Class C misdemeanor and file it in municipal court, no, probably not, we don't work any kind of things like that at all.  And my interest in this was when my Commander called and said there is a sexual assault at the unit do you know about it, and the answer should have been yes I do and here it is, but I didn't, so I had to hustle a bit and go find out uh, I think on my end, all those guys are smoothed back down a little bit all the way up to the Inspector General everybody is ok now, they weren't okay yesterday evening and last night, but they're going to be ok that we didn't miss something, I'm sad that you didn't come to us to start with, I hope that anything in the future, I hope you think we're just incredible.  And we do admin cases as well, and our object is to look at this like it's an administrative violation and we're gonna run with it, see where we go.

Hale:       Thank you

Archer:      And you may feel more comfortable with a female, you know, there's me, and there's other....

**Plaintiff's App.  195**

Burt:       Wait a minute, you're a female?

Archer:     That's the rumor.

Burt:       That's the rumor, okay.  Well, there it is then. Learn something new every day.

Archer:     My boss and (inaudible) and we have an open door.

Hale:       Thank you

Burt:       And the only reason she is here today is because I never sit down to talk with a young lady about things like this without at least somebody else.  That's for you and that's for me.  It would be on a rare occasion that I would ever sit down and talk with you alone.  And so, if it's on the unit, and you want to step in, I hope you don't mind if we don't close the door.  If you need to have a private conversation I would always want somebody else to come visit with us. Ok?

Hale:       Ok.

Burt:       Bye.  I think we're all good. We're done here, I guess.  We'll be visiting with you from time to time in the appropriate fashion (inaudible)
            Time on this is presently 2:13 p.m.  I'm going to turn the recorder off now.

 

16003260

06·30·2016

Caroline Herring

**From:** Ambur Hale <redburr83@aol.com>
**Sent:** Monday, June 20, 2016 9:35 PM
**To:** Caroline Herring
**Cc:** redburr83@aol.com
**Subject:** PD-13 Violation- James V. Allred Unit

Ms. Caroline Herring

TDCJ Human Resources Headquarters
ATTN: Intake
2 Financial Plaza Suite #600
Huntsville, Tx. 77340

Sergeant Ambur N. Hale

TDCJ- James V. Allred Unit
2101 North FM 369
Iowa Park, Texas 76367
(940) 855-7477

June 20, 2016

Formal complaint in regard to: Major Jonathon Eastep / James V. Allred Unit

Dear Ms. Herring,

My name is Ambur N. Hale. I have been a Correctional Officer for the State of Texas, since October 2006 and I promoted to Sergeant of Corrections August of 2013. I am writing you to report a violation of Personnel Directive No. 13- Sexual Harassment and Discourteous Conduct of a Sexual Nature. I, Sergeant Ambur Hale was subjected to forcible and non-consensual sexual contact by Major Jonathon Eastep.

On 06/15/2016, I was assigned to supervisory duties on GP- 3 Building. At approximately 1155 hours, I.C.S. was initiated by Picket Officer S. Allen on GP- 3 Building B- Pod 2-Section 45 Cell for an unresponsive offender inside the cell. I responded to stated location and was briefed by Roving Officer Stevenson. I instructed the Picket Officer to open the cell door to further assess the offender. The offender assigned to said location was responsive and stated he was engaged in cardio activity, became dizzy and passed out in the cell. Additional security and medical staff arrived on scene and assisted the offender to the dayroom and onto a gurney. All staff proceeded to escort the offender to 10 Building for further medical assessment. As I exited the sally-port, I approached the GP- 3 Building Desk fencing. I instructed Desk Officer Page to retrieve a towel and submerge the towel in the ice water cooler for the offender, due to suspicion of heat exhaustion. As I stood at the fe·· ·= with my back facing the sally-port, without warning I observed hands grip the fence on either side of my body. I felt a larger figure behind me. The figure pulled himself toward the fence, trapping me between the fence and his body. He pressed his penis against my bottom as if engaged in a sexual act and with a breathy lower toned voice stated "What is that?" in my ear, as if to arouse me. Alarmed and confused I murmured "What?!" and tried to shift around but the figure would not release his grip from the fence. I then duck beneath his arm and realized the figure was Major Eastep. I faced him and demanded "what are you doing?!" I scanned my surroundings and noticed the staff escort and offenders in the area and discontinued my inquisition. I feared a confrontation would result in disciplinary action, so I just tried to pretend nothing happened and returned to my normal duties.

After this incident occurred, I immediately became consumed with horrifying thoughts of what my peers, subordinates and the offenders present may have witnessed or the rumors potentially fabricated after such an unprofessional and illicit encounter. This situation has brought me embarrassment, anxiety, frustration, anger and grief. I have mentally debated with myself on the risk of reporting this incident but I truly feel that Major Easteps' sexual behavior will continue and **Plaintiff's App. 197**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

EXHIBIT G

possibly escalate. I believe due to his authority, any future declines to his sexual advances would result in hostile or negative treatment in the workplace. I am in a position of a leadership role and I take that responsibility very seriously. I can not expect my subordinates to invest in the concept of the C.O.R.E. values if I myself can not display the courage it takes to report this situation. At no time have I ever gave Major Eastep any indication that I would be interested in perusing and/or participate in any non-professional relationship. I am requesting an investigation in this matter be conducted and a just reprimand be given to ensure other staff members are not subjected to similar behavior and to give staff confidence in TDCJ's "Zero-Tolerance" position.

Respectfully,

Sgt. Ambur N. Hale

<u>Video Surveillance Incident Request</u>

Unit- James V. Allred
Date- 06/15/2016
Time- 1200 Hours (approx)
Location- GP-3 Building Desk

**Plaintiff's App. 198**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

Questions for Sergeant Ambur Hale (Complainant)
Allred Unit
EEO Case# 16003260
Investigator G. McClendon
Page 1 of 6

---

### IMPORTANT

**This is an official Agency investigation.  Providing any false and/or misleading information could result in discipline, including termination**

************************************************************************
************************************************************************

Provide a response to the following questions regarding the investigation.

An interview may be conducted with you after your responses are received.

Have your responses faxed to my attention at (936) 437-3000.

---

It has been claimed that during the incident on June 15, 2016, when he put his hands on the fence, Major Estep said something to you about blood needing to be cleaned up.

**Q:** Did Major Estep mention anything about blood when the incident occurred? (If so, explain in detail what he said)

**Your response:** YES. AFTER I SAID "WHAT ARE YOU DOING" HE STATED NO, WHAT IS THAT AND POINTED TO THE GROUND. HE STATED IS THAT BLOOD OR PAINT ON THE GROUND, I RESPONDED I WASN'T SURE AND WOULD GET AN SSI TO GET A MOP. HE THEN ASKED WHY OFFENDER RHODES WAS CRYING AND I GAVE A BRIEF DISCRIPTION OF THE SITUATION AND CONTINUED WITH MY DUTIES — AN4   THERE IS RED PAINT AROUND THE DESK AREA. THE PAINT HAS BEEN THERE FOR SEVERAL YEARS. ~~THIS~~ᶜᴴ IS — AN4

**EXHIBIT H**

Signature _Ambur N. Hale_   Date _07/07/2016_   **Plaintiff's App. 199**

Certified copy of EEO administrative case 16003260/5 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

Questions for Sergeant Ambur Hale (Complainant)
Allred Unit
EEO Case# 16003260
Investigator G. McClendon
Page 2 of 6

**Q:** After you ducked under Major Estep's arm, did you say anything to him? (If so, explain)
**Your response:**

DUE TO BEING TRAPPED FROM BEHIND, AFTER I DUCKED UNDER MAJOR EASTEPS ARM I STATED "WHAT ARE YOU DOING?" (IN A DEMANDING TONE). MAJOR EASTEP ATTEMPTED TO REDIRECT MY ATTENTION TO THE GROUND AND STATED NO, WHAT IS THAT... IS THAT BLOOD OR PAINT? I TOLD HIM I WOULD GET AN SSI TO GET A MOP. HE THEN REDIRECTED THE TOPIC TO OFFENDER RHODES. I EXPLAINED THE SITUATION WITH OFFENDER RHODES AND RETURNED TO MY NORMAL DUTIES. IT SHOULD BE NOTED WHILE MAJOR EASTEP PRESSED HIMSELF AGAINST ME HE WISPERED "WHAT IS THAT?" IN A SEXUAL MANNER. -AnH

Signature _____ Date 07/07/2016

Confidential administrative case 16003260 of the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

**Plaintiff's App.  200**

Questions for Sergeant Ambur Hale (Complainant)
Allred Unit
EEO Case# 16003260
Investigator G. McClendon
Page 3 of 6

**In your email to Ms. Herring, you indicated that you faced Major Estep and said, "What are you doing?"**
**Q:** Did Major Estep say anything to you when you asked him this? (If so, explain)
**Your response:**

N/A    Answered on 1st page
                    G.M.

**Plaintiff's App. 201**

Signature                                    Date
Scanned copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

Questions for Sergeant Ambur Hale (Complainant)
Allred Unit
EEO Case# 16003260
Investigator G. McClendon
Page 4 of 6

**Q: When the fence was first grabbed, did you think that the individual was possibly an offender?**
**Your response:**

WHEN THIS INCIDENT OCCURRED MY FIRST THOUGHT WAS OH MY GOD! WHAT IS GOING ON. WHEN I SAW THE GRAY SLEEVES MY CONCERN FOR RAPE AND/OR HOSTAGE SITUATION DISSOLVED BUT MY FEAR WAS STILL THERE. MY CONCERN FOR MY REPUTATION, MY FINANCES MY FAMILY, ALL OF WHAT MATTERS TO ME WAS IN JEPARDY. -AH

**Q: Has Major Estep ever subjected you to any other behavior that you considered to be sexual in nature? (If so, explain)**
**Your response:** YES, HE HAS TRIED TO HOLD/KISS MY HAND AND WHEN I PULLED MY HAND BACK STATED I WAS JUST TRYING TO LOOK AT YOUR NAILS. HE HAS ASKED ME IF I'VE EVER HAD MY TOES SUCKED AND I TOLD HIM HE WAS GROSS AND LEFT THE AREA. HE HAS TRIED HUGGING ME AND WHEN I PUT MY ARM UP TO BLOCK HIM OTHER OFFICERS WOULD INFORM HIM THAT I DON'T LIKE TO BE HUGGED AND I WOULD CONCUR. THESE HAVE HAPPENED OVER TIME. -AH

Signature _____ Date 07/07/2016        **Plaintiff's App. 202**

Certified copy of original administrative case 16003260 to the Office of the Attorney General - EEOC on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

Questions for Sergeant Ambur Hale (Complainant)
Allred Unit
EEO Case# 16003260
Investigator G. McClendon
Page 5 of 6

**In your email to Ms. Herring, you indicated that Major Estep should just get a reprimand for his actions.**

**Q: Why do you only think that he should be given a reprimand for his actions?**
**Your response:**

I WANT THE APPROPRIATE ACTIONS FOR THIS OFFENSE TO BE CHARGED. IF THE BOARD DETERMINE HIS BEHAVIOR ONLY WARRANTS A REPRIMAND THEN I'LL HAVE TO ACCEPT THAT DISCISION BUT THAT IS NOT "ONLY" WHAT I THINK. I ASK THAT ALL ASPECTS OF THIS BEHAVIOR, SEXUAL MISCONDUCT, BE CONSIDERED. HOW THIS BEHAVIOR EFFECTS AND COMPROMISES THE AGENCY AND EMPLOYEE RETENTION. HOW IT EFFECTS MORAL AND TRUST. I WOULD LIKE THE BOARD TO CONSIDER HOW DIFFICULT IT IS FOR SOMEONE TO SPEAK UP AND WORRY OVER THE AFTERMATH OF SUCH ALLEGATIONS. - AH

Signature: _____ Date: 07/07/2016

**Plaintiff's App.  203**

copy of such administrative case updated on 75 to the Office of the Attorney General - EDD on 03-13-2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

Questions for Sergeant Ambur Hale (Complainant)
Allred Unit
EEO Case# 16003260
Investigator G. McClendon
Page 6 of 6

**VIDEO:**

**Q:** Who is the woman in front of the stretcher?  N/A  identified G.M
**Your response:**

**Q:** Who is the woman behind the stretcher?  N/A  identified G.M
**Your response:**

**Q:** Who is the officer behind the stretcher?  N/A  identified G.M
**Your response:**

**Q:** Who was working behind the fence at the desk area?  N/A  identified G.M.
**Your response:**

**Q:** Do you know of any other individual(s) who might have witnessed the incident?
**Your response:**

NO, NOT TO MY KNOWLEDGE - amy

Signature _____  Date 07/05/2016

**Plaintiff's App.  204**

Copy of this administrative case #16003260 to the Office of the Attorney General.   LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

### Inter-Office Communications

TO: _____   DATE: _____

FROM: _____   SUBJECT: _____

Q: When did Major Estep try to hold or kiss your hand?

Q: Were there any witnesses to him doing this?

I DO NOT RECALL THE DATE. THE SITUATION OCCURRED IN THE LIEUTENANTS OFFICE SEVERAL MONTHS AGO. THE ~~SEAR~~ OUT SERGEANTS FILE CABINETS ARE IN SAID LOCATION. HE WAS AT THE DESK PREPARING FOR COUNT AND I WAS GETTING SOMETHING FROM THE CABINET. HE SPUN THE CHAIR AROUND AND GRABBED AT MY HAND AND STARTED TO LEAN IN WITH HIS MOUTH, LIPS PUCKERED I PULLED MY HAND FROM HIM. I GOT MY ITEMS AND LEFT. ALTHOUGH THERE ARE WINDOWS, I DO NOT BELIEVE THERE ARE ANY WITNESSES TO THIS EVENT

*HE STATE I WHAT I WAS TRYING TO LOOK AT YOUR NAILS*

**Plaintiff's App. 205**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

## Inter-Office Communications

TO: _____    DATE: _____

FROM: _____    SUBJECT: _____

Do you recall which individuals observed
major Estep try to hug you and them telling
him you do not liked to be hugged.?

~~Captain Miller~~,

CAPTAIN MILLER, SGT. MURRAY, LT. BOATMAN

                                    - cw4

                                    Amber Uffale

**Plaintiff's App. 206**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

### Inter-Office Communications

TO: _____   DATE: _____

FROM: _____   SUBJECT: _____

Q: When did Major Estep ask you if you ever had your toes sucked?

Q: Were there any witnesses?

MAJOR EASTEPS OFFICE IS CONNECTED TO THE CAPTAINS OFFICE. I WAS IN THE CAPTAINS WHEN MAJOR EASTEP CALLED ME ∓ (VERBALLY) FROM HIS OFFICE. HE ASKED ME SOME WORK RELATED QUESTIONS AND IN THE SAME QUESTION FORM ASK IF I EVER HAD MY TOES SUCKED BECAUSE HE DOES THAT. I STATED YOUR GROSS AND WALKED OUT I DON'T KNOW OF A SPECIFIC DATE AND NO WITNESSES WERE PRESENT.

— AWH

*Amber W Hale*

**Plaintiff's App.  207**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE

### Inter-Office Communications

TO: _____    DATE: _____

FROM: Cpt Miller _____    SUBJECT: _____

Allegation: Sgt. Hale has indicated that you have been present when Major Estep has attempted to hug her and you have had to tell him that she does not like being hugged.

Your response:

I did see Major Estep greet Sgt Hale once by extending his arm to one side as if he was going to pat her on the shoulder or half-hug her. I later told him as an F.T.I. that Sgt Hale didn't like for people to touch her. I only saw this happen one time. I was two to three months ago.

Cpt C.J. Miller
07-07-2016

EXHIBIT I

Plaintiff's App. 208

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

Case 7:18-cv-00097-M-BQ   Document 47   Filed 07/18/19   Page 209 of 298   PageID 994
Case Action/Comment History Report - Case#: 16003260

Page 5 of 6

| CASE | 06-30-2016 00:00 |
|---|---|
| BC00063 | 06-30-2016 10:16 |

Email to Patty Garcia, Eve Shelly with cc: to Sharon Whitmire of Complainant's email and my recommendations.

| CASE | 06-30-2016 00:00 |
|---|---|
| BC00063 | 06-30-2016 10:04 |

Returned from Eve Shelly with: ok

I left a message for Warden Wathen 06/30/2016 10:00 am

| CASE | 06-30-2016 00:00 |
|---|---|
| BC00063 | 06-30-2016 10:02 |

After viewing the recording of the incident, Respondent does step behind Complainant and place both hands on the fencing on each side of Complainant's body and it appears Complainant is "blocked" in by Respondent's stance and body. Respondent appears to bend his knee moving his groin area toward Complainant's buttocks. On the recording, Complainant appears to be very upset and turns and says something to Respondent.

Due to the angle of the camera, it is not possible to say whether physical contact is made but Complainant's reaction appears to indicate physical contact was made. I recommend this matter go to IFF for investigation of Respondent's behavior. Even though there are several layers of rank between Complainant (sergeant) and Respondent (major), I recommend Respondent limit all contact with Complainant immediately.

To Eve Shelly for review.

| CASE | 06-30-2016 00:00 |
|---|---|
| BC00063 | 06-30-2016 09:06 |

DVD of the incident was received in Intake 06/27/2016.

| CASE | 06-30-2016 00:00 |
|---|---|
| BC00063 | 06-30-2016 09:05 |

Email from Complainant:
Sergeant Ambur N. Hale

TDCJ- James V. Allred Unit
2101 North FM 369
Iowa Park, Texas 76367
(940) 855-7477

June 20, 2016
Formal complaint in regard to: Major Jonathon Eastep / James V. Allred Unit

Dear Ms. Herring,

My name is Ambur N. Hale. I have been a Correctional Officer for the State of Texas, since October 2006 and I promoted to Sergeant of Corrections August of 2013. I am writing you to report a violation of Personnel Directive No. 13- Sexual Harassment and Discourteous Conduct of a Sexual Nature. I, Sergeant Ambur Hale was subjected to forcible and non-consensual sexual contact by Major Jonathon Eastep.

On 06/15/2016, I was assigned to supervisory duties on GP-3 Building. At approximately 1155 hours, I.C.S. was initiated by Picket Officer S. Allen on GP-3 Building B- Pod 2-Section 45 Cell for an unresponsive offender inside the cell. I responded to stated location and was briefed by Roving Officer

EXHIBIT J

**Plaintiff's App. 209**

**Texas Department of Criminal Justice**
**NOTIFICATION OF EEO INVESTIGATION AND INTERIM REMEDIAL ACTIONS**

TO:    Eastep        Jonathan      R    MONTH/DAY OF BIRTH: _____
Print Name: Last        First       MI                MM/DD

PAYROLL JOB TITLE: __Major__            UNIT or DEPT: __Allred__

A complaint has been filed with the TDCJ's Employee Relations Intake relating to (check one):

- ☒ Sexual harassment or discourteous conduct of a sexual nature.
- ☐ Slurs and hostile epithets.
- ☐ Discrimination based on race, sex, color, national origin, religion, age, disability, or genetic information.
- ☐ Failure to report: (1) an alleged act of discrimination or harassment; (2) discourteous conduct of a sexual nature; or (3) retaliation.
- ☐ Retaliation for filing a charge of, participating in a proceeding regarding, or otherwise opposing what would constitute, an EEO rule violation, or for associating with an individual who does so.
- ☐ Other, for example, tampering with a witness.

This complaint identifies you as the (check one):

- ☐ Complainant
- ☒ Respondent (Complainant's Name: __Ambur Haie__ )

An investigation regarding the complaint shall be conducted by the EEO investigators. In order to protect the integrity of the investigation, you are hereby ordered to not discuss any aspect of the allegations with any employee except representatives from Employee Relations conducting the investigation until the fact-finding inquiry is complete. The interim remedial actions indicated below are being implemented. These interim remedial actions do not in any way suggest that the respondent is guilty of the allegation(s). Interim remedial actions are designed to protect both the complainant and the respondent during the investigation.

1. TDCJ officials, in consultation with Employee Relations, have determined it is in the best interest of the TDCJ and all parties (check one):

- ☒ to separate the complainant and the respondent within their work location.
  If the separation includes a change to the complainant's shift, work assignment, or location, provide justification specifying extraordinary reasons for such action. The change and justification are to be approved by the manager of Employee Relations prior to providing this form to the complainant or respondent.

- ☐ not to separate the complainant and the respondent within their work location; line of supervision shall be changed.

- ☐ not to separate the complainant and the respondent within their work location, line of supervision shall not be changed. Reason for not separating the parties or changing line of supervision: _____

- ☒ to take the following interim remedial action: __Respondent will not have any contact with Complainant unless in the presence of another ranking officer__

2. · You are hereby ordered to limit communications with the other party (complainant or respondent) to necessary job-related communications until the fact-finding inquiry is complete.

You (complainant or respondent) are advised that retaliation, intimidation, or tampering with a witness is prohibited by TDCJ policy, shall not be tolerated, and may result in disciplinary action up to and including dismissal in accordance with PD-22, "General Rules of Conduct and Disciplinary Action Guidelines for Employees." Complainants and respondents are advised that failure to comply with the interim remedial actions shall be considered a violation of Rule Number 3. Failure to Obey a Proper Order from an Authority.

_____    _____    _____    _____
EMPLOYEE SIGNATURE         Date         WARDEN or DEPT HEAD SIGNATURE    Date

Note to Employee: With few exceptions, you are entitled upon request: (1) to be informed about the information the TDCJ collects about you; and (2) under Tex. Gov't Code §§ 552.021 and 552.023, to receive and review the collected information. Under Tex. Gov't Code § 559.004, you are also entitled to request, in accordance with TDCJ procedures, that incorrect information the TDCJ has collected about you be corrected.

Distribution:
Mail original to Employee Relations, HR Division
Copy - Employee (Note: The complainant may not receive a copy of the respondent's notification or vice versa.)
Copy - Employee's Unit or Department Human Resources EEO File
PERS 408 (11/14)

RECEIVED
JUL 01 2016
EMPLOYEE RELATIONS

EXHIBIT K                                  Plaintiff's App. 210

## Texas Department of Criminal Justice
## INSTITUTIONAL DIVISION

## Inter-Office Communications

To:   Mr. G. McClendon, Investigator                                Date: July 6, 2016

From:   Richard Wathen Senior Warden                       Subject:  Sgt. Amber Hale
         James V. Allred Unit

On July 1, 2016 I summoned Sgt. Amber Hale to my office. The purpose of the meeting was to serve her with the Notification of EEO Investigation and Interim Remedial Action form. A previous discussion with Ms. Cynthia Barnes resulted in a decision to separate Sgt. Hale and Major Jon Eastep within their work areas but not to separate beyond that. This was in response to an EEO complaint filed against Major Eastep by Sgt. Hale.
When Sgt. Hale arrived I informed her that I had spoken with Ms. Barnes and that the Labor Relations Department would be conducting an investigation into her claim. I also instructed her that if she should need to conduct any business with Major Eastep that she should only do so in the presence of another supervisor and to remain professional in her dealings with him. I then instructed her to sign the Remedial Action form and I would provide her a copy. I informed her that the decision was to separate her and Major Eastep within their work area. At that time she stated "Am I getting moved"? I stated to her that they were being separated within their work area and it should address any concerns she had. Sgt. Hale seemed disappointed and stated "So, you're not going to move me"? I informed her that we were not and she sighed and stated "Ok, whatever". I then made her a copy of the Remedial Action form and she left my office.
I had no further discussions with her regarding this matter.

At some point after this conversation with Sgt. Hale I became curious in regards to her insistence on being moved. I inquired to Warden Anders if Sgt. Hale had been requesting to change work areas at any point in the recent past. He informed me that she had requested previously but did not recall when. I did not state to Warden Anders that my question was in regards to her complaint against Major Eastep nor did I disclose to Warden Anders the content of the conversation between myself and Sgt. Hale.

EXHIBIT L                                                          **Plaintiff's App.  211**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED





| TEXAS DEPARTMENT | **NUMBER:** | PD-13 (rev. 6) |
| OF | **DATE:** | November 1, 2014 |
| CRIMINAL JUSTICE | **PAGE:** | 1 of 19 |
| | **SUPERSEDES:** | PD-13 (rev. 5) January 1, 2010 |

# EXECUTIVE DIRECTIVE

**SUBJECT:**       SEXUAL HARASSMENT AND DISCOURTEOUS CONDUCT OF A SEXUAL NATURE

**AUTHORITY:**    Tex. Pen. Code § 39.03; Tex. Gov't Code § 493.007; Title VII, *Civil Rights Act of 1964*, as amended; 42 USC § 2000e – e-17; Tex. Lab. Code §§ 21.001-.556, 301.151-.156

Reference: American Correctional Association Standard 4-4056

**APPLICABILITY:** Texas Department of Criminal Justice (TDCJ)

**EMPLOYMENT AT WILL CLAUSE:**

These guidelines **do not** constitute an employment contract or a guarantee of continued employment. The TDCJ reserves the right to change the provisions of these guidelines at any time.

Nothing in these guidelines and procedures limits the executive director's authority to establish or revise human resources policy. These guidelines and procedures are adopted to guide the internal operations of the TDCJ and **do not** create any legally enforceable interest or limit the executive director's, deputy executive director's, or division directors' authority to terminate an employee at will.

**POLICY:**

The TDCJ has zero tolerance for all forms of gender discrimination, to include sexual harassment. The TDCJ also prohibits discourteous conduct of a sexual nature that a reasonable person would find offensive or which is known to be unwelcome to the person against whom it is directed. Retaliation for opposing or reporting discrimination, or for associating with someone who has opposed or reported discrimination, is prohibited. Allegations of conduct prohibited by this directive shall be investigated by Employee Relations, Human Resources Division.

EXHIBIT M

**Plaintiff's App. 212**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED



An employee who violates the provisions of this directive shall be subject to disciplinary action, up to and including dismissal, in accordance with PD-22, "General Rules of Conduct and Disciplinary Action Guidelines for Employees."

## DEFINITIONS:

"Complainant," for the purpose of this directive, is an employee or other individual bringing forth allegations of prohibited conduct.

"Discourteous Conduct of a Sexual Nature" is conduct, in words or actions of a sexual nature toward or witnessed by another TDCJ employee or other individual (see definition for "Other Individual") that: (a) a reasonable person would find offensive; or (b) is unwelcome to the person to whom such conduct is directed and that person has communicated, by words or actions, to the other person that the conduct is unwelcome.

"Discrimination" is unequal treatment of persons based on sex (gender), including sexual harassment, race, color, religion, national origin, age (40 or above), disability, or genetic information. Discrimination by employers falls into four general areas: (1) hiring and firing, such as failing or refusing to hire, or discharging; (2) employment conditions, such as compensation, terms, conditions, or privileges; (3) segregation and classification, such as limiting, segregating, or classifying employees in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect their status as an employee; and (4) training programs, such as unequal access to training that may affect an individual's ability to promote.

"Employee," for the purpose of this directive, is any person employed by the TDCJ on a full-time, part-time, or temporary basis.

"Equal Employment Opportunity Commission" (EEOC) is the federal agency which enforces federal laws prohibiting discrimination in employment or retaliation. The EEOC is separate from the TDCJ's Employee Relations.

"Equal Employment Opportunity Designated Agency Official" (EEO-DAO) is a TDCJ employee designated by the executive director to: (1) conduct disciplinary hearings for EEO rule violations; (2) represent the TDCJ during dismissal mediation for an EEO dismissal recommendation; (3) respond to grievances regarding EEO disciplines; or (4) approve a dismissal resulting from an EEO dismissal recommendation.

"Equal Employment Opportunity (EEO) Rule Violation," for the purpose of this directive, is a violation of one of the following TDCJ Employee General Rules of Conduct, as published and described in PD-22, Attachment A, Listing of Employee General Rules of Conduct and Disciplinary Violations: (a) Rule Number 14b, Use of Offensive Words or Actions – Protected Class; (b) Rule Number 21, Discrimination or Harassment Against Persons of a Protected Class or Retaliation; (c) Rule Number 32, Destroying Evidence or Giving False Testimony or Information, when related to an EEO issue; (d) Rule Number 44, Tampering with a Witness, when related to an EEO issue; (e) Rule Number 50, Discourteous Conduct of a Sexual Nature; (f) Rule Number 53, Failure to Report Alleged Acts of Discrimination or Harassment Against Persons of a Protected Class, Discourteous

**Plaintiff's App. 213**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED



Conduct of a Sexual Nature, or Retaliation; or is an EEO violation in accordance with PD-33, "Trainee Management."

"Hostile Work Environment," for the purpose of this directive, is offensive behavior based on sex (gender), race, color, religion, national origin, age (40 or above), disability, or genetic information that is severe or pervasive enough to alter employment conditions. All the circumstances must be judged, including the frequency of the conduct, the severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.

"Other Individual," for the purpose of this directive, includes, but is not limited to, a contract employee, applicant, employee of a vendor, or a volunteer. The definition does not include an individual under the supervision or custody of the TDCJ.

"Pre-Service Training Academy" includes academies for the Correctional Institutions Division's Pre-Service Training Academy (PSTA), Parole Division's Parole Officer Training Academy (POTA), and Office of the Inspector General's Training Academy (OIGTA).

"Reprimanding Authority," for the purpose of this directive, is a TDCJ official designated to perform certain duties relating to the employee disciplinary process, including pre-service academy rule violations.

"Respondent," for the purpose of this directive, is an employee accused of committing an act prohibited by this directive.

"Retaliation," for the purpose of this directive, is any action that may deter a reasonable person from filing a complaint, participating in a proceeding regarding, or otherwise opposing, an alleged EEO rule violation, or from associating with an applicant, employee, or other individual who is engaged in a protected activity.

"Sexual Harassment" is unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when: (a) the conduct is sufficiently pervasive or severe that it has the effect of unreasonably interfering with an individual's work performance or creating a work environment that a reasonable person would find intimidating, hostile, or offensive; (b) submission to the conduct is made either explicitly or implicitly a term or condition of an individual's employment; or (c) submission to or rejection of the conduct by an individual is used as a basis for employment decisions affecting the individual.

"Supervisor" is an employee whose job duties include, expressly or implicitly: (1) directing the job performance of an employee or group of employees; (2) ensuring TDCJ policies are carried out; and (3) ensuring all applicable state and federal employment-related laws are observed.

"Texas Workforce Commission, Civil Rights Division" (TWC-CRD) is the state agency charged with: (1) enforcement of state laws prohibiting discrimination in employment or retaliation; and (2) investigating alleged violations of such laws.

"Trainee" is an employee attending a pre-service training academy.

**Plaintiff's App. 214**

**DISCUSSION:**

I.   Prohibition on Sexual Harassment and Discourteous Conduct of a Sexual Nature

    A.   TDCJ employees are prohibited from stating, threatening, or insinuating, either explicitly or implicitly, that the terms, conditions, or privileges of employment shall be affected if an employee or other individual refuses to submit to unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.

    B.   TDCJ employees are prohibited from conduct of a sexual nature that has the purpose or effect of unreasonably interfering with an employee's or other individual's work performance or creating an intimidating, hostile, or offensive working environment.

    C.   TDCJ employees are prohibited from discourteous conduct of a sexual nature. Conduct of a sexual nature may be offensive or unwelcome even if another employee or other individual does not openly object to it.  However, all employees and other individuals are encouraged to immediately inform an individual engaging in offensive or unwelcome conduct that such behavior is unwelcome and should cease immediately.

    Discourteous conduct of a sexual nature that is prohibited by this directive and which may rise to the level of sexual harassment includes, but is not limited to, the following:

        1.   Physical acts such as intentional physical conduct that is sexual in nature or a reasonable person would find offensive.  Examples of such acts include, but are not limited to, intentional touching, jabbing, pinching, grabbing, rubbing, pressing, or brushing against a person's body.

        2.   Sexual advances, propositions, or comments, such as:

            a.   Gestures, remarks, or jokes of a sexual nature that are unwelcome or would be offensive to a reasonable person;

            b.   Displaying, reading, publicizing, or bringing into the workplace any materials of a sexual nature, such as pictures, posters, calendars, graffiti, objects depicting sexual poses, videos, movies, sound recordings, screen savers, or other materials that a reasonable person would regard as sexual in nature and inappropriate in a professional work environment; or

            c.   Displaying sexually-oriented tattoos.

**Plaintiff's App.  215**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

 

PD-13 (rev. 6)
Page 5 of 19

D.  Discourteous conduct of a sexual nature occurring at a TDCJ-sponsored or work-related event held away from the everyday worksite may constitute a violation of this directive.

II.  Prohibitions on Retaliation and Providing False Information

In addition to prohibiting sexual harassment and discourteous conduct of a sexual nature, the TDCJ also prohibits retaliation and providing false information.

A.  Prohibition on Retaliation

1.  The TDCJ prohibits retaliation.

Some examples of adverse actions that may be considered by the TDCJ to be retaliation include, but are not limited to:

a.  Inappropriately disciplining employees;

b.  Inappropriately changing an employee's work assignment;

c.  Inappropriately refusing to cooperate or discuss work-related matters with an employee;

d.  Providing ratings on an employee's performance evaluation that are below the employee's actual job performance; or

e.  Intimidating an employee.

All employees should be aware that the term "retaliation" has a legal meaning, and some of the foregoing examples may not constitute legally actionable retaliation. Nevertheless, the TDCJ retains the right to discipline employees for acts the TDCJ defines as retaliation, regardless of whether such acts would constitute legally actionable retaliation.

2.  Retaliation against individuals other than employees for engaging in protected activities may be a violation of PD-22, "General Rules of Conduct and Disciplinary Action Guidelines for Employees."

B.  Prohibition on Providing False Information

The TDCJ also prohibits employees from providing false information in any report, investigation, or hearing. Filing a complaint under this directive that the employee knows is unjustified is a violation of PD-22, "General Rules of Conduct and Disciplinary Action Guidelines for Employees."

**Plaintiff's App. 216**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

 

III.    Dissemination

Every employee is responsible for becoming familiar with the provisions of this directive so that each employee can assist in ensuring the TDCJ's work environment is free of sexual harassment, discourteous conduct of a sexual nature, and retaliation. To assist employees in becoming familiar with the procedures of this directive, a copy of this directive shall be provided to each newly-hired or rehired employee as part of the employee's Direct Hire Packet. All newly-hired or rehired employees shall be required to initial a receipt indicating they received a copy of this directive.  In addition, this directive shall be published in the TDCJ *Personnel Manual*, which is available on the TDCJ mainframe report system known as INFOPAC, on the TDCJ website at http://www.tdcj.texas.gov/, and from the employee's human resources representative.

IV.    Training

All employees shall receive training regarding the provisions of this directive in accordance with PD-97, "Training and Staff Development."

**PROCEDURES:**

I.    Reporting Allegations

Wardens, department heads, supervisors, and other employees shall follow the procedures of this directive when reporting allegations of sexual harassment, discourteous conduct of a sexual nature, or retaliation. Through adherence to these procedures, the TDCJ strives to maintain a work environment free of sexual harassment and discourteous conduct of a sexual nature and to take prompt remedial action in response to such reports before the alleged conduct creates a hostile work environment.  The TDCJ shall protect the confidentiality of the parties involved to the extent possible.

A.    Employee or Other Individual Responsibilities

1.    Prompt Reporting

The most effective means of eliminating sexual harassment and discourteous conduct of a sexual nature is the prompt reporting of such matters by employees or other individuals who have been subjected to, made aware of, or have witnessed prohibited conduct. Therefore, the TDCJ strongly encourages those persons who believe they have been subjected to, made aware of, or have witnessed conduct prohibited by this directive to immediately report the allegation directly to one or more of the following, not necessarily in the order listed:

a.    The employee's immediate supervisor, warden, or department head

**Plaintiff's App. 217**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

b.   The employee's second level supervisor or higher authority, if the person complained of is the employee's immediate supervisor or in the employee's chain of supervision

c.   The TDCJ executive director

d.   TDCJ Employee Relations Intake

During normal business hours, 8 a.m. - 5 p.m., Monday through Friday, TDCJ employees may contact Employee Relations Intake, Human Resources Division. During hours other than normal business hours, TDCJ employees may call the after-hours phone number.

The phone number for Employee Relations Intake and the cell phone number for after-hours reporting may be obtained through the following sources:

(1)   The unit or department human resources representative

(2)   The warden or department head

(3)   INFOPAC Report HR/PO/02 (listed at the end of PD-13 within the report)

(4)   The notice posted in the common-use area at each unit or department

(5)   The TDCJ website at http://www.tdcj.texas.gov/divisions/hr/hr-home/eeo-intake.html

e.   The EEOC

The deadline to file a complaint with the EEOC is 300 calendar days from the last date the alleged conduct took place.

f.   The TWC-CRD

The deadline to file a complaint with the TWC-CRD is 180 calendar days from the last date the alleged conduct took place.

2.   Criminal Charges

An employee or other individual may contact the Office of the Inspector General (OIG) if the allegation involves a potentially criminal act. The OIG may conduct a criminal investigation simultaneously with the Human Resources Division's EEO investigation.

**Plaintiff's App. 218**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

3.   **Signed Written Complaint**

Although an employee's or other individual's initial report of an allegation may be verbal, the complainant is required to submit a signed written complaint in order for the complaint to be processed by the TDCJ. The complainant is encouraged to complete the PERS 497, EEO Complaint Form (Attachment A) when submitting an EEO-related complaint in accordance with this directive; however, a signed written EEO-related complaint shall not be rejected if it is submitted via another format.

The signed written complaint may identify only one respondent.  If the complainant is reporting alleged violations of this directive committed by more than one respondent, the complainant shall submit separate signed written complaints identifying each respondent's alleged conduct.

The employee or other individual need not specify whether the alleged conduct is "sexual harassment" or "discourteous conduct of a sexual nature," but it is recommended that the employee or other individual include one of these phrases or "PD-13" in the complaint.

Any questions concerning the reporting of an allegation may be directed to Employee Relations Intake.

B.   **Supervisor, Warden, or Department Head Responsibilities**

1.   Employee Relations Intake shall be contacted via telephone, fax, or email no later than 72 hours of a supervisor witnessing conduct or becoming aware of any alleged conduct that may be prohibited by this directive.  Employee Relations Intake shall be contacted regardless of whether the individual objects to the alleged conduct or even if it appears that the alleged conduct may not rise to the level of an EEO rule violation.

2.   The supervisor, warden, or department head may call the after-hours phone number during hours other than normal business hours to report an allegation that may be prohibited by this directive.

The contact information for after-hours reporting may be obtained through the sources listed in Procedures Section I.A.1.d of this directive.

3.   If a supervisor who witnessed conduct or became aware of alleged conduct that may be prohibited by this directive reports the allegation through the supervisor's chain-of-command to a designated higher level of authority, such as a warden or department head, the designated higher level of authority shall contact Employee Relations Intake within 72 hours of becoming aware of the alleged behavior. The higher level of authority shall provide each supervisor

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

PD-13 (rev. 6)
Page 9 of 19

in the chain-of-command who has knowledge of the allegation with written verification, such as an inter-office communication (IOC) or email, of the date and time that Employee Relations Intake was contacted.  If the supervisor who witnessed or became aware of the alleged conduct does not receive written verification within 72 hours of the event, the supervisor shall immediately contact Employee Relations Intake.

4.    The supervisor, warden, or department head shall provide the following information, if available, to Employee Relations Intake:

a.    Specific nature of the complaint or description of the witnessed or alleged conduct;

b.    Names and titles of parties involved; and

c.    Date and time the supervisor, warden, or department head witnessed the conduct or became aware of the alleged conduct and the date(s) the alleged conduct occurred.

5.    A supervisor, warden, or department head shall contact Employee Relations Intake even if an individual making or reporting the allegations requests that the matter be kept confidential and no action be taken. If the individual refuses to provide information without assurance of no action being taken, the supervisor, warden, or department head shall:

a.    Advise the individual that TDCJ policy requires the supervisor, warden, or department head to take action;

b.    Refer the individual to Employee Relations Intake; and

c.    Inform the intake officer of the referral when reporting the incident.

If a supervisor, warden, or department head fails to take action in response to an allegation, the supervisor, warden, or department head shall be subject to disciplinary action.

II.    Responding to Allegations

A.    Intake Officer Responsibilities

1.    Upon notification of an allegation of conduct that may be prohibited by this directive, an intake officer shall take the following actions:

a.    Advise the complainant how to obtain a PERS 497.  If the notification was in a format other than a PERS 497, the intake officer shall encourage the complainant to complete the form.

**Plaintiff's App.  220**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

 

    b.    Process a signed written complaint in accordance with the procedures outlined in this directive. If the complaint was submitted as a grievance, the intake officer shall close the grievance prior to processing the complaint as an EEO complaint.

    c.    Ensure the complainant has been notified of the following:

        (1)    The complainant's right to file with the EEOC and TWC-CRD; and

        (2)    The complainant's option to contact the OIG if the complainant wants to pursue criminal charges.

    d.    The intake officer shall consult with the supervisor, warden, or department head on any remedial action to be taken.

  2.    When referring a complaint for EEO investigation, the intake officer shall consult with the warden or department head to determine whether interim remedial action shall be taken and the nature of any such action, and the issuance of the PERS 408, Notification of EEO Investigation and Interim Remedial Actions (Attachment B).

**B.**    Warden or Department Head Responsibilities Relating to Interim Remedial Actions

After consulting with the intake officer, the warden, department head, or designee shall meet separately with the complainant and respondent, provide each with a separate PERS 408, and distribute as indicated on the form.

**C.**    Investigation

  1.    General Provisions

    a.    All EEO investigations shall be conducted discreetly and fairly to all parties involved.

    b.    The EEO investigation shall be conducted in a timely and thorough manner.

    c.    An EEO investigation shall be completed when it contains valid claims of a possible violation of EEO policy, even if the complainant withdraws the complaint.

    d.    The manager of Employee Relations shall direct that an EEO investigation be conducted as warranted.

**Plaintiff's App. 221**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

2.     Investigation Process

    a.     The EEO investigator shall:

        (1)     Complete Sections I and III of the PERS 325-EEO, EEO Prehearing Investigation Report (Attachment C);

        (2)     Interview all relevant parties;

        (3)     Gather related documentation as needed; and

        (4)     Upon completion of the investigation, forward for review to the Employee Relations section director or designee.

    b.     The Employee Relations section director or designee shall:

        (1)     Review the investigation and, if necessary, revise the EEO Prehearing Investigative Findings;

        (2)     Complete Section IV of the PERS 325-EEO; and

        (3)     Submit the investigation to the manager of Employee Relations or designee.

    c.     The manager of Employee Relations or designee shall:

        (1)     Review the investigation and, if necessary, revise the EEO Prehearing Investigative Findings;

        (2)     Complete Section V of the PERS 325-EEO; and

        (3)     If appropriate, forward to the Office of the General Counsel (OGC) to review the manager of Employee Relations' action.

D.     Notification of Further Action

    1.     If the investigation is forwarded to an EEO-DAO or pre-service training academy director or designee for review of an alleged EEO rule violation, the manager of Employee Relations or designee shall ensure written notification is provided to the complainant advising the investigation has been forwarded for review. The notification shall identify the name and title of the reprimanding authority. The notification shall not identify any other information relating to the investigation.

    2.     If the investigation is forwarded to a reprimanding authority or pre-service training academy director or designee for review of an alleged rule violation

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED



other than an EEO rule violation or is not forwarded to a reprimanding authority, the manager of Employee Relations or designee shall ensure the findings are disclosed in writing only to the following:

a. The respondent's warden, department head, regional director, any other manager, or pre-service training academy director or designee, as appropriate;

b. The executive director, deputy executive director, the appropriate division director, and, if applicable, the appropriate division deputy director;

c. The complainant; and

d. The respondent.

E. Follow-Up

If the investigation is forwarded to an EEO-DAO or pre-service training academy director or designee for review of an alleged EEO rule violation, the manager of Employee Relations or designee shall monitor the review to ensure documentation is received relating to the outcome of the review, such as determination that no employee hearing was held, an employee hearing was held but no discipline imposed, an employee hearing was held and disciplinary action imposed, or imposition of pre-service training academy rules. Upon receipt of this documentation, the manager of Employee Relations shall ensure the following are notified of the outcome of the reprimanding authority's review:

1. The respondent's warden, department head, regional director, any other manager, or pre-service training academy director or designee, as appropriate;

2. The executive director, deputy executive director, the appropriate division director, and, if applicable, the appropriate division deputy director;

3. The complainant; and

4. The respondent.

F. Dispute Resolution

A warden or department head may contact Employee Relations Intake and request that the complainant and respondent participate in the dispute resolution process in accordance with PD-35, "Independent Dismissal Mediation and Dispute Resolution,"

**Plaintiff's App.  223**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED



when an EEO investigation has been completed and:

1.  The manager of Employee Relations or designee has determined the investigation shall not be forwarded to a reprimanding authority; or

2.  The manager of Employee Relations or designee has determined the investigation shall be forwarded to a reprimanding authority, and a final decision relating to disciplinary action has been made.

Participation in a dispute resolution session shall not be in lieu of appropriate disciplinary action.

III.   External Complaints or Court Actions

The following procedures shall apply when an employee files a complaint with the EEOC or TWC-CRD or files an action in a court of competent jurisdiction alleging sexual harassment or retaliation.

A.   Closing of Internal EEO Complaint

Upon receiving notice of such an external complaint or court action, Employee Relations Intake shall determine whether there is an internal complaint filed by the same employee. Employee Relations shall close the internal complaint when:

1.  The internal complaint and external complaint or court action are based on the same or similar allegations; and

2.  The internal EEO investigation has not been completed.

B.   Complainant's Participation in External Mediation

1.   Time Reporting

If the complainant is on the TDCJ payroll at the time of the external mediation, the complainant's appearance at the mediation shall be considered official business and on paid time. The complainant shall provide sufficient advance notice of the scheduled mediation to the complainant's supervisor in order to allow management to ensure adequate staffing.

a.   The time that may be reported as time worked shall be limited to:

(1)  The time that an employee is required to be available at the mediation; and

**Plaintiff's App.   224**

 

PD-13 (rev. 6)
Page 14 of 19

(2)    The time required for the employee to travel to and from the location of the mediation in accordance with state travel regulations and TDCJ policies.

b.    Time for an employee to observe another employee's mediation shall not be reported as time worked.

2.    State Travel and Per Diem

The complainant shall be reimbursed for any reasonable and necessary expenses in connection with such attendance in accordance with state travel regulations and TDCJ policies.

3.    Former Employees

A former employee who attends an external mediation conducted by the EEOC or TWC-CRD shall not receive travel expenses or per diem for the purpose of participating in external mediation.

C.    Participation in Judicial Proceeding

When participating in a judicial proceeding relating to alleged sexual harassment or retaliation, time reporting, and state per diem reimbursement shall be in accordance with PD-57, "Employee Appearances in Judicial or Legislative Proceedings or for Jury Service."

D.    Follow-Up Internal EEO Investigation

Human Resources, and the OGC when warranted, shall determine on a case-by-case basis whether to complete an internal EEO investigation when:

1.    A complaint filed with the EEOC or TWC-CRD has not been the subject of a completed internal EEO investigation; and

2.    The complaint filed with the EEOC or TWC-CRD results in:

a.    A mediated settlement agreement; or

b.    Other conclusion.

Brad Livingston
Executive Director

**Plaintiff's App.  225**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

 

PD-13 (rev. 6)
Attachment A
Page 15 of 19

**Texas Department of Criminal Justice**
## EEO COMPLAINT FORM

**Complainant Information (Person Complaining)**

Name: _____   SSN: _____
    Last      First     MI

Title: _____   Unit or Dept: _____

Work Shift: _____   Schedule Card: _____

Home Mailing Address: _____
    Street Address

Home or Cell Phone #: _____
    (Area Code)

_____
City    State    Zip

Name of Warden or Department Head: _____

**Respondent Information (Person Complained Against)**

Name: _____   Title: _____   Unit or Dept: _____

| Date(s) of Discriminatory Event: | Earliest: _____ | Latest: _____ |
|---|---|---|

Are you complaining about:

    (Check)

| | | | |
|---|---|---|---|
| Slurs or Hostile Epithets? | ☐ Yes ☐ No | If yes, explain: _____ | |
| Color Discrimination? | ☐ Yes ☐ No | If yes, identify your color: _____ | |
| Race Discrimination? | ☐ Yes ☐ No | If yes, identify your race: _____ | |
| National Origin Discrimination? | ☐ Yes ☐ No | If yes, identify your national origin: _____ | |
| Gender Discrimination? | ☐ Yes ☐ No | If yes, identify your sex: | ☐ Male ☐ Female |
| Discourteous Conduct of a Sexual Nature? | ☐ Yes ☐ No | If yes, identify your sex: | ☐ Male ☐ Female |
| Sexual Harassment? | ☐ Yes ☐ No | If yes, identify your sex: | ☐ Male ☐ Female |
| Age Discrimination? | ☐ Yes ☐ No | If yes, identify your date of birth: _____ | |
| Disability Discrimination? | ☐ Yes ☐ No | If yes, identify your disability: _____ | |
| EEO Retaliation? | ☐ Yes ☐ No | If yes, retaliation for what EEO activities? _____ | |
| Genetic Information? | ☐ Yes ☐ No | If yes, specify: _____ | |
| Religion? | ☐ Yes ☐ No | If yes, identify your religious belief: _____ | |
| Other? | ☐ Yes ☐ No | If yes, specify: _____ | |

PERS 497 (11/14)    Complainant's Initials: _____    Date: _____
    MM/DD/YYYY

**Plaintiff's App. 226**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

 

PD-13 (rev. 6)
Attachment A
Page 16 of 19

## STATEMENT

(Attach additional pages as needed.  Number, sign, and date each additional page.)

1.  Include specific details such as "who, what, when, and where" for each alleged event of your complaint.

_____

_____

_____

_____

_____

2.  List name(s) of all known witnesses and provide, in your own words, a summary of what the witness(es) may testify about the alleged event.

_____

_____

_____

_____

3.  List name(s) of all individuals to whom you reported the alleged event and the date(s) you reported the alleged event.

_____

_____

_____

_____

The foregoing statement contains all of my complaint(s), all names of witnesses, and all names of individuals to whom I reported the alleged event. This complaint includes this two-page form and _____ additional pages attached, numbered, signed, and dated. I understand that in addition to any action the TDCJ may take in this matter, I may have filing rights with the Texas Workforce Commission, Civil Rights Division (TWC-CRD) and the U.S. Equal Employment Opportunity Commission (EEOC).  I also understand that I may contact the Office of the Inspector General (OIG) if I elect to pursue criminal charges relating to this complaint.

Complainant Signature: _____   Date: _____
MM/DD/YYYY

Note to Employee:  With few exceptions, you are entitled upon request: (1) to be informed about the information the TDCJ collects about you; and (2) under Tex. Gov't Code §§ 552.021 and 552.023, to receive and review the collected information. Under Tex. Gov't Code § 559.004, you are also entitled to request, in accordance with TDCJ procedures, that incorrect information the TDCJ has collected about you be corrected.

PERS 497 (11/14)

**Plaintiff's App.  227**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

 

PD-13 (rev. 6)
Attachment B
Page 17 of 19

**Texas Department of Criminal Justice**
**NOTIFICATION OF EEO INVESTIGATION AND INTERIM REMEDIAL ACTIONS**

TO: _____   MONTH/DAY OF BIRTH: _____
Print Name: Last          First          MI                              MM/DD

PAYROLL JOB TITLE: _____   UNIT or DEPT: _____

A complaint has been filed with the TDCJ's Employee Relations Intake relating to (check one):

☐ Sexual harassment or discourteous conduct of a sexual nature.
☐ Slurs and hostile epithets.
☐ Discrimination based on race, sex, color, national origin, religion, age, disability, or genetic information.
☐ Failure to report: (1) an alleged act of discrimination or harassment; (2) discourteous conduct of a sexual nature; or (3) retaliation.
☐ Retaliation for filing a charge of, participating in a proceeding regarding, or otherwise opposing what would constitute, an EEO rule violation, or for associating with an individual who does so.
☐ Other, for example, tampering with a witness.

This complaint identifies you as the (check one):
☐ Complainant
☐ Respondent (Complainant's Name: _____ )

An investigation regarding the complaint shall be conducted by the EEO investigators. In order to protect the integrity of the investigation, you are hereby ordered to not discuss any aspect of the allegations with any employee except representatives from Employee Relations conducting the investigation until the fact-finding inquiry is complete. The interim remedial actions indicated below are being implemented. These interim remedial actions do not in any way suggest that the respondent is guilty of the allegation(s). Interim remedial actions are designed to protect both the complainant and the respondent during the investigation.

1. TDCJ officials, in consultation with Employee Relations, have determined it is in the best interest of the TDCJ and all parties (check one):

   ☐ to separate the complainant and the respondent within their work location.
      If the separation includes a change to the complainant's shift, work assignment, or location, provide justification specifying extraordinary reasons for such action. The change and justification are to be approved by the manager of Employee Relations prior to providing this form to the complainant or respondent.

   ☐ not to separate the complainant and the respondent within their work location; line of supervision **shall be** changed.

   ☐ not to separate the complainant and the respondent within their work location, line of supervision shall not be changed. Reason for not separating the parties or changing line of supervision: _____

   ☐ to take the following interim remedial action: _____

2. You are hereby ordered to limit communications with the other party (complainant or respondent) to necessary job-related communications until the fact-finding inquiry is complete.

You (complainant or respondent) are advised that retaliation, intimidation, or tampering with a witness is prohibited by TDCJ policy, shall not be tolerated, and may result in disciplinary action up to and including dismissal in accordance with PD-22, "General Rules of Conduct and Disciplinary Action Guidelines for Employees." Complainants and respondents are advised that failure to comply with the interim remedial actions shall be considered a violation of Rule Number 13, Failure to Obey a Proper Order from an Authority.

_____          _____
EMPLOYEE SIGNATURE          Date          WARDEN or DEPT HEAD SIGNATURE   Date

Note to Employee: With few exceptions, you are entitled upon request: (1) to be informed about the information the TDCJ collects about you; and (2) under Tex. Gov't Code §§ 552.021 and 552.023, to receive and review the collected information. Under Tex. Gov't Code § 559.004, you are also entitled to request, in accordance with TDCJ procedures, that incorrect information the TDCJ has collected about you be corrected.

Distribution:
Mail original to Employee Relations, HR Division
Copy - Employee (Note: The complainant may not receive a copy of the respondent's notification or vice versa.)
Copy - Employee's Unit or Department Human Resources EEO File
PERS 408 (11/14)

**Plaintiff's App. 228**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

 

PD-13 (rev. 6)
Attachment C
Page 18 of 19

## Texas Department of Criminal Justice
### EEO PREHEARING INVESTIGATION REPORT

**Purpose:** This form shall be used to record allegations by an employee of conduct that may be a violation of the TDCJ EEO policies PD-12, PD-13, PD-31, other EEO violations per PD-22, or PD-33. If additional space is needed for any portion of this report, a continuation sheet may be attached.

**I. To be completed by the EEO investigator (Attach a copy of the complainant's written description of respondent's alleged specific conduct, with information redacted as necessary.)**

EEO Case Number: _____

Complainant's Name: _____        Month/Day of Birth: _____
                     Last          First          MI                        (mm/dd)

Payroll
Job Title: _____   Date(s) of Incident(s): _____
                                                              (mm/dd/yyyy)

**II. Respondent's statement (obtained by EEO investigator):**

_____

_____

_____

_____

_____

_____

_____

_____

_____

Respondent's Name: _____   Title: _____
Please Print:       Last        First        MI                 Payroll Job Title

Respondent's Signature: _____   Date: _____

**Note to Employee:** With few exceptions, you are entitled upon request: (1) to be informed about the information the TDCJ collects about you; and (2) under Tex. Gov't Code §§ 552.021 and 552.023, to receive and review the collected information. Under Tex. Gov't Code § 559.004, you are also entitled to request, in accordance with TDCJ procedures, that incorrect information the TDCJ has collected about you be corrected.

PERS 325-EEO (11/14)                    Page 1 of 2

**Plaintiff's App. 229**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

**III. EEO Prehearing Investigative Findings:  See attached.**

EEO Case Number:_____

---

**IV.  Section Director, Employee Relations or Designee Review**
Based on the information available, the facts ☐ do ☐ do not support that a rule violation may have occurred.
**Recommended violation: PD-** _____  **Rule(s) #** _____
**Comments:**

_____

_____

_____

| Name (printed) | Signature | Date |
|---|---|---|

**V.  Prehearing Investigator (Manager, Employee Relations or Designee) Action:**  There is sufficient information for the following:

**Rule violation may have occurred:**

☐ Proceed to EEO-DAO reprimanding authority for alleged EEO rule violation

  Alleged rule violation number(s):  _____

☐ Proceed to reprimanding authority for alleged rule violation that is not an EEO rule violation

  Alleged rule violation number(s):  _____

☐ Other, such as respondent's employment separation (Attach explanation)

**No rule violation identified:**

☐ No Action Taken

☐ Other, such as dispute resolution or training (Attach explanation of action taken)

**Comments:** _____

_____

_____

| Name (printed) | Signature | Date |
|---|---|---|

**VI.  Reprimanding Authority's Action:**

☐ Proceed to employee hearing.  Alleged rule violation number(s):  _____

☐ No employee hearing and no action taken

☐ No employee hearing and other action taken, such as separation from a training academy or letter of instruction. (Attach explanation of action taken.)

| Reprimanding Authority's Name and Title (printed) | Signature | Date |
|---|---|---|

If this report is forwarded to a reprimanding authority for an alleged EEO rule violation or other alleged rule violation, this report serves as the prehearing investigation required by PD-22, "General Rules of Conduct and Disciplinary Action Guidelines for Employees."  Another prehearing investigation shall not be conducted.

PERS 325-EEO (11/14)                     Page 2 of 2

**Plaintiff's App.  230**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED



**TEXAS DEPARTMENT**

**OF**

**CRIMINAL JUSTICE**

| | |
|---|---|
| <u>NUMBER</u>: | PD-22 (rev. 12) |
| <u>DATE</u>: | January 1, 2009 |
| <u>PAGE</u>: | 1 of 66 |
| <u>SUPERSEDES</u>: | PD-22 (rev. 11) October 1, 2007 |

# EXECUTIVE DIRECTIVE

| | |
|---|---|
| <u>SUBJECT</u>: | **GENERAL RULES OF CONDUCT AND DISCIPLINARY ACTION GUIDELINES FOR EMPLOYEES** |
| <u>AUTHORITY</u>: | Texas Government Code Chapter 571 and §§493.007, 500.003, 614.023; Texas Family Code §2.401; and 18 U.S.C. §§921(a) and 922(g) |
| | Reference: American Correctional Association (ACA) Standard:  4-4063 and 4-4281-6 |

## APPLICABILITY:

The provisions within this directive are applicable to all Texas Department of Criminal Justice (TDCJ or Agency) employees with the exception of the disciplinary process for employees who allegedly commit a PD-22, "General Rules of Conduct and Disciplinary Action Guidelines for Employees" rule violation while attending: (a) the Pre-Service Correctional Training Course or Non-Correctional Officer Training Course at the TDCJ Correctional Institutions Division's Pre-Service Training Academy (PSTA); (b) the TDCJ Parole Division's Parole Officer Entry Level Training Academy (POTA); or (c) the Office of Inspector General Training Academy (OIGTA). When this occurs, the disciplinary process shall be in accordance with PD-33, "Trainee Management."

## EMPLOYMENT AT WILL CLAUSE:

These guidelines **do not** constitute an employment contract or a guarantee of continued employment.  The Agency reserves the right to change the provisions of these guidelines at any time.

Nothing in these guidelines and procedures limits the Executive Director's authority to establish or revise human resources policy.  These guidelines and procedures are adopted to guide the internal operations of the Agency and **do not** create any legally enforceable interest or limit the Executive Director's, Deputy Executive Director's or Division Directors' authority to terminate an employee at will.

Plaintiff's App.  231

2.   A unit/department pre-hearing investigation conducted by the charged employee's unit/department for any other alleged violation(s).

NOTE:  If an alleged EEO rule violation is discovered during a unit/department pre-hearing investigation, the Employee Relations Intake Section, Human Resources Division shall be contacted before proceeding further.

D.   A unit/department pre-hearing investigation shall be completed and the findings submitted to the Reprimanding Authority within ten (10) workdays of an alleged violation(s), except:

1.   When justification for a delay exists (e.g., employee/witness is hospitalized, scheduling conflicts); or

2.   When an alleged violation(s) results in a UOF Fact-Finding Inquiry, a Risk Management Incident Review Board or an Office of the Inspector General (OIG) investigation.  Upon completion of the proceeding, a pre-hearing investigation shall be conducted in accordance with the procedures in this directive.

NOTE:  The justification for a delay shall be explained in writing.

E.   A PERS 325-EEO, EEO Pre-Hearing Investigation Report shall be used when conducting a pre-hearing investigation relating to an alleged EEO rule violation(s).

NOTE: The PERS 325-EEO is Attachment B to PD-13, "Sexual Harassment and Discourteous Conduct of a Sexual Nature" and PD-31, "Discrimination in the Workplace."

F.   The PERS 325, Employee Offense and Pre-Hearing Investigation Report, (Attachment F) shall be used when recording an alleged violation(s) other than an alleged EEO rule violation(s), when conducting a pre-hearing investigation, and when making a recommendation(s) to the Reprimanding Authority.

NOTE:  The pre-hearing investigator may determine that the employee's specific conduct and/or the witness statements have been sufficiently documented in the related UOF Fact-Finding Inquiry, Risk Management Incident Review Board or OIG investigation.  If so, the pre-hearing investigator shall indicate the identity of the fact-finding inquiry/investigation in the applicable areas of the PERS 325 (e.g., "See attached releasable copy of OIG Investigation No. [insert identifying number]") and attach a releasable copy of the fact-finding inquiry or investigation to the PERS 325.  In such instances, the pre-hearing investigator shall still obtain a statement from the charged employee on the PERS 325.

PD-22 (rev. 12)
Attachment A
Page 41 of 66

**18d. Trafficking and/or Trading of any Contraband Other than Those Items Listed in Rule No. 18a or 18b - Violation Level 2:**
Accepting or agreeing to accept such contraband from an offender, offering such contraband to an offender or agreeing to purchase contraband for an offender is prohibited.

**19. Use of Alcohol or Illicit Drugs on the Job - Violation Level 1:**
Use of alcohol or illicit drugs, including the misuse of prescription drugs, while on duty is prohibited.

**20. Violation of Statutory Authority/Court Order/Rules/Regulations/Policies - Violation Level 2:**
It is the employee's responsibility to know, have a clear understanding of and comply with rules, regulations, policies, court orders and statutory authority governing the operation of the Agency. Not being aware of the existence of any of the aforementioned is not a defense for violation of the same.

NOTE: The specific rule, regulation, policy or statutory authority shall be clearly identified when charging an employee with this violation.

**21. Discrimination/Harassment against Persons of a Protected Class/Retaliation - Violation Level 1:**
Discrimination or harassment based on race, color, religion, sex (gender), including sexual harassment, national origin, age (40 or above), disability or genetic information is prohibited. In addition, an employee is prohibited from retaliating against or harassing an employee or other individual who: (1) opposed discrimination, sexual harassment or other prohibited conduct; (2) has filed a complaint alleging such discrimination or harassment; or (3) has cooperated in an Agency or external investigation, hearing or court proceeding regarding such an allegation. Some examples of adverse employment actions that might be construed by the Agency to be retaliation are identified in PD-13, "Sexual Harassment and Discourteous Conduct of a Sexual Nature" and PD-31, "Discrimination in the Workplace."

NOTE: This rule violation shall be supported by an EEO pre-hearing investigation conducted in accordance with PD-13, "Sexual Harassment and Discourteous Conduct of a Sexual Nature" or PD-31, "Discrimination in the Workplace."

**22. Harassing or Retaliating against Another (not EEO-related) - See 22a and 22b:**
An employee is prohibited from harassing or retaliating against another individual in any form or for any reason.

**22a. Harassing or Retaliating against Another Individual - Violation Level 2:** (Includes all forms of harassment or retaliation not prohibited by Rule No. 21 or 22b.)

**22b. Harassing or Retaliating against an Offender or Another Individual for Participating in an Official Investigation/Inquiry or for Pursuing Legal Activities (i.e., petitioning the courts) - Violation Level 1**

**Plaintiff's App. 233**



| | |
|---|---|
| **TEXAS DEPARTMENT** | **NUMBER:** PD-31 (rev. 6) |
| **OF** | **DATE:** January 1, 2010 |
| **CRIMINAL JUSTICE** | **PAGE:** 1 of 21 |
| | **SUPERSEDES:** PD-31 (rev. 5) October 1, 2007 |

# EXECUTIVE DIRECTIVE

**SUBJECT:** DISCRIMINATION IN THE WORKPLACE

**AUTHORITY:** Texas Government Code § 493.007; Title VII, *Civil Rights Act of 1964*, as amended, 42 U.S.C. § 2000e, et seq.; *Americans with Disabilities Act*, as amended, 29 U.S.C. § 12101, et seq.; *Equal Pay Act of 1963*, 29 U.S.C. § 206; *Age Discrimination in Employment Act of 1967* (ADEA), as amended, 29 U.S.C. § 621, et seq.; Texas Labor Code Ch. 21 and §§ 301.151-301.156; Executive Order 11246

**APPLICABILITY:** Texas Department of Criminal Justice (TDCJ)

## EMPLOYMENT AT WILL CLAUSE:

These guidelines **do not** constitute an employment contract or a guarantee of continued employment. The TDCJ reserves the right to change the provisions of these guidelines at any time.

Nothing in these guidelines and procedures limits the executive director's authority to establish or revise human resources policy. These guidelines and procedures are adopted to guide the internal operations of the TDCJ and **do not** create any legally enforceable interest or limit the executive director's, deputy executive director's, or division directors' authority to terminate an employee at will.

## POLICY:

The TDCJ has zero tolerance for all forms of discrimination based on race, color, religion, sex (gender), national origin, age, disability, or genetic information. Any harassment or retaliation is also prohibited. Employees shall follow the guidelines within this directive for the reporting of such discrimination in the workplace so that prompt remedial action can occur, and a work environment free from all forms of employment discrimination can be maintained.

The Human Resources Division shall conduct an Equal Employment Opportunity (EEO) investigation of all allegations of conduct prohibited by this directive.

Plaintiff's App. 234

2.  The warden/department head or designee shall obtain the complainant's and the respondent's signatures on separate PERS 408, Notification of EEO Investigation and Interim Remedial Actions forms, (one for the complainant and one for the respondent) and mail both of the original signed forms to Employee Relations, Human Resources Division.

C.  Investigation

1.  General Provisions

a.  All EEO investigations shall be conducted discreetly and in a good faith effort to be fair to all parties involved.

b.  The investigation shall be conducted in a timely and thorough manner. The EEO investigator shall cooperate with the supervisor or warden/department head and request assistance as needed (e.g., access to a room to interview the respondent, a telephone, or a computer).

c.  An EEO investigation shall be completed even if the complainant withdraws the complaint.

2.  Investigation Process

a.  The EEO investigator shall:

(1)  Complete Section I of the PERS 325-EEO, EEO Prehearing Investigation Report (Attachment C) and make a copy for the respondent identified in the written complaint.

(2)  Attach a copy of the written complaint to the PERS 325-EEO, EEO Prehearing Investigation Report.

If the complainant included the following information in the written complaint, the information shall be redacted (obliterated, blacked out, or otherwise obscured) from the written complaint before it is attached to the PERS 325-EEO form:

(a)  Information regarding an allegation against another respondent;

(b)  Social security numbers, home addresses, home telephone numbers, personal e-mail addresses, and names of family members who are not material to the charge; and

To: Ms. Eve Shelly
Manager, Employee Relations

TDCJ- Human Resouces Headquarters
#2 Financial Plaza Suite #600
Huntsville, Texas 77340


From: Sergeant Ambur N. Hale

TDCJ- James V. Allred Unit
2101 North FM 369
Iowa Park, Texas 76367
(940) 855-7477


August 15, 2016
In regard to EEO Intake #16003260- Sergeant Ambur Hale (C) v. Major Johnathan Eastep:


Dear Ms. Shelly,

My name is Sergeant Ambur N. Hale and I filed a complaint against Major Johnathan
Eastep on June 20, 2016. When I reported my incident, I clearly stated that I was reporting
a violation of Personal Directive No. 13- Sexual Harassment and Discourteous Conduct of
a Sexual Nature. During the first week of August 2016, I received a three sentence I.O.C
stating that my complaint of "sexual harassment" was concluded and a "policy violation
did not occur". I made multiple unsucessful attempts to contact you, via telephone. On
August 5, 2016, I was finally sucessful, via telephone. During our brief conversation, you
stated that "Sexual Harassment" and "Discourteous Conduct of a Sexual Nature" were the
"same difference". I am sure your office and the EEO investigators are well aware that
Sexual Harassment and Discourteous Conduct of a Sexual Nature are two separate
violations with different charging elements. Ms. Shelly you stated that Major Eastep's
behavior was "inappropriate" and "it was apparent that you tried to move but he
wouldn't let you" referring to myself and Major Eastep's incident (on June 15, 2016).
When I inquired why my complaint was being dismissed, You stated that due to it "not
being sexual" your office found no violation. I am requesting a review of PD-13, page 4 I. B
& C-1. Said Directive clearly states that Discourteous Conduct of a Sexual Nature may rise
to the level of Sexual Harassment, which implies the two are separate charges and are not
the "same difference". Furthermore, although your office may believe Major Eastep
walking up behind me, grabbing the fence in front of me and pulling himself into my
backside while trapping me between his arms and body against my will is "not sexual" the
directive states the following;

16 - 080850

Plaintiff's App. 236

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

EXHIBIT O

Physical acts such as intentional physical conduct that is sexual in nature or a reasonable person would find offensive. Examples of such acts include, but are not limited to, intentional touching, jabbing, pinching, grabbing, rubbing, pressing or brushing against a person's body.

Without a doubt, I believe a reasonable person would find Major Eastep's behavior offensive. Major Eastep's behavior was unwelcomed, unsolicited and prohibited by PD-13. This Directive was implemented to ensure a safe work environment. Executive Director, Mr. Bryan Collier stated and I quote "Sexual harassment is a form of illegal sex discrimination that is prohibited, and for which the Texas Department of Criminal Justice (TDCJ) has zero tolerance. In order to prevent sexual harassment, TDCJ also prohibits any discourteous conduct of a sexual nature that a reasonable person would find offensive, or which is known to be unwelcome to the person against whom it is directed. Retaliation is also prohibited." I am requesting your office re-evaluate my complaint against Major Eastep, EEO Intake #1600326o and issue a statement/disposition on the PD-13 violation of Discourteous Conduct of a Sexual Nature. I eagerly await a response from your office.

Respectfully,

Sergeant Ambur N. Hale
James V. Allred Unit

16 - 0808050

Plaintiff's App. 237

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED



SJCardwell
COUNSELING & CONSULTING, P.L.L.C.

AUTHORIZATION TO RELEASE/EXCHANGE INFORMATION
(Use Black Ink Only)

Client Name: _Ambur Hale_ Phone#: _940 444 3777_ SS#: ▐▐▐ DOB: _8|20|83_

| I Hereby Authorize: | Name: | Susan J Cardwell, M.A., LPC-S | | |
|---|---|---|---|---|
| | Address | 4245 Kemp Blvd, Suite 315 | | |
| | City: | Wichita Falls | State: TX | Zip: 76308 |
| | Contact Person: | Susan Cardwell | Phone: 940-691-1267 | |

☑ To Release to:
☐ To Obtain From:

Name: _Ambur Hale_

Address: _____

City: _____ State: _____ Zip: _____

Contact Person: _____ Phone: _____

**Information to be Released:** (check all that apply):

☐ Client ID (Phone, Address)          ☐ Diagnosis
☐ Assessment/Social History           ☐ Psychological Evaluation
☐ Treatment Plan                      ☑ Progress Notes
☐ Verbal Exchange                     ☐ Discharge Summary
☐ Other: _____

This release is for the following reason(s) (be specific): _Client request._

**NOTE:** The above information may include drug and alcohol/mental health/communicable disease information, including HIV test results, AIDS related information. I have been informed that this specific release is required because if my records are protected under the federal regulations governing Confidentiality of Alcohol and Drug Abuse Client Records; 42 CFR, Part 2, the records cannot be disclosed without my written consent unless otherwise provided for in the regulations. A general authorization for the release of medical or other information is **not** sufficient for this purpose. If I am signing as a parent of a minor child or guardian of a minor child, I further understand the information released may contain references to my family or myself. Except for the information related to alcohol or drug abuse treatment, the information disclosed pursuant to this authorization may not be protected by medical privacy laws and may be subject to re-disclosure by the recipient. The authorizing person through written notice may revoke this authorization at any time, except to the extent that Cardwell Counseling has already relied upon your authorization to use or disclose your health information as described in the Notice of Privacy Practices. We will not withhold treatment, Medicaid benefits, or payment processing if you refuse to sign the authorization. If not earlier revoked, this consent shall expire on:
_1-25-18_          or Not to exceed One (1) year from date of client signature.
Date or event

Form must be completed before signing

This authorization is hereby revoked at my request:

_Ambur N Hale_  _1-24-2018_
Client Signature          Date

_____  _____
Client Signature          Date

_____  _____
Legal Authorized Representative          Date
And Relationship to Client

_____  _____
Legal Authorized Representative          Date

_Susan Cardwell MA LPC-S_ _1/24/18_
Witness          Date

_____  _____
Witness          Date

_____ Action by Medical Records
_____ File in Chart

Updated 07/06/17

**Plaintiff's App.  238**

EXHIBIT P

| Notes/Ins Cert. | Date/time | Process Notes |
|---|---|---|
| | 8/19/16 | See note in file. |
| | 1/23/18 | Rec'd req for cc of file from Atchley, Russell, etc w/signed released. Called atty office to advise no records release to attys & process for clients to obtain records. |
| | 1/24/18 | Ambur p/u cc of notes & signed Release of Info - see file. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Plaintiff's App.  239**

**SJCardwell**

CLIENT _Amber Hale_                                          Date _8/18/16_

| | | | |
|---|---|---|---|
| **Appearance** | Well Groomed | Disheveled | Bizarre | Inconsistant |
| **Motor Activity** | Normal | Retarded | Agitated | |
| **Affect** | Worrisome | Sad | Blunted | Expansive |
| | Appropriate | Labile | Constricted | Flat |
| **Mood** | Normal | Depressed | Anxious | Labile |
| **Speech** | Normal | Pressured | Loud | Slurred |
| | Delayed | Soft | | |
| **Thought Process** | Intact | Circumstantial | Tangential | Flight of Ideas |
| | Loose | Concentration Impaired | Memory Impaired | Attention Deficit |
| **Hallucinations** | None | Auditory | Visual | |
| **Delusions** | None | Persecutory | Paranoid | Grandiose |
| **Orientation** | Fully Oriented | Disoriented | | |
| **Judgment** | Intact | Impulsive | | |
| **At Risk Behavior** | Suicidal | No With Plan W/O Plan With Intent W/O Intent | Homicidal | No With Plan W/O Plan With Intent W/O Intent |

UHC

**Diagnosis:**

Axis I F43.0 Acute Stress Disorder  Axis III                Axis V

Axis II                        Axis IV

**Treatment Plan:**

ST Goals: Establish rapport
Verbalize event from beginning to end
Learn & implement 3 calming skills

LT Goals: Talk abt the incident w/o excessive emotional response
Engage fully in further investigation - if any
Return to work & fit for duty

Referrals/Notes: filed rpt against male superior w/ unsatisfactory outcome (no disciplinary action) at this time.

**Plaintiff's App. 240**

## CLIENT PROGRESS NOTE

Name Ambur Hale                Date 8/19/16              Dx F43.0

Session: ☑ Individual   ☐ Family   ☐ Group

Place of Service: ☑ Office              Start Time 11A          End Time 11:45A

### MENTAL STATUS

**Appearance:** ☑ appropriate  ☐ disheveled  ☐ inappropriate attire  ☐ well-groomed

**Orientation** ☐ person  ☐ place  ☐ time  ☐ situation ___ X4

**Functioning:** ☑ alert/oriented  ☐ disoriented/incoherent  ☐ confused  ☐ impaired judgment  ☐ impaired insight
☐ memory impairment  ☐ abnormal movements  ☐ tremors  ☐ tangential
☐ psychomotor retardation  ☐ weight loss  ☐ weight gain  ☐ tearfulness

**Speech:** ☑ normal  ☐ rapid  ☐ slow  ☐ monotone  ☐ pressured

**Behavior:** ☑ cooperative  ☐ uncooperative  ☐ threatening  ☐ agitated  ☐ aggressive

**Mood/Affect:** ☑ congruent  ☐ blunted/flat  ☐ labile  ☑ depressed/sad  ☐ anxious  ☐ irritable  ☐ angry  ☐ hostile
☐ intense  ☐ hopeless/helpless  ☐ worthless  ☐ anhedonia  ☐ euthymic  ☐ euphoria

**Daily Patterns:** ☐ insomnia  ☐ hypersomnia  ☐ nightmares  ☐ decreased libido  ☐ increased libido  ☑ fatigue
☐ social isolation  ☐ decreased work/school performance  ☐ no impairment in daily patterns

**Thought Content:** ☑ normal  ☐ suicidal/homicidal ideation  ☐ intent  ☐ loosening of association  ☐ flight of ideas
☐ plan/means _____  ☐ attempts

☐ hallucinations  TYPE: ☐ auditory  ☐ visual  ☐ olfactory  ☐ tactile
☐ delusions  TYPE: ☐ paranoid  ☐ grandiose  ☐ bizarre  ☐ persecutory

**Presenting Problem:**
Ambur reported that action was taken through IOG which reduced her fear of retaliation and resulted in feeling validated.

**Goal/Objectives:**
Assist Ambur with verbalizing her thoughts and feelings about assault and impact on her sense of self.

**Intervention:**
... had stable mood and affect; reported that she'd "cried enough yesterday" and was preparing herself to return to work on Monday. She
...ed steps in moving forward: reconnect emotionally with BF, prepare for Training in Plano if it occurs, get son ready for school, stop crying,
... family with a stable mood. Her actions were affirmed. We reviewed the meeting with the IOG, and collaborated to identify mind reading that
perpetuated her fear.

**Homework/Action Plan:**
She will schedule appt when she finds out if training in Plano or continuing regular sched at Alred.

**Medical Necessity:**
Yes, based on Ambur's Sx supporting Dx and evidence supporting CBT as effective treatment for Dx.

**Professional Intervention services referral:** ☐ Social worker  ☐ Nutritionist  ☐ Nurse  ☐ Other specialist  ☑ None needed
services needed please describe:

**Transportation needed:** ☐ Yes  ☑ No  If yes please describe purpose, type needed, and arrangements:

**Community services referral:** ☐ mental health  ☐ substance abuse  ☐ domestic violence shelter  ☐ ECI  ☐ parenting classes
☐ medical  ☐ educational assistance  ☐ child care  ☐ homeless services  ☐ financial aid  ☐ senior citizens services  ☐ food/clothing
☐ childbirth classes  ☑ no services needed
**Describe services needed:**
Not at this time. Will consider if mood is not stabilized over 6 month period.

**Describe coordination with medical/mental healthcare providers:**

Therapist _____ J Cardell MA LPC-S           Date 8/19/16

**Plaintiff's App. 241**

RE: Ambur N. Hale
DOB: 08/20/1983
SSN: XXX-XX-████

## MEDICAL RECORDS AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared _Susan Cardwell_ who, being by me duly sworn, deposed as follows:

My name is _Susan J Cardwell_, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of the records of SJCardwell Counseling & Consulting, PLLC. Attached hereto are **13** pages of records from SJCardwell Counseling & Consulting, PLLC regarding AMBUR N. HALE. These said **13** pages of records are kept by SJCardwell Counseling & Consulting, PLLC in the regular course of business and it was the regular course of business of SJCardwell Counseling & Consulting, PLLC for an employee or representative of SJCardwell Counseling & Consulting, PLLC, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record, and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

_____
AFFIANT

SWORN TO AND SUBSCRIBED before me on the 24 day of _May_, 2019.



_____
Notary Public, State of Texas

**Plaintiff's App. 242**

Amber Hale

5/6/19 tired. Stress w/pending lawsuit. Irritated that proc/judgment
on-1 Discovered BF phone passcode - ✓ his phone & found.
Used Guided Discovery:

Deposition went well! - Attended alone

• attempted to ↓ stress - internal    - day after Warden called her in &
as planned        & external        asked abt tx

✗✗ fear - ↑ hypervigilance question your integrity, threatened
        ↑ hypervigilance to write her up "you have an Agenda"

can't        • taking steps to be home & provide meals for BF
not at           • meets both their needs
work/life
bal         • Explored relationship w/ BF - she views him
            - she & BF put diff        as victim
              import on job

            • How to communicate needs to BF - inform
              him of what is negotiable & off limits.
            • Prog w/ steps to ↑ work/life balance.

                    Sam J Cardwell MA LPC-S

                                        **Plaintiff's App. 243**

Ambur Hale

4/8/19 Mixed mood & affect. Intact thought processes
11-noon & judgment.
Deposition 17th — Im confident, can't hurt myself
w/ truth

His depo — she observed his agitation
— her exper — how could anyone believe
anger                    — trust w/ his testimony but not for me
— some empathy for his bad
decisions resulting in
truck driving, embarrassing
for family

Moderate struggle w/ forgiveness & cont lawsuit.
Trust w/ BF — perceived his emot distance
— "I am more invested"   — angry
— I have to throw a fit to
get you to help"

How to trust your instincts. Wait & see.
I don't want to lose everyone on my team.

                    Cardell MA LPC-S

Plaintiff's App. 244

Amber Hale
3|11|19 WNL mood & affect. Became tearful abt BF.
1-noon

Court date - pushed to Oct.
Deposition - Thurs 3|14|19

Work - Complementary abt work
      - Regional certificate

Fear of Retaliation - has ↓ due to change in
                      upper mgment/her wardens
                    - lower level employees have
                      no info/exper of incident

Personal life - eliminated Δ
              - hearing her truth.
              - STD tests complete
              - decide to trust
              - genuine feeling is hurt - intimacy

Cardell MA-LPC-S

Plaintiff's App. 245

Ambur Hale

11/11/19  WNL mood & affect. Denied major concerns.

12

Work sched change wk 2 - BF opposite shift, temp. "This is only temp"

Lawsuit update - deposition - Accused deposed
- she had balanced thoughts abt process.

Managing job by the rules w/ ↓ staff -
 - "exiting 10 hrs a wk" - Øpd
 - calcts stress - gender ID, reporter?
 - PTSD trigger - hypervigilance, hyperarousal
            - ID & benefits - way aware
            - check info w/others

Overall prog w/ managing triggers. ——

Erin J Cardell MA LPC-S

Amber Hale

14/19   Return from vacation; Family drama. Mixed mood & affect
1- noon

Reviewed Sx — ups & downs                                    ↓ SE
            — improved w/ fear of relapse to neg thoughts
            — ↓ crying                                        abt
            — their loss is covered

Work Satisfaction — they don't let you have separation
                 — new warden is changing things
                 — leave work at work

When event occurred —
  — I didn't want to include others
  — isolating                              "hurt me more"
                                            than him
  — "I couldn't cuss him/punch him" → chose
                          the long game
  — I suffer — I'm waiting for my justice  ★Automatic
              — Did I do enough?            Thoughts
  Schema — Ignored, minimized
   Issues                          sad affect


Erin J Cardell MA LPC-S

Amber Hale

2/10/18 Tired. Prob solved insurance. WNL
- norm mood & affect.
Trip to Mex for son's soccer. Exchange
for Xmas gifts. Priority.

Stressor - work flexibility is challenging
  w/ co worker
  - rptd crying last wk
  - love lang - words of affirmation
  - brain stormed coping

☆ Agreed to monthly session to monitor
stress & coping.

Erin Cardwell MA LPC-S

Ambur Hale
/19/18 Well groomed - left work.
- noon She & Trainer - "I drank the Kool Aid"
            - ethics & policy

Violation - no policy on how to counsel
        - policy important, keeps everyone safe

Reviewed Policies of sexual harassment &
            " misconduct &
- actual events - her volume ↑
            - she con't to believe in institution
            - doesn't blame everyone
            - Ambur had balanced thoughts

Listening to Podcasts/Youtube on Active Listening -
    - more hopeful in relationship
    - Improved communication

Project - prep house to sell

Ann Cardell MA LPC-S

Amber Hale

11/5/18    Tearful. Mixed depr/anx mood. "I need a
11-noon    "lifeover." Exercising to improve mood.
Used Active Listening & Avoidance –
Triggered by rec'd of CD w/ defense discovery
  – anger              – req for court date 5/2019
  – "I know it's lies"
Update – discovered BF unfaithful after 4-6 mo
reconciliation.
                              ↓
                    during time she was
                    assaulted


Couldn't file charges –
TWC – filed complaint – took too long
Atty – Sexual Harassment at Workplace
  – if we settle it will never end
  – how will it affect my life


Who believes you? – BF            – Atty
                    – therapist
                    – parents

"Pinned me to a fence & put his business against
my back end." Shocked, what's the best thing
for me to do? embarrassment. repercussions for hurting
him. Said he was "counseling" me. She wants
stipulation that's not "counseling."

                    Carroll MA LPCS

Plaintiff's App. 250

SJCardwell Counseling & Consulting PLLC

## CLIENT PROGRESS NOTE

Name Ambur Hale                Date 8/19/16              Dx F43.0

☑ Individual  ☐ Family  ☐ Group

Service: ☑ Office                    Start Time 11A          End Time 11:45A

### MENTAL STATUS

Appearance: ☑ appropriate  ☐ disheveled  ☐ inappropriate attire  ☐ well-groomed

Orientation: ☐ person  ☐ place  ☐ time  ☐ situation  X4

Functioning: ☑ alert/oriented  ☐ disoriented/incoherent  ☐ confused  ☐ impaired judgment  ☐ impaired insight
☐ memory impairment  ☐ abnormal movements  ☐ tremors  ☐ tangential
☐ psychomotor retardation  ☐ weight loss  ☐ weight gain  ☐ tearfulness

Speech: ☑ normal  ☐ rapid  ☐ slow  ☐ monotone  ☐ pressured

Behavior: ☑ cooperative  ☐ uncooperative  ☐ threatening  ☐ agitated  ☐ aggressive

Mood/Affect: ☑ congruent  ☐ blunted/flat  ☐ labile  ☑ depressed/sad  ☐ anxious  ☐ irritable  ☐ angry  ☐ hostile
☐ intense  ☐ hopeless/helpless  ☐ worthless  ☐ anhedonia  ☐ euthymic  ☐ euphoria

Daily Patterns: ☐ insomnia  ☐ hypersomnia  ☐ nightmares  ☐ decreased libido  ☐ increased libido  ☑ fatigue
☐ social isolation  ☐ decreased work/school performance  ☑ no impairment in daily patterns

Thought Content: ☑ normal  ☐ suicidal/homicidal ideation  ☐ intent  ☐ loosening of association  ☐ flight of ideas
☐ plan/means  ☐ attempts

☐ hallucinations  TYPE: ☐ auditory  ☐ visual  ☐ olfactory  ☐ tactile
☐ delusions  TYPE: ☐ paranoid  ☐ grandiose  ☐ bizarre  ☐ persecutory

**Presenting Problem:**
Ambur reported that action was taken through IOG which reduced her fear of retaliation and resulted in feeling validated.

**Goal/Objectives:**
Assist Ambur with verbalizing her thoughts and feelings about assault and impact on her sense of self.

**Action:**
...had stable mood and affect; reported that she'd "cried enough yesterday" and was preparing herself to return to work on Monday. She identified steps in moving forward: reconnect emotionally with BF, prepare for Training in Plano if it occurs, get son ready for school, stop crying, spent family with a stable mood. Her actions were affirmed. We reviewed the meeting with the IOG, and collaborated to identify mind reading that perpetuated her fear.

**Homework/Action Plan:**
She will schedule appt when she finds out if training in Plano or continuing regular sched at Alred.

**Medical Necessity:**
is, based on Ambur's Sx supporting Dx and evidence supporting CBT as effective treatment for Dx.

**Professional intervention services referral:** ☐ Social worker  ☐ Nutritionist  ☐ Nurse  ☐ Other specialist  ☑ None needed
services needed please describe:

**Transportation needed:** ☐ Yes  ☑ No  If yes please describe purpose, type needed, and arrangements:

**Community services referral:** ☐ mental health  ☐ substance abuse  ☐ domestic violence shelter  ☐ ECI  ☐ parenting classes
☐ medical  ☐ educational assistance  ☐ child care  ☐ homeless services  ☐ financial aid  ☐ senior citizens services  ☐ food/clothing
☐ childbirth classes  ☑ no services needed

**Prescribe services needed:**
not at this time. Will consider if mood is not stabilized over 6 month period.

**Prescribe coordination with medical/mental healthcare providers:**

Signature Sam J Cardwell MA LPC-S          Date 8/19/16

**Plaintiff's App. 251**

...e Ambur Hale...  ...Date of Birth...  ...DOB...

sion: ☑ Individual  ☐ Family  ☐ Group
...e of Service: ☑ Office    Start Time 11A    End Time 11:45A

## MENTAL STATUS

...ce: ☑ **appropriate**  ☐ disheveled  ☐ inappropriate attire  ☐ well-groomed
...ntation  ☐ person  ☐ place  ☐ time  ☐ situation  X4
...ctioning: ☑ alert/oriented  ☐ disoriented/incoherent  ☐ confused  ☐ impaired judgment  ☐ impaired insight
☐ memory impairment  ☐ abnormal movements  ☐ tremors  ☐ tangential
☐ psychomotor retardation  ☐ weight loss  ☐ weight gain  ☐ tearfulness
...ech: ☑ **normal**  ☐ rapid  ☐ slow  ☐ monotone  ☐ pressured
...avior: ☑ **cooperative**  ☐ uncooperative  ☐ threatening  ☐ agitated  ☐ aggressive
...od/Affect: ☑ **congruent**  ☐ blunted/flat  ☐ liable  ☑ depressed/sad  ☐ anxious  ☐ irritable  ☐ angry  ☐ hostile
☐ intense  ☐ hopeless/helpless  ☐ worthless  ☐ anhedonia  ☐ euthymic  ☐ euphoria
...y Patterns: ☐ insomnia  ☐ hypersomnia  ☐ nightmares  ☐ decreased libido  ☐ increased libido  ☑ fatigue
☐ social isolation  ☐ decreased work/school performance  ☐ **no impairment in daily patterns**
...ught Content: ☑ **normal**  ☐ suicidal/homicidal ideation  ☐ intent  ☐ loosening of association  ☐ flight of ideas
☐ plan/means  ☐ attempts  _____
☐ hallucinations  TYPE: ___ ☐ auditory  ☐ visual  ☐ olfactory  ☐ tactile
☐ delusions  TYPE: ☐ paranoid  ☐ grandiose  ☐ bizarre  ☐ persecutory

...senting Problem:
...bur reported that action was taken through IOG which reduced her fear of retaliation and resulted in feeling validated.

...al/Objectives:
...sist Ambur with verbalizing her thoughts and feelings about assault and impact on her sense of self.

...ervention:
...k ...ad stable mood and affect; reported that she'd "cried enough yesterday" and was preparing herself to return to work on Monday. She
... steps in moving forward: reconnect emotionally with BF, prepare for Training in Plano if it occurs, get son ready for school, stop crying,
it ...ay with a stable mood. Her actions were affirmed. We reviewed the meeting with the IOG, and collaborated to identify mind reading that
...rpetuated her fear.

...mework/Action Plan:
...e will schedule appt when she finds out if training in Plano or continuing regular sched at Aired.

...dical Necessity:
...s, based on Ambur's Sx supporting Dx and evidence supporting CBT as effective treatment for Dx.

...ofessional Intervention services referral: ☐ Social worker  ☐ Nutritionist  ☐ Nurse  ☐ Other specialist  ☑ None needed
...ervices needed please describe: _____
...nsportation needed: ☐ Yes  ☑ No  If yes please describe purpose, type needed, and arrangements:

...mmunity services referral: ☐ mental health  ☐ substance abuse  ☐ domestic violence shelter  ☐ ECI  ☐ parenting classes
...medical  ☐ educational assistance  ☐ child care  ☐ homeless services  ☐ financial aid  ☐ senior citizens services  ☐ food/clothing
...childbirth classes  ☑ no services needed
...scribe services needed:
...t at this time. Will consider if mood is not stabilized over 6 month period.

...scribe coordination with medical/mental healthcare providers:

...st _~~J Cardell MA LPC-S~~_    Date 8/19/16

**Plaintiff's App. 252**

Ambur Hale

| Notes/Ins ert: | Date/time | Process Notes | | |
|---|---|---|---|---|
| | 8/19/16 | See note in file. ——— | | |
| | 1/23/18 | Rec'd req for cc of file from Atchley, Russell, etc w/signed released. Call ea atty office to advise no records release to attys & process for clients to obtain records. ——— | | |
| | 1/24/18 | Provided Ambur w/cc of case notes after signing Release of Info. | | |
| new | 11/5/18 | See note in file ——— | | |
| this | 11/19/18 | See note in file ——— | | |
| | 12/10/18 | See note in file ——— | | |
| | 1/14/19 | See note in file ——— | | |
| | 2/11/19 | See note in file. ——— | | |
| | 3/11/19 | See note in file ——— | | |
| | 4/8/19 | See note in file ——— | | |
| | 5/6/19 | See note in file ——— | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Plaintiff's App.  253**

SJCardwell

CLIENT _Ambur Hale_                                    Date _8/18/16_

| | | | |
|---|---|---|---|
| **Appearance** | Well Groomed | Disheveled | Bizarre | Inconsistant |
| **Motor Activity** | Normal | Retarded | Agitated | |
| **Affect** | Worrisome | Sad | Blunted | Expansive |
| | Appropriate | Labile | Constricted | Flat |
| **Mood** | Normal | Depressed | Anxious | Labile |
| **Speech** | Normal | Pressured | Loud | Slurred |
| | Delayed | Soft | | |
| **Thought Process** | Intact | Circumstantial | Tangential | Flight of Ideas |
| | Loose | Concentration Impaired | Memory Impaired | Attention Deficit |
| **Hallucinations** | None | Auditory | Visual | |
| **Delusions** | None | Persecutory | Paranoid | Grandiose |
| **Orientation** | Fully Oriented | Disoriented | | |
| **Judgment** | Intact | Impulsive | | |
| **At Risk Behavior** | Suicidal | No With Plan  W/O Plan  With Intent  W/O Intent | Homicidal | No With Plan  W/O Plan  With Intent  W/O Intent |

UHC / 2018 BCBS - Magellan beh Health

**Diagnosis:**

Axis I F43.0 Acute Stress Disorder   Axis III

Axis II F43.10 PTSD, unspecified   Axis IV

Axis V

**Treatment Plan:**

ST Goals:  Establish rapport
Verbalize event from beginning to end
Learn to implement 3 calming skills

LT Goals:  Talk abt the incident w/o excessive emotional response
Engage fully in further investigation - if any
Return to work & fit for duty

Referrals/Notes:  filed rpt against male superior w/ unsatisfactory outcome (no disciplinary action) at this time.

**Plaintiff's App.  254**

Report Date: 5/24/2019

**Patient Account Ledger**

Patient ID: 62137062   Patient Name: Hale JR, Ambur   DOB: 8/20/1983

Address: 324 Westside Dr, Wichita Falls, TX 76301

Transaction Date: All Dates

| Date | Description | Account No - Desc | Procedure | Provider | Amount |
|---|---|---|---|---|---|
| /2016 | | | EAP34 | Susan Cardwell, MA, LPC-S | $105.00 |
| /2016 | | | 90791 | Susan Cardwell, MA, LPC-S | $125.00 |
| /2016 | Patient Payment (cash) | 100-Payment | | | ($25.00) |
| /2016 | Insurance Payment | 100-Payment | | | ($50.00) |
| /2016 | | 200-Adjustment - CR | | | ($50.00) |
| /2016 | Patient Payment (check # 159867) | 100-Payment | | | ($50.00) |
| /2016 | | 200-Adjustment - CR | | | ($55.00) |
| /2018 | | | 90791 | Susan Cardwell, MA, LPC-S | $145.00 |
| /2018 | Patient Payment (credit card) | 100-Payment | | | ($25.00) |
| /9/2018 | | | 90834 | Susan Cardwell, MA, LPC-S | $115.00 |
| 19/2018 | Patient Payment (credit card) | 100-Payment | | | ($25.00) |
| 10/2018 | | | 90834 | Susan Cardwell, MA, LPC-S | $115.00 |
| 10/2018 | Patient Payment (credit card) | 100-Payment | | | ($25.00) |
| /2019 | Insurance Payment | 100-Payment | | | ($25.00) |
| /2019 | Insurance Payment | 100-Payment | | | ($25.00) |
| /2019 | Insurance Payment | 100-Payment | | | ($25.00) |
| 4/2019 | | | 90834 | Susan Cardwell, MA, LPC-S | $115.00 |
| /2019 | Insurance Payment | 100-Payment | | | ($25.00) |
| | | 200-Adjustment - CR | | | ($65.00) |
| 9/2019 | Patient Payment (credit card) | 100-Payment | | | ($25.00) |
| 9/2019 | | 200-Adjustment - CR | | | ($95.00) |
| 9/2019 | | 200-Adjustment - CR | | | ($65.00) |
| 9/2019 | | 200-Adjustment - CR | | | ($65.00) |
| 1/2019 | | | 90834 | Susan Cardwell, MA, LPC-S | $115.00 |
| 1/2019 | Patient Payment (credit card) | 100-Payment | | | ($25.00) |
| 14/2019 | Insurance Payment | 100-Payment | | | ($25.00) |
| 7/2019 | | 200-Adjustment - CR | | | ($65.00) |
| 1/2019 | | | 90834 | Susan Cardwell, MA, LPC-S | $115.00 |
| 1/2019 | Patient Payment (credit card) | 100-Payment | | | ($25.00) |
| 16/2019 | Insurance Payment | 100-Payment | | | ($25.00) |
| 5/2019 | | 200-Adjustment - CR | | | ($65.00) |
| 8/2019 | | | 90834 | Susan Cardwell, MA, LPC-S | $115.00 |
| 8/2019 | Patient Payment (credit card) | 100-Payment | | | ($25.00) |
| 11/2019 | Insurance Payment | 100-Payment | | | ($25.00) |
| 25/2019 | | 200-Adjustment - CR | | | ($65.00) |
| 6/2019 | | | 90834 | Susan Cardwell, MA, LPC-S | $115.00 |
| 6/2019 | Patient Payment (credit card) | 100-Payment | | | ($25.00) |
| | | | | Balance: | $90.00 |

**Plaintiff's App. 255**

**Linda A. Reinhardt, M.D.**
2601 Harrison Street, Suite 500
Wichita Falls, Texas 76308
Phone 940-322-9606
Fax: 940-322-9241

## *Facsimile Transmittal Form*

**DATE:** 2-15-18

**TO:** Louise Tausch

**FROM:** Lori - Dr. Linda Reinhardts Office

**FAX#:** 903-792-5801

**Number of sheets transmitted:** 14

**Special Instructions:**

Records for patient Amber N. Hale per your request.

**NOTICE**
The information contained in the transmission accompanying this notice is confidential and protected by the physician-patient privilege. It is intended only for the use of the individual or entity identified above. If the reader of the message is not the intended recipient, you are hereby notified that any dissemination or distribution of the accompanying communication is prohibited. The parties sending the accompanying documents do not waive the physician-patient privilege. If you have received this communication in error, please notify us immediately by telephone, collect, and return the original message to us at the above address via the United States Postal Service. We will reimburse you for the postage. Thank you.

**Plaintiff's App.  256**

EXHIBIT Q

RE: Ambur N. Hale
DOB: 08/20/1983
SSN: XXX-XX██████

## MEDICAL RECORDS AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared _____, who, being by me duly sworn, deposed as follows:

My name is *Dr. Linda A. Reinhardt*, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of the records of **Linda Reinhardt Dermatology**. Attached hereto are _13_ pages of records from **Linda Reinhardt Dermatology** regarding **AMBUR N. HALE**. These said _13_ pages of records are kept by **Linda Reinhardt Dermatology** in the regular course of business and it was the regular course of business of **Linda Reinhardt Dermatology** for an employee or representative of **Linda Reinhardt Dermatology**, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record, and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

_____
AFFIANT

SWORN TO AND SUBSCRIBED before me on the ___ day of _____, 2018.

_____
Notary Public, State of Texas

**Plaintiff's App.  257**

*Linda A. Reinhardt, M.D.  2601 Harrison Street Suite 500  Wichita Falls, TX 73608*

Patient Name _AMBUR N. HALE_____ Age _34_ Date _10/30/17_

Allergies to Medications: _NONE_

Current Medications: _BIRTH CONTROL (ORTHO TRI CYCLEN)_

**Current or Past Problems With:** (please circle)

| | | |
|---|---|---|
| Eyes | Yes **No** | |
| Ears/Nose/Throat | Yes **No** | |
| Heart | Yes **No** | |
| Lungs | Yes **No** | |
| Stomach/Bowel | Yes **No** | |
| Kidneys | Yes **No** | |
| Arthritis/Muscles/Joints | Yes **No** | |
| Skin | **Yes** No | _ACNE_ |
| Headaches/Seizures | Yes **No** | |
| Psychological Disorder | Yes **No** | |
| Thyroid/Diabetes | Yes **No** | |
| Blood/Bleeding Disorder | Yes **No** | |
| Lupus/Rheumatoid Arthritis | Yes **No** | |
| Asthma/Hayfever | Yes **No** | |

Females:  Are You Pregnant?      Yes **No**
Planning To Become Pregnant?   Yes **No**

Significant Health History Past  or Present   _NONE_

**Please Check The Following Medical Conditions That Have Occurred In Your Family:**

| Relative | Mother | Father | Blood |
|---|---|---|---|
| Arthritis | ☐ | ☐ | ☐ |
| Asthma | ☐ | ☐ | ☐ |
| Eczema | ☒ | ☐ | ☐ |
| Hayfever | ☐ | ☐ | ☐ |
| Malignant Melanoma | ☐ | ☐ | ☐ |
| Psoriasis | ☐ | ☐ | ☐ |
| Skin Cancer | ☐ | ☐ | ☐ |

Social History:

Occupation _____

| | | |
|---|---|---|
| Do You Live Alone? | **Yes No** | |
| Do You Drink Alcohol? | **Yes** No | Frequency _1 per week_ |
| Do You Smoke? | Yes **No** | Amount _____ |
| Do You Use Recreational Drugs? | Yes **No** | Frequency _____ |

**Plaintiff's App.  258**

From:                                    11/02/2017 10:51      #800 P.001/010

Linda Reinhardt Dermatology
2601 Harrison St #500
~~Whir~~ Wichita Falls TX 76308
940-322 9604
940 322 9241
Debbie.

REF#
Gave Referral # 173058809C

Referral Sumit
On #173058880
11-01-17
Start On
10.30.17
End
10.30.18



TO Lori on
11/01/17

# CLINICAS MI DOCTOR

Date of Referral: 08. 28. 17

Referred to: Linda Reinhardt          Dermatology

Preferred Doctor: Robert  Smith

Patient Name: Ambur Hale

Parent's Name: Oct 30 @ 9:00Am

Date Of Birth: 08.20.1983

Phone Number: 940.444.3777          Insurance: United Health care

This Patient has been referred for your professional evaluation and expert opinion. Please send your reports to my office via fax. Please feel free to call me if you need to report anything immediately or if you have to admit the patient to the hospital.

Thank you for sharing your expertise in treating our mutual patient.

Signature of Referring Provider: _____ MD

**mi DOCTOR**          506 S. Nursery Rd. Ste. 101 • Irving, TX 75060
tel 972.573.3288 • fax 972.573.3291          **Plaintiff's App. 259**

**NAME:** Amber Hale
**DATE:** 10/30/17

*NP*

*Dr Robert Smith – her dad*

**Smoking Status:** *NO*
**Medication Update:** *BCP*

*Hair loss — used Ketoconazole Shamp & Ketoconozole crm + Lamisil generic*

*1½ mo Lamisil orally stopped*

*Thy thyroid   Previously tested ✓*

*2 cc  ½ + ½   5 cm x 3 cm   Clobetasol Solution  → Rogaine*

CHIEF COMPLAINT: Hair loss. The patient has been noticing an increasing amount of loss of her hair. She works at the prison, she is a nurse. Her father is a physician's assistant. She has received some Lamisil orally for one and a half months, but it did not really show improvement. She has a family history of thyroid disease. She herself has been checked, she does not have it.
ALLERGIES: NKA
MEDICATIONS: Oral contraceptive.
PAST MEDICAL HISTORY: Acne.
FAMILY HISTORY: Thyroid problems.
SOCIAL HISTORY: Drinks once a week, works at TDCJ.
EXAM: Examination shows a very pleasant lady. She has thick curly hair. The scalp, however, shows round patches of alopecia quite well defined, non-scarring. She has numerous lesions scattered on the scalp, most notably on the occiput.
ASSESSMENT: Alopecia areata.
PLAN: ILK 7 mg per ML. Rogaine. Clobetasol. Discussed, information given. Recheck 1 month.

DEC 0 4 2017 NS *mt* 12/04/19

**Smoking Status:**
**Medication Update:**

From:                                                    08/29/2017 14:12      #661 P.002/005

Patient Name:      Ambur Hale
Street Address:
Mailing Address: 324 WESTSIDE DR WICHITA FALLS TX 76301-1816
Home Phone:      940-443-3777
Work Phone:          Leave a Message:
Date of Birth:      08/20/1983
Marital Status:      Unknown                          Social Security Number:
                                                      Email Address:

## Insurance Information

Primary Insurance: ~~United HealthCare~~ *BCBS    HS*          Phone Number: 877-842-3210
P O BOX 740809, Atlanta, GA, 30374-0809

Subscriber Name: Hale, Ambur                 Date of Birth  : 08/20/1983
Subscriber ID: 008493940                     Group Number: 744260

## Employer Information

Employer Name:
Address          :                 Phone Number:

Emergency Contact Name:            Phone Number:
Pharmacy Name:                     Walgreens Drug Store 09041
                                                      Pharmacy Number: 940-723-7979

*Ref. # thru 10/30/18*
*Conf #17305AAB9L*

**Plaintiff's App. 262**

Page 1 of 4

## REFERRAL

Robert S Smith                                              Ambur Hale
Family Practice                                            08/20/1983
012 Irving

506 S Nursery Rd ste 101, Irving, TX-750603188
Tel: 972-573-3288 Fax: 972-573-3291

Date:08/28/2017

**Patient Information:**

| | |
|---|---|
| Patient Name: | Ambur Hale |
| Patient DOB: | 08/20/1983 |
| Patient Insurance: | United HealthCare |
| Patient Subscriber No: | 008493940 |
| Patient Address: | 324 WESTSIDE DR, WICHITA FALLS, TX 76301-1816 |
| Patient Phone: | 940-443-3777 |
| Patient Work Phone: | |
| Patient Cell Phone: | 940-443-3777 |

**Insurance Information**

| | |
|---|---|
| Insurance Name: | United HealthCare |
| Subscriber Name: | Hale, Ambur |
| Subscriber DOB: | 08/20/1983 |
| Subscriber No: | 008493940 |
| Subscriber Group No: | 744260 |
| Subscriber Address: | 324 WESTSIDE DR, WICHITA FALLS, TX 76301-1816 |
| Subscriber Phone: | 940-443-3777 |

**Referral From Information:**

| | |
|---|---|
| Provider Name: | Robert S Smith |
| Provider ID Number: | |
| Provider UPIN: | |
| Provider NPI: | 1083609135 |
| Provider Facility: | 012 Irving |
| Provider Speciality: | Family Practice |
| Address1: | 506 S Nursery Rd |
| Address2: | ste 101 |
| City, State, Zip: | Irving, TX, 750603188 |
| Phone: | 972-573-3288 |
| Fax: | 972-573-3291 |

**Referral To Information:**

| | |
|---|---|
| Provider Name: | |
| Provider ID Number: | |
| Provider UPIN: | |
| Provider NPI: | |
| Provider Facility: | |
| Provider Speciality: | Dermatology |
| Address1: | |
| Address2: | |
| City, State, Zip: | , , |
| Phone: | |
| Appt. Date/Time: | |

Fax:                                              Facility Tax ID
                                                 Number:

**Plaintiff's App. 263**

From:                          .,                    11/02/2017 10:54    #300 P.004/010

Page 2 of 4

## REFERRAL

Robert S Smith                                                    Ambur Hale
Family Practice                                                  08/20/1983
012 Irving

506 S Nursery Rd ste 101, Irving, TX-750603188
Tel: 972-573-3288  Fax: 972-573-3291

**Reason For Referral:**

Authorization No:
Reason:        Evaluate and treat              Authorization Type:
Diagnosis:     B35.0 - Tinea capitis
               L65.9 - Alopecia
Procedures:
Visits Allowed:0
Unit Type:     V (VISIT)
Start Date:    08/28/2017
End Date:      08/28/2018

Notes:
**Clinical Notes:**
**Structured Data:**

Electronically signed by Smith, Robert S on 08/28/2017 at 11:47 AM CDT

**Plaintiff's App. 264**

From:                                           11/02/2017 10:54        #300 P.006/010

## Attachments

Hale, Amber
324 WESTSIDE DR, WICHITA FALLS, TX 76301-1816

DOB: 08/20/1983   Age: 34 Y   Sex: Female
Home: 940-443-3777
Work:
Cell: 940-443-3777
Email:

Primary Insurance:   United HealthCare
PCP:
Account Number:   284295

Allergies : N.K.D.A

Medical History
Active Problem List

| Code | Name | Specify | Notes | Added On | Modified On | Modified By |
|------|------|---------|-------|----------|-------------|-------------|
| V72.31 | Routine gynecological examination | | (Mfg_APR_New) Mediaformatix ICD9 Name: Well woman exam with routine gynecological exam | | | |
| 616.10 | Unspecified vaginitis and vulvovaginitis | | (Mfg_APR_New) Mediaformatix ICD9 Name: VAGINITIS | | | |
| Z00.01 | Encounter for general adult medical examination with abnormal findings | | | 07/19/2017 | 07/19/2017 | Smith, Robert S |
| N76.0 | Acute vaginitis | | | 07/19/2017 | 07/19/2017 | Smith, Robert S |
| H61.23 | Bilateral impacted cerumen | | | 07/19/2017 | 07/19/2017 | Smith, Robert S |
| Z30.41 | Encounter for surveillance of contraceptive pills | | | 07/19/2017 | 07/19/2017 | Smith, Robert S |

Medications
Name strength formulation, Sig: take route frequency
Taking Norgestim-Eth Estrad Triphasis 0.18/0.215/0.25 MG-25 MCG Tablet, Sig: 1 tablet Orally Once a day Start Date: 08/27/2015
Refill Ortho Tri-Cyclen (28) 0.18/0.215/0.25 MG-35 MCG Tablet, Sig: 1 tablet Orally Once a day

Surgical History

| Date | Reason |
|------|--------|
| 2007 | c-section |

Social History

| Name | Value |
|------|-------|
| Alcohol Screen (Audit-C) | Did you have a drink containing alcohol in the past year?: Yes, How often did you have a drink containing alcohol in the past year?: 2 to 4 times a month (2 points), How many drinks did you have on a typical day when you were drinking in the past year?: 1 or 2 drinks (0 point), How often did you have 6 or more drinks on one occasion in the past year?: Less than monthly (1 point), Points: 3 |
| Tobacco Use/Smoking | Are you a nonsmoker |
| Sexual History | Had sex in the past 12 months (vaginal, oral, or anal)?: Yes, with: Men only, Use protection?: No, Have you ever had a Sexually transmitted disease?: No, Last menstrual period: 07/14/17 |
| Caffeine: | 1-2 cups per day |

Family History
Relation : Description
Father: alive
Mother: alive
2 sister(s) , 1 son(s) .

OB History

| Date | Symptom | Notes |
|------|---------|-------|
| 07/19/2017 | GP | Gravida: 0 |

GYN History

| Date | Symptom | Notes |
|------|---------|-------|
| 07/19/2017 | Periods : | every month but last month was 1 week before had 2 imp at the same month |

**Plaintiff's App. 265**

From:                                    11/02/2017 10:55   #300 P.005/010

| 07/19/2017 | Sexual activity | currently sexually active, with men |
| 07/19/2017 | Pap Smear | Pap smear done in the last 3 years? Yes, Date of last pap smear done 2/19/2017 |
| 07/19/2017 | Mammogram | Mammogram done in the last 2 years? No |
| 07/19/2017 | Abnormal pap smear | none |
| 07/19/2017 | Date of Last Period | 07/14/2017 |
| 07/19/2017 | Sexually Transmitted Diseases (STDs) | Trichomoniasis (Trich) |
| 07/19/2017 | Birth control | Ortho Tri-Cyclen Lo |
| 07/19/2017 | Menstruation: | Time since last menstrual period: 1-2 months, Time between periods: < 21 days apart, Lasts: 2-7days, Pad/tampon use per day: 4-6, Character of period: without discomfort/pain |

## Vitals

| Name | Date | Value |
|---|---|---|
| Temp | 07/19/2017 | 97.0 |
| BP | 07/19/2017 | 99/65 |
| HR | 07/19/2017 | 57 |
| RR | 07/19/2017 | 18 |
| Ht | 07/19/2017 | 63 |
| Wt | 07/19/2017 | 152.8 |
| Oxygen sat % | 07/19/2017 | 99 |
| BMI | 07/19/2017 | 27.06 |
| Wt-kg | 07/19/2017 | 69.31 |
| Ht-cm | 07/19/2017 | 160.02 |

## Patient Encounters

| Date | Visit | Reason | Diagnosis |
|---|---|---|---|
| 07/19/2017 | WV | ****claim du fc****SP//SO//DONE//MM//well exam | Encounter for general adult medical examination with abnormal findings Acute vaginitis Bilateral impacted cerumen Encounter for surveillance of contraceptive pills |
| 08/30/2016 | TEL | RX Change | |
| 03/08/2016 | TEL | Refill | |
| 01/14/2016 | TEL | Rx. Refill | |
| 12/21/2015 | TEL | Rx refill | |
| 08/27/2015 | TEL | Rx request | |
| 07/29/2015 | TEL | Backk pain | Low back strain Muscle spasm |
| 05/08/2015 | TEL | EMR-Mig | |

## Health Maintenance

| Name | Last Done | DueDate | Result/Comment |
|---|---|---|---|
| Pap Smear, 2 Slide | | 08/28/2017 | |

## Referrals

### Outgoing Referrals

| Referral From | Referral To | Start Date | End Date | Reason |
|---|---|---|---|---|
| Robert S Smith | | 08/28/2017 | 08/28/2018 | Evaluate and treat |
| | Gunnar West, DO | 07/13/2016 | 07/13/2017 | Evaluate and treat |

TX Result Report

P 1
08/29/2017 14:15
Serial No.  A61F011018911
TC:  258124

| Addressee | Start Time | Time | Prints | Result | Note |
|---|---|---|---|---|---|
| 19403229241 | 08-29 14:11 | 00:03:53 | 006/006 | OK | |

Note

Result



Linda Reinhardt Dermatology
2601 Harrison St #500
both Wichita Falls TX 76308
940-322-7004
940 322 9241
Debbie

# CLINICAS MI DOCTOR

Date of Referral: 08.28.17

Referred to: Linda Reinhardt Dermatology

Preferred Doctor: Robert Smith

Patient Name: Amber Hale

Parent's Name: Oct 30 @ 9:10 am

Date of Birth: 08.20.1983

Phone Number: 940-444-3777          Insurance: United Health Care

This patient has been referred for your professional evaluation and expert opinion. Please send your reports to my office via fax. Please feel free to call me if you need to report anything immediately or if you have to admit the patient to the hospital.

Thank you for sharing your expertise in treating our mutual patient.

Signature of Referring Provider:

**Plaintiff's App. 267**





Plaintif's App.  269





Plaintif's App.  272

# Texas Workforce Commission
## A Member of Texas Workforce Solutions

Andres Alcantar, Chairman
Commissioner Representing the Public

Ruth R. Hughs
Commissioner Representing Employers

Julian Alvarez
Commissioner Representing Labor

Larry E. Temple
Executive Director

December 13, 2017

**_VIA EMAIL ATTACHMENT AND REGULAR MAIL_**
Texas Department of Criminal Justice
By and through its counsel,
Eve Shelly
Employee Relations, Human Resources Division
2 Financial Plaza, Suite 600
Huntsville, TX 77340

Re: **PRELIMINARY DETERMINATION LETTER**
    Ambur N. Hale v. TEXAS DEPARTMENT OF CRIMINAL JUSTICE
    TWCCRD#: 1A17474          EEOC#: 31C-2017-00574

Dear Ms. Shelly:

This letter serves to inform you that the investigation of the above-referenced Charge is near completion. It is the policy of the Texas Workforce Commission, Civil Rights Division (TWCCRD) to inform you of the preliminary results of the investigation and provide you the opportunity to submit any further information and/or documentation that may be relevant to the investigation. This is not a final decision. A final decision will be made at a later date.

## I. Jurisdiction

Sergeant Ambur Hale's (Charging Party) complaint, filed with the Texas Workforce Commission Civil Rights Division (TWCCRD) on or about December 02, 2016. The complaint meets the jurisdictional requirements set forth in the Texas Labor Code, Chapter 21 in terms of location, timeliness and number of employees. The Charging Party was employed in Wichita Falls, Texas. The complaint was filed within 180 days from the date of last harm. Further, Texas Department of Criminal Justice employs more than 30,000 individuals, which meets the jurisdictional requirement of 15 employees at a minimum.

## II. Charging Party's Allegations

Charging Party alleges that Respondent discriminated against her in violation of Chapter 21 of the Texas Labor Code because of her sex. Specifically, Charging Party contends that on June 15, 2016, as she was standing at the chain-linked fence of the 3-Building desk, Major Jonathan Eastep (Eastep), Charging Party's supervisor at the time, trapped her body against the fence, pulled himself against her, pressed his penis against her buttocks making unwelcome physical contact of a sexual nature, and stated "What is that?" in a low voice as if to arouse her. Charging Party indicated that in two prior incidents, Eastep attempted to kiss her hand and once asked her if she had ever had her toes sucked because he does that. On June 20, 2016, Charging Party filed an internal

1215 Guadalupe Street • Austin, Texas 78701-1829 • (512) 463-2642 (T) • (512) 463-2643 (F) • Relay Texas: 800-735-2989 (TDD) 800-735-2988 (Voice) •
www.texasworkforce.org
Equal Opportunity Employer / Program

EXHIBIT S                                                                 Plaintiff's App. 273

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

Preliminary Determination Letter
TWCCRD#: 1A17474; EEOC#: 31C-2017-00574
Page 2 of 4
December 13, 2017

EEO complaint of sexual harassment against Eastep; however, nothing was done by Respondent to reprimand Eastep.

## III. Respondent's Defenses

Respondent has denied all allegations of sexual harassment. Respondent indicated that once Charging Party filed her complaint, a prompt and thorough investigation was conducted. On July 06, 2016, Eastep was questioned regarding Charging Party's allegations. Eastep contended that when he entered the 3-Building, he noticed something on the floor (blood/paint) in the fenced-in desk area. Eastep claimed that he attempted to question Charging Party in a private manner so that other staff and/or offenders could not hear him counsel Charging Party. Eastep denied making any physical contact with the Charging Party or making any comments of a sexual nature. Based on surveillance video evidence, which captured the interaction between Charging Party and Eastep, Respondent questioned the only two witnesses in a position to have possibly observed any contact between Eastep and Charging Party. Officer Gary West and Officer Steven Page both denied seeing any physical contact or hearing anything said between Eastep and Charging Party. At the conclusion of their investigation, it was determined from video and witness evidence that it could not be concluded that Eastep pressed his penis against Charging Party's buttocks and it appeared that if any contact occurred, it was incidental. Counsel for the Respondent, Eve Shelly, made the recommendation to discuss social boundaries with Eastep because it was not necessary for Eastep to place his arms on both sides of Charging Party "to convey the privacy of the conversation." Respondent indicated that on June 30, 2016, as an interim remedial action, Eastep was instructed to have another supervisor present when having contact with the Charging Party. Respondent stated this was an effective preventative measure because Charging Party did not indicate she was subjected to any further harassment or retaliation; Charging Party was therefore not removed from Eastep's supervision. Respondent stated Eastep did not receive any type of counseling or reprimand based on the Respondent's internal EEO investigation.

## IV. Findings and Analysis

### A. Sex Discrimination

To prevail on a sexual harassment claim based on a hostile work environment, a complainant must show the following prima facie elements: 1) she belongs to a protected class; 2) she was subjected to unwelcome harassment; 3) the harassment was based on sex; and 4) the harassment affected a term, condition, or privilege of employment; and 5) the employer knew or should have known of the harassment and failed to take prompt remedial action. To satisfy the fourth element, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

Charging Party met element one. She is a member of a protected group (female).

Charging Party met element two. Charging Party stated that Eastep's sexual advances were unwelcome. The video provided by Respondent shows that when Eastep placed his hands on either side of Charging Party to trap her against the fence, she immediately began to twist and contort in order to remove herself from his obstruction. Further, TWCCRD notes Charging Party's attempt to avoid Eastep's blocking supports that Charging Party found Eastep's actions unwelcome. Respondent contends that Eastep was asking Charging

Plaintiff's App. 274

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

Preliminary Determination Letter
TWCCRD#: 1A17474; EEOC#: 31C-2017-00574
Page 3 of 4
December 13, 2017

Party about blood on the floor inside the fenced desk area. Eastep, however, did not question the officer who was inside the fenced desk area, Correctional Officer V S. Page, a male employee. Charging Party also alleged that Eastep once tried to kiss her hand, and she responded by telling him he was "gross" and left the area. On another occasion, Eastep asked Charging Party if she liked to have her toes sucked, because he does that.

Charging Party met element three. There is no evidence that Eastep similarly trapped men. In addition, there is also no evidence of Eastep telling men how he sucked toes or attempted to kiss the hand of any male. When a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex. *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57 (1986).

Charging Party met element four. Courts have ruled that "the deliberate and unwanted touching of [a charging party's] intimate body parts can constitute severe sexual harassment." *Harvill v. Westward Comm. et al.,* 433 F.3d 438 (5th Cir. 2005). Charging Party states that Eastep pressed his body up against Charging Party, whereby she could feel his penis touching her buttocks, followed by him whispering "What is that?" into her ear. TWCCRD finds Charging Party's account of the incident more persuasive than Eastep's. Eastep claims he was showing her blood or paint on the floor, but to do so certainly did not require putting both arms around Charging Party to trap her, rather than just standing on one side of Charging Party. This behavior was so severe that it altered the conditions of Charging Party's employment creating an intimidating, hostile and abusive work environment for her. Furthermore, the combination of the three incidents of blocking, the sucking of toes comment, and kissing of hand attempt show a pattern of discriminatory conduct. Therefore, Eastep's behavior is severe and/or pervasive.

Charging Party met the fifth and final element. Although the Respondent investigated Charging Party's allegations, Respondent virtually failed to take any remedial action. Respondent contends it could not determine through the video evidence whether Eastep pressed himself against Charging Party's body in a sexual manner or not, so no remedial action needed to be taken against Eastep. No weight was given by Respondent to Charging Party's testimony or the actions that were visible in the video, namely, how she quickly removed herself from what was clearly an uncomfortable blocking by Eastep. Despite a recommendation from Respondent's own counsel to at least discuss Eastep's social boundaries when counseling subordinates, no disciplinary action was taken whatsoever against Eastep. Respondent did not even consider removing Charging Party from under the supervision of Eastep. Instead, the only action Respondent took was to warn Eastep to have another supervisor present when Eastep contacted Charging Party. This action could be interpreted to protect Eastep from further allegations of impropriety and not to protect Charging Party or any other female from Eastep's improper actions.

Based on the above findings, Charging Party has met all indicia of a claim of sexual harassment due to hostile work environment.

## V. Conclusion

Based upon the evidence described above, TWCCRD has preliminarily determined that there is reasonable cause to believe that Respondent subjected the Charging Party to sexual harassment in violation of Texas Labor Code, Chapter 21.

**Plaintiff's App.  275**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

Preliminary Determination Letter
TWCCRD#: 1A17474; EEOC#: 31C-2017-00574
Page 4 of 4
December 13, 2017

Notwithstanding the foregoing preliminary determination, TWCCRD will continue its efforts to potentially resolve the issues alleged in the complaint. The parties have the right of offer any resolution they believe would settle the issues alleged in the complaint. Any offer extended should be in writing to be made a part of the file and will be conveyed to the opposing party.

You are now invited to submit to TWCCRD, IN WRITING, any further rebuttal arguments, explanation and/or supporting evidence, which you believe to be appropriate or necessary to demonstrate and support your position no later than noon on December 23, 2017. Please address any response to Javier Cano at 101 East 15th Street, Rm. Guadalupe CRD, Austin, TX 78778-0001 or javier.cano@twc.state.tx.us.

Sincerely,

Betty D. Stanton
Equal Employment Manager
Civil Rights Division

**Plaintiff's App. 276**



U.S. Department of Justice
Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

**CERTIFIED MAIL**
7016 2140 0000 5582 1149

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4701*
*Washington, DC 20530*

May 18, 2018

Ms. Ambur N. Hale
c/o Louise Tausch, Esquire
Law Offices Atchley, Russell, et al.
P.O. Box 5517
Texarkana, TX  75505-5517

Re: EEOC Charge Against Texas Dept. of Criminal Justice
    No. 31C201700574

Dear Ms. Hale:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC San Antonio District Office, San Antonio, TX.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

John M. Gore
Acting Assistant Attorney General
Civil Rights Division

by *Karen L. Ferguson*
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: San Antonio District Office, EEOC
    Texas Dept. of Criminal Justice

**Plaintiff's App.  277**

**EXHIBIT T**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| **AMBUR HALE,** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | **CIVIL ACTION NO. 7:18-CV-0097-M** |
| | § | **JURY DEMAND** |
| **TEXAS DEPARTMENT OF** | § | |
| **CRIMINAL JUSTICE,    and** | § | |
| **MAJOR JONATHAN EASTEP** | § | |
| **Defendants.** | § | |

---

## AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared AMBUR HALE who, being by me duly sworn, deposed and said:

1. My name is Ambur Hale.   I am over 18 years of age, of sound mind, and have direct knowledge of the facts contained in this affidavit.

2. I am the Plaintiff in the above styled lawsuit.

3. After I filed the EEO complaint, I was treated differently than the other sergeants. In early July 2016, Warden Anders and Major Eastep conducted a walkabout at 6:00 am. My shift started at 6:00 am, and I was in a briefing with sergeants and COs.  During the walkabout, the Warden instructed the Major to write me up because a feather was on the walkway.

4. The following day, Major Eastep conducted another walkabout of my area at 6:05am. This time, he was not with the Warden.  He was alone.  It was not routine or customary for a walkabout to take place two days in a row.

5. The normal procedure for walkabouts is that one building is selected each week.

6. After I filed the EEO Complaint against Maj. Eastep for sexual harassment, I was assigned to work as Utility Sergeant. During that time, I was tense, anxious, stressed, and worried because I was held to a higher standard. Maj. Eastep's office was connected to the office where I was working and he had monitors that showed everything I was doing. This occurred because TDCJ refused to move me after I filed the EEO Complaint.

7. After I filed the EEO complaint against Major Eastep for sexual harassment, I was placed on probation for 3 months on August 25, 2016.  During that probation, I could not apply

**Plaintiff's App.  278**

for any promotions. I was charged for an incident that occurred on July 9, 2016. The incident was investigated by Maj. West, who did not complete the investigation until July 26, 2016. Maj. West's investigation did not include interviews of myself, the medical staff, nor the staff that was present during the incident. Maj. West confused 3-building, where I was sexually assaulted by Eastep, with 7-building, where the July 9 incident occurred that Maj. West was supposed to be investigating. I was not on the phone during the incident; I was on the radio initiating the ICS, which is standard protocol in this situation.

8.  After my deposition was taken in this matter by TDCJ in Dallas on April 24, 2019, TDCJ continued to retaliate against me.   The following day, Thursday, April 25, 2019, at approximately 8 a.m., Warden Smith arrived to teach his class called C.O.R.E. Values. I was instructing Pre-service in a different class. I was interrupted by my training officer (Officer Toft). I stepped into the hallway to learn that CO Fields had been kicked out of class by the Warden and was in the office crying hysterically. I approached the office door, looked through the window and saw her; I motioned if I could come in. I opened the door, leaned in and said, "Are you okay?" and she started crying because she was afraid that she was being fired for asking a question. Her question was in open forum, when Warden Smith wanted staff feedback, opinions, and ideas. I told her to calm down, where the water was located, and to help herself to the donuts; if she needed anything to let me know, and then I returned to my class. Shortly after that, I was interrupted again by my training officer that Warden Smith (male) was alone in the office with CO Fields (female) counseling her. I returned to the office door, stood at the window, gained the attention of Warden Smith, and gestured "can I come in?" I stepped into the office, shut the door, and asked Warden Smith, "would you like me here for this," and he said "no." I turned to CO Fields who was crying profusely and asked her if she was okay.  She wanted me to stay.  I originally went in the office because it is common practice that when a male supervisor is counseling a female subordinate, a female supervisor will be asked to stand in. Per policy, when CO Fields wanted me to stay, that is her right as an employee so I stayed. When you are a third person, you are not there to mediate or inject your opinions or feelings; you are just there as an extra pair of ears, which I was. After the conclusion of their counseling session, I exited the office and proceeded to the restroom.  CO Fields was in the restroom hyperventilating and crying.  I attempted to calm her down.  I was called to return to the training office and Warden Smith asked me what I was doing. I told him I was trying to calm CO Fields down because she was very upset and she had to return to class. He told me to tell her that she had until the end of the day to call his secretary and set-up an appointment time to speak with him again.  I said, "Yes sir." He stated also. "If she needs to go home then let her" and not to notate it on her time. I said, "Ok." Then he stated, "Sgt. Hale, do you have something to say" and I replied. "No sir," and he again asked me "do you have something to say?" I again said, "No sir." He said, "You look like you have something to say," and I again said, "no sir." I relayed the information to CO Fields and returned to my normal duties.   At approximately 3:45 p.m., I received a call from the unit, and my training Captain (Captain Cooke) stated, "Warden Smith wants you to report to the unit to speak with him."  Captain Cooke asked my side of the events and prepped me for what to expect. When I arrived to the Warden's office, his door was open and I stated, "I was told you

wanted to speak with me." As I made my way to the chair directly across from his desk, he stated, "We won't start until Warden Lozada (female) gets here." I stated, "Okay" and requested that my training Captain (Captain Cooke) be present as well. Warden Smith stayed out of the office until everyone arrived. Warden Smith stated numerous times that my presence during his counseling session was "disrespectful and contemptuous." I stated numerous times that "although it is not policy, it is in the best interest of everyone involved to have a third person in the room." He threatened to write me up for insubordination. He continually stated, "I don't know your history, I don't know why you're being so defensive or why you would have a grudge against this agency but you need to have faith in the process. You need to believe in this agency and it will look out for you." I was not being defensive or negative during this discussion. He questioned my CORE values and my abilities to represent the agency well. He stated that he is "unsure if I should remain in the training department because I appear to have an agenda" and he questioned my integrity. He stated that he will start **"watching me more closely"** (emphasis added) because he is 'not sure if I am the type of person that should be working for this agency.' He instructed me from now on I must knock before entering the training office if he is in there; to not enter the training office if he is counseling someone; and that when I conduct counseling, I must get consent from the subordinate before I have a third person present. It should be noted that he requested Warden Lozada and did not ask my consent. The office he is speaking about is furnished by Vernon College for the instructors to which I have an assigned key. Warden Smith told my training Captain that he was authorized to write me up. Captain Cooke did not write me up because I did nothing wrong but advised me that **"you know what time it is, so be on your game"**. (emphasis added)

Further, Affiant sayeth not.



Affiant

SUBSCRIBED AND SWORN TO before me on the 12th day of July, 2019, to certify which witness my hand and official seal.

LESLIE HEGGER
NOTARY PUBLIC STATE OF TEXAS
MY COMM. EXP. 06/09/2020
NOTARY ID 13084577-4

Notary Public in and for the State of Texas

**Plaintiff's App.  280**

Texas Department of Criminal Justice
**REPRIMAND FORM**

OIG Number
MAUF Number D4434-07-16
EEO Number

Employee Name: Hale _____ Ambur _____ N. ✓ SSN. 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
                    Last              First         M

Payroll Job Title: Sgt. Of CO's                Unit or Department:              JA
Date of Violation(s): 07/09/16    Date Pre-Hearing Investigation Completed: 08/16/16

VIOLATION(S):
                                                    FINDINGS (check one [1]): GUILTY
Level: 2 Number: 25f Rule Title: Administrative/Procedural Violation of a Security Nature Relating to Use [ ] Yes [✓] No
Level: 4 Number: 7 Rule Title: Substandard Duty Performance [✓] Yes [ ] No

Synopsis of Incident:
At the conclusion of a Fact Finding Inquiry on 07/26/16, it was determined that Sgt. A. Hale failed to respond to a non-compliant offender in her immediate area. She failed to initiate ICS and a spontaneous Use of Force ensued.

DISCIPLINARY ACTION:
Is this a subsequent violation(s)? [X] Yes [ ] No   If yes, list applicable previous rule number violation(s) and disciplinary date(s):
20  01/26/15

Check and complete one or more of the following:
[ ] NO DISCIPLINE IMPOSED (Provide justification at bottom of page if guilty findings.)
[ ] REPRIMAND ONLY
[✓] DISCIPLINARY PROBATION: 3 Calendar Months Beginning: 8-25-16    11-25-16
[ ] SUSPENSION WITHOUT PAY:         Workdays Beginning.         Return:
[ ] REDUCTION IN PAY TO:  $         Beginning:         Ending:
    Method used:         %      Step (number of steps)         Minimum established rate
[ ] DEMOTION TO (Title and Salary Group)         Beginning:         Ending:
[ ] DISMISSAL RECOMMENDED

DISCIPLINE IS: [✓] Within [ ] Above [ ] Below the guidelines. Provide justification at the bottom of the page if above or below.
For violations of Rule Number 24 or 25, check one (1) of the following: This violation [ ] did [✓] did not involve an aggravated use of excessive force.
JUSTIFICATION (If applicable): Sgt. Hale responded appropriately & initiated ICS when the offender turned toward the C.O. Sgt. Hale was substandard by failing to take control of the situation prior to it escalating to a Use of force.

Kendall Richerson, Warden II
Reprimanding Authority Name and Title (printed)     Signature     8-25-16 Date

Employee's Acknowledgement: I have been advised of the procedures of progressive disciplinary actions, and my right to file a grievance. I acknowledge receipt of a copy of this reprimand and know the original is to be placed in my Master Human Resources File. If recommended for dismissal, I verify the following are my current address and phone number.

Mailing Address:
Phone Number, Including Area Code:
Employee Signature: Sgt Ambur N Hale     Date: 08/25/2016

Note to Employee: With few exceptions, you are entitled upon request: (1) to be informed about the information the Agency collects about you; and (2) under Texas Government Code §§552.021 and 552.023, to receive and review the collected information. Under Texas Government Code §559.004, you are also entitled to request, in accordance with the Agency's procedures, that incorrect information the Agency has collected about you be corrected.

**RECEIVED**
SEP 0 1 2016
EMPLOYEE RELATIONS 281

**EXHIBIT V**
PERS 185 (09/14)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| AMBUR HALE, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 7:18-cv-0097-M |
| | § | JURY DEMAND |
| TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE, and | § | |
| MAJOR JONATHAN EASTEP | § | |
| Defendants. | § | |

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

EXHIBIT W
VIDEO OF INCIDENT

Per instructions from the District Clerk's Office, the video recording
was mailed to
U.S. District Court, Clerk of Court
1000 Lamar Street, Room 203
Wichita Falls, TX 76301

Plaintiff's App.  282

EXHIBIT W

 

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

### Inter-Office Communications

TO:    Ambur Hale                          DATE:    July 27, 2016
         Complainant

FROM:  Eve Shelly                          SUBJECT:  EEO Intake #16003260
         Manager, Employee Relations                R – Jonathan Eastep

The investigation of your complaint alleging sexual harassment by the Respondent has been concluded. Based on the information available, the facts do not appear to support the allegation.

Although a policy violation did not occur, a recommendation has been forwarded to the appropriate authority.


ES/th

c:   Jonathan Eastep
     EEO File


EXHIBIT X

**Plaintiff's App.  283**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

**Eve Shelly**

FILE IN

**From:** Eve Shelly
**Sent:** Wednesday, August 17, 2016 2:51 PM
**To:** 'redburr83@aol.com'
**Cc:** Human Resources Mail-In
**Subject:** RE: Atten: Eve Shelly / EEO Intake #16003260

**Categories:** Print

Ms. Hale, I have reviewed your statement below and apologize for your initial inability to reach me via telephone. Regarding your allegations against Mr. Eastep, a thorough internal investigation was conducted by the EEO section which found no information to support the allegation Mr. Eastep violated Agency EEO policy. Please be advised that in addition to the TDCJ's internal EEO investigation, you may have filing rights with the Equal Employment Opportunity Commission, the Texas Workforce Commission-Civil Rights Division, or the TDCJ's Office of Inspector General.

If you have any questions about your filing rights, please feel free to contact the above identified agency or department.

Eve Shelly
Manager, Employee Relations
Phone 936/437-3173
Fax 936/437-3105

**From:** Human Resources Mail-In
**Sent:** Wednesday, August 17, 2016 12:01 PM
**To:** Eve Shelly <eve.shelly@tdcj.texas.gov>
**Subject:** FW: Atten: Eve Shelly / EEO Intake #16003260

**From:** Ambur Hale [mailto:redburr83@aol.com]
**Sent:** Monday, August 15, 2016 9:01 PM
**To:** Human Resources Mail-In <human.res@tdcj.texas.gov>
**Cc:** Angela Moore <angela.moore@tdcj.texas.gov>
**Subject:** Atten: Eve Shelly / EEO Intake #16003260

Ms. Eve Shelly
Manager, Employee Relations

TDCJ- Human Resouces Headquarters
#2 Financial Plaza Suite #600
Huntsville, Texas 77340

Sergeant Ambur N. Hale

TDCJ- James V. Allred Unit
2101 North FM 369
Iowa Park, Texas 76367
(940) 855-7477

**EXHIBIT Y**

**Plaintiff's App. 284**

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

Case Action/Comment History Report - Case#: 16003260                                    Page 1 of 6

---

Intake Case #16003260

Complainant: HALE , AMBUR N (█████████)

Respondent(s): EASTEP , JONATHAN R (█████████)

| Action Date | Action Entered By Comment Entered By | Entered Date Comment | Action Code | Description |
|---|---|---|---|---|
| 07-28-2016 | ACTION | 07-28-2016 14:15 | 4131 | IFF NO CAUSE |
| 07-28-2016 | ACTION | 07-28-2016 14:15 | 3101B | SEND NON-EEO FINAL NOTIFICATION |
| | THI9911 | 07-28-2016 14:15 | | |

Final results mailed to Brad Livingston, Lorie Davis, Patty Garcia, Warden Richard Wathen, Jason Heaton, Ambur Hale, & Jonathan Eastep on 7/28/16

| 07-26-2016 | ACTION | 07-26-2016 11:03 | 3092F | PROCESS OGC CONCUR NO CAUSE |
| 07-26-2016 | ACTION | 07-26-2016 11:01 | 3962 | IFF CONCURRED BY OGC |
| 07-20-2016 | ACTION | 07-20-2016 15:33 | 3076A | IFF ROUTE TO OGC FOR CONCURRANCE |
| | MP00053 | 07-20-2016 15:33 | | |

Approved by Eve Shelly to send to OGC on 07/20/2016.

| 07-20-2016 | ACTION | 07-20-2016 09:57 | 2022 | IFF ROUTED TO MER FOR INITIAL REVIEW |
| 07-20-2016 | ACTION | 07-20-2016 08:26 | 2021 | IFF RESUBMITTED TO SECTION DIRECTOR |
| 07-19-2016 | ACTION | 07-19-2016 08:13 | 2020 | IFF RETURNED TO INVESTIGATOR FOR CORRECTIONS |
| 07-12-2016 | ACTION | 07-12-2016 13:45 | 3074 | ROUTE TO SECTION DIRECTOR FOR REVIEW |
| | CASE | 07-07-2016 00:00 | | |
| | GMC1818 | 07-12-2016 09:05 | | |

MET WITH THE COMPLAINANT AT THE ALLRED UNIT. HAD HER WATCH THE VIDEO WITH ME. SHE CLAIMED THAT THE RESPONDENT'S PENIS MADE CONTACT WITH HER BUTTOCKS WHEN SHE LEANED OVER HER. DURING THE INTERVIEW, THE COMPLAINANT WAS ASKED IF THE RESPONDENT MENTIONED ANYTHING ABOUT BLOOD BEING ON THE FLOOR WHEN HE APPROACHED HER AT THE FENCE. SHE INDICATED THAT THE RESPONDENT ASKED HER IF THAT WAS "BLOOD OR PAINT ON THE FLOOR." SHE INDICATED THAT THERE WERE SPECKS OF RED PAINT ON THE FLOOR THAT WERE FROM A RED PAINTED LINE THAT USED TO BE ON THE FLOOR. HAD THE COMPLAINANT TAKE ME TO THE 3- BUILDING DESK AREA. HAD HER DEMONSTRATE WHAT OCCURRED DURING THE INCIDENT. THE COMPLAINANT TOOK PICTURES OF THE RED SPECKS THAT SHE WAS REFERRING TO. THE COMPLAINANT ASSERTED THAT THE RESPONDENT WOULD NOT HAVE BEEN ABLE TO SEE THE RED SPECKS OF PAINT WHEN HE ENTERED 3-BUILDING, BUT HAD ONLY MENTIONED THEM TO HER AS AN AFTERTHOUGHT AFTER HE MADE PHYSICAL CONTACT WITH HER AT THE FENCE AREA.

DURING INTERVIEW WITH THE COMPLAINANT SHE TALKED AT LENGTH ABOUT HOW SHE DID NOT LIKE ANYONE AT WORK TOUCHING HER.
SHE INDICATED THAT THE RESPONDENT HAD ATTEMPTED TO HUG HER AND ASKED HER IF SHE LIKED HER TOES SUCKED. SHE NAMES THREE SUPERVISORS (CAPTAIN MILLER, SERGEANT MURRAY, AND LIEUTENANT BOATMAN) WHO SHE INDICATED

**Plaintiff's App. 285**

EXHIBIT Z

Case 7:18-cv-00097-M-BQ   Document 47   Filed 07/18/19   Page 286 of 298   PageID 1071
Case 7:18-cv-00097-M   Document 40   Filed 06/28/19   Page 6 of 502   PageID 217

Case Action/Comment History Report - Case#: 16003260                                    Page 2 of 6

WITNESSED THE RESPONDENT HUG HER AND TELLING THE RESPONDENT THAT SHE DID NOT LIKE BEING HUGGED.

CONDUCTED INTERVIEWS WITH CAPTAIN MILLER, SERGEANT MURRAY AND LIEUTENANT BOATMAN.

INTERVIEWED OFFICER STEVEN PAGE WHO WAS WORKING THE DESK AT THE TIME OF THE ALLEGED INCIDENT. SHOWED HIM THE VIDEO. HE INDICATED THAT HE DID RECALL WHAT THE RESPONDENT SAID THE COMPLAINANT DURING THE INCIDENT OR THE RESPONDENT MAKING ANY CONTACT WITH THE COMPLAINANT. HE EXPLAINED THAT THE COMPLAINANT HAD COME TO THE FENCE ASKING HIM TO GET A COLD TOWEL FOR THE OFFENDER. HE STATED THAT HE WAS BUSY DOING THIS WHEN THE RESPONDENT HAD CAME UP TO THE FENCE. HE STATED THAT HE HAD NO KNOWLEDGE OF ANY BLOOD BEING BETWEEN THE FENCE AND DESK.

INTERVIEWED OFFICER GARY WEST. SHOWED HIM THE VIDEO. HE INDICATED THAT HE DID NOT HEAR ANYTHING THAT THE RESPONDENT SAID TO THE COMPLAINANT DURING THE INCIDENT. HE STATED THAT HE DID NOT SEE THE RESPONDENT MAKE ANY PHYSICAL CONTACT WITH THE COMPLAINANT DURING THE INCIDENT.

RE-INTERVIEWED THE RESPONDENT REGARDING NEW ALLEGATIONS. HE DENIED ALLEGATIONS.

CASE                07-06-2016 00:00

GMC1818           07-12-2016 09:02

Met with Respondent at the Allred Unit. Had Respondent take me to the 3- Building Desk area. The Respondent demonstrated his actions during the alleged incident. The Respondent denied making any contact with the Complainant during the incident. He asserted that he leaned over the Complainant to counsel her about a puddle of blood that was located inside the fenced in area between the desk and the chain linked fence, explaining that there were others in the area and he did not want them to hear what he saying to the Complainant about the blood.

Watched the video of the incident with the Respondent, the Respondent pointed out on video where he pointed down at the blood and Complainant looking down. (Note: No blood can be seen on the video.) The Respondent contended that the video clearly showed that he did not make any contact with the Complainant when he leaned over her.

(Note: While at the Unit I watched the video on a 60 inch screen in Warden Wrathen's Office. Supervisors familiar with the video equipment showed me to zoom in on any area of the video. After zooming in just on the Complainant and Respondent and playing the video, I still could not determine if the Respondent made any physical contact with the Complainant when he leaned over her at the fence. It appears that it was a possibility that if the Respondent made any contact with the Complainant, it could have been incidental contact. The Respondent has a large build and the video shows the Respondent placing both of his hands on the fence on the fence on each side of the Complainant and leaning over. There is no indication on the video that the Respondent pushed his pelvic area forward when he leaned over the Complainant.)

Met with Warden Wrathen. While talking to Warden Wrathen, he indicated that when he had the Complainant sign her notification letter, she seemed upset when he told her that she was not going to be moved to another assignment away from the Respondent. He stated that he advised the Complainant that remedial action taken was determined by Employee Relations Intake. He stated that he recalled talking to Assistant Warden Anders after serving the Complainant with the notification, and that the Complainant had previously been requesting to be moved to another assignment. Had Warden Wrathen document this information in his statement.

Note: Regarding the video, the individuals in the video were identified. Robin Roberts (Charge Nurse) identified the individual in front of the stretcher as Star Harrison (LVN with Texas Tech Medical). Was advised that she is on leave and it is not know if she would be returning to work. Her telephone on record is ▮▮▮▮▮▮▮▮ Her address is ▮▮▮▮▮▮▮▮▮ The female walking behind the stretcher was identified as Roxanne Milburn, also Texas Tech Medical employee. The officer Walking behind the stretcher was identified as Gary West and Officer working the Desk was identified as Steven Page.

Note: The video shows that Ms. Roberts and Ms. Milburn had passed the fence area before the Respondent

Plaintiff's App.  286

Case Action/Comment History Report - Case#: 16003260                    Page 3 of 6

had placed in hands on the fence; therefore, they would have not been able to see if the Respondent had made any physical contact with the Complainant.

| 07-05-2016 | ACTION | 07-05-2016 12:39 | 3106 | ROUTE IP BACK APPROVED |
|---|---|---|---|---|
| 07-05-2016 | ACTION | 07-05-2016 11:32 | 3105 | ROUTE IP FOR APPROVAL |
| | CASE | 07-05-2016 00:00 | | |
| | KM00022 | 07-05-2016 15:48 | | |

Original IRA received for both parties

| | CASE | 07-05-2016 00:00 | | |
| | GMC1818 | 07-05-2016 10:24 | | |

Received the Respondent's response dated July 1, 2016.

| 07-01-2016 | ACTION | 07-01-2016 12:25 | 3102 | IFF NOTIFICATION TO RESPONDENT |
|---|---|---|---|---|
| 07-01-2016 | ACTION | 07-01-2016 12:25 | 3101 | IFF NOTIFICATION TO COMPLAINANT |
| 07-01-2016 | ACTION | 07-01-2016 09:42 | 2002 | NON-DIRECTED ACCEPTED BY INVESTIGATOR |
| | CASE | 07-01-2016 00:00 | | |
| | GMC1818 | 07-01-2016 12:28 | | |

Called and spoke with the Complainant. Advised her that I was planning on being at the Unit to interview her on July 7, 2016, in the morning.

| | CASE | 07-01-2016 00:00 | | |
| | GMC1818 | 07-01-2016 12:27 | | |

Emailed the Respondent PHI packet. Called the Respondent. He advised that he would be at work on July 7, 2016. Requested that the Respondent prepare a detailed statement regarding the complaint. He advised that he would fax statement.

| | CASE | 07-01-2016 00:00 | | |
| | GMC1818 | 07-01-2016 10:59 | | |

Called Unit and spoke with Warden Wathen. He advised that he spoke with the Complainant on this date. He stated that the Complainant seemed to be upset that he was not moving to her to another location, such as Ad Seg. He stated that he informed her that he was doing what Intake had informed him to do, not have the Respondent supervise her.

| | CASE | 07-01-2016 00:00 | | |
| | GMC1818 | 07-01-2016 10:56 | | |

Called Unit and spoke with Assistant Warden Anders. He advised that Ms. Herring had spoke with him regarding getting a video of the alleged incident. He indicated that he had spoke to the Respondent (Major) and asked him what had happened. Warden Anders indicated that the Respondent told him that he whispered to the Complainant that she needed to have some blood that was near the desk cleaned up. Asked Major Anders to send me an email explaining what the Respondent told him about the incident.

| | CASE | 07-01-2016 00:00 | | |
| | GMC1818 | 07-01-2016 10:53 | | |

Discussed case with MER. She asked that I send email updates regarding information received in case.

**Plaintiff's App.  287**

| | CASE | | | |

Case Action/Comment History Report - Case#: 16003260               Page 4 of 6

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | 07-01-2016 00:00 |  |  |
|  | GMCI818 | 07-01-2016 09:43 |  |  |
| Received case. Reviewed video in file with Section Director Lawson. |  |  |  |  |
|  | CASE | 07-01-2016 00:00 |  |  |
|  | KM00022 | 07-01-2016 09:15 |  |  |
| IRA received for both parties |  |  |  |  |
| 06-30-2016 | ACTION | 06-30-2016 14:04 | 3042 | ASSIGN NON-DIRECTED INVESTIGATION |
| 06-30-2016 | ACTION | 06-30-2016 11:04 | 1003 | REFERRED TO IFF |
|  | BC00063 | 06-30-2016 11:04 |  |  |
| To Marilyn K for processing |  |  |  |  |
| 06-30-2016 | ACTION | 06-30-2016 08:59 | 3001 | ASSIGN TO INTAKE OFFICER |
| 06-30-2016 | ACTION | 06-30-2016 08:59 | 0500 | CASE CREATED |
|  | CASE | 06-30-2016 00:00 |  |  |
|  | MP00053 | 06-30-2016 13:08 |  |  |
| Received case file from Intake. To Marylan Thomas for assignment. |  |  |  |  |
|  | CASE | 06-30-2016 00:00 |  |  |
|  | KM00022 | 06-30-2016 12:14 |  |  |
| Routed to Pam Muggli for acceptance |  |  |  |  |
|  | CASE | 06-30-2016 00:00 |  |  |
|  | BC00063 | 06-30-2016 11:01 |  |  |

Email to Warden Wathen with IRA Forms attached:
ALLEGATION: Complainant submitted an email, dated 06/20/2016, in which Complainant states Complainant was subjected to forcible and non-consensual sexual contact by [Respondent].

DISPOSITION: This matter is referred to Internal Fact Finding for an investigation.

**Warden: The Complainant and Respondent should sign the attached Notification of Interim Remedial Actions forms. The original document should be forwarded to this office for inclusion in the case file. The Complainant and the Respondent will not have contact with one another unless in the presence of another ranking officer.

**Note to HR: Please provide a copy of this document to the Complainant ONLY.

**Note to Complainant: In addition to any action the Agency may take in this matter, you may have filing rights with the Texas Workforce Commission, Civil Rights Division (TWC-CRD) and the U.S. Equal Employment Opportunity Commission (EEOC). You may also contact the Office of the Inspector General should you elect to pursue criminal charges relating to this matter.

|  |  |  |
|---|---|---|
|  | CASE | 06-30-2016 00:00 |
|  | BC00063 | 06-30-2016 10:49 |

I spoke with Warden Wathen 06/30/2016 @ 10:45 am and Respondent is over GP and Complainant is sergeant of GP. If Respondent has contact with Complainant, Respondent will have a captain, lieutenant, etc. with him.

**Plaintiff's App. 288**

Case 7:18-cv-00097-M-BQ   Document 47   Filed 07/18/19   Page 289 of 298   PageID 1074
Case 7:18-cv-00097-M   Document 40   Filed 06/28/19   Page 9 of 502   PageID 220

Case Action/Comment History Report - Case#: 16003260                                    Page 5 of 6

| CASE | 06-30-2016 00:00 |
|------|------------------|

| BC00063 | 06-30-2016 10:16 |
|---------|------------------|

Email to Patty Garcia, Eve Shelly with cc to Sharon Whitmire of Complainant's email and my recommendations.

| CASE | 06-30-2016 00:00 |
|------|------------------|

| BC00063 | 06-30-2016 10.04 |
|---------|------------------|

Returned from Eve Shelly with: ok

I left a message for Warden Wathen 06/30/2016 10:00 am

| CASE | 06-30-2016 00:00 |
|------|------------------|

| BC00063 | 06-30-2016 10:02 |
|---------|------------------|

After viewing the recording of the incident, Respondent does step behind Complainant and place both hands on the fencing on each side of Complainant's body and it appears Complainant is "blocked" in by Respondent's stance and body. Respondent appears to bend his knee moving his groin area toward Complainant's buttocks. On the recording, Complainant appears to be very upset and turns and says something to Respondent.

Due to the angle of the camera, it is not possible to say whether physical contact is made but Complainant's reaction appears to indicate physical contact was made. I recommend this matter go to IFF for investigation of Respondent's behavior. Even though there are several layers of rank between Complainant (sergeant) and Respondent (major), I recommend Respondent limit all contact with Complainant immediately.

To Eve Shelly for review.

| CASE | 06-30-2016 00:00 |
|------|------------------|

| BC00063 | 06-30-2016 09:06 |
|---------|------------------|

DVD of the incident was received in Intake 06/27/2016.

| CASE | 06-30-2016 00:00 |
|------|------------------|

| BC00063 | 06-30-2016 09:05 |
|---------|------------------|

Email from Complainant:
Sergeant Ambur N. Hale

TDCJ- James V. Allred Unit
2101 North FM 369
Iowa Park, Texas 76367
(940) 855-7477

June 20, 2016
Formal complaint in regard to: Major Jonathon Eastep / James V. Allred Unit

Dear Ms. Herring,

My name is Ambur N. Hale. I have been a Correctional Officer for the State of Texas, since October 2006 and I promoted to Sergeant of Corrections August of 2013. I am writing you to report a violation of Personnel Directive No. 13- Sexual Harassment and Discourteous Conduct of a Sexual Nature. I, Sergeant Ambur Hale was subjected to forcible and non-consensual sexual contact by Major Jonathon Eastep.

On 06/15/2016, I was assigned to supervisory duties on GP-3 Building. At approximately 1155 hours, I.C.S. was initiated by Picket Officer S. Allen on GP-3 Building B- Pod 2-Section 45 Cell for an unresponsive offender inside the cell. I responded to stated location and was briefed by **Plaintiff's App. 289**

Case 7:18-cv-00097-M-BQ   Document 47   Filed 07/18/19   Page 290 of 298   PageID 1075
Case 7:18-cv-00097-M   Document 40   Filed 06/28/19   Page 10 of 502   PageID 221

Case Action/Comment History Report - Case#: 16003260                               Page 6 of 6

Stevenson. I instructed the Picket Officer to open the cell door to further assess the offender. The offender assigned to said location was responsive and stated he was engaged in cardio activity, became dizzy and passed out in the cell. Additional security and medical staff arrived on scene and assisted the offender to the dayroom and onto a gurney. All staff proceeded to escort the offender to 10 Building for further medical assessment. As I exited the sally-port, I approached the GP-3 Building Desk fencing. I instructed Desk Officer Page to retrieve a towel and submerge the towel in the ice water cooler for the offender, due to suspicion of heat exhaustion. As I stood at the fence with my back facing the sally-port, without warning I observed hands grip the fence on either side of my body. I felt a larger figure behind me. The figure pulled himself toward the fence, trapping me between the fence and his body. He pressed his penis against my bottom as if engaged in a sexual act and with a breathy lower toned voice stated "What is that?" in my ear, as if to arouse me. Alarmed and confused I murmured "What?!" and tried to shift around but the figure would not release his grip from the fence. I then duck beneath his arm and realized the figure was Major Eastep. I faced him and demanded "what are you doing?!" I scanned my surroundings and noticed the staff escort and offenders in the area and discontinued my inquisition. I feared a confrontation would result in disciplinary action, so I just tried to pretend nothing happened and returned to my normal duties.

After this incident occurred, I immediately became consumed with horrifying thoughts of what my peers, subordinates and the offenders present may have witnessed or the rumors potentially fabricated after such an unprofessional and illicit encounter. This situation has brought me embarrassment, anxiety, frustration, anger and grief. I have mentally debated with myself on the risk of reporting this incident but I truly feel that Major Eastep's sexual behavior will continue and possibly escalate. I believe due to his authority, any future declines to his sexual advances would result in hostile or negative treatment in the workplace. I am in a position of a leadership role and I take that responsibility very seriously. I can not expect my subordinates to invest in the concept of the C.O.R.E. values if I myself can not display the courage it takes to report this situation. At no time have I ever gave Major Eastep any indication that I would be interested in perusing and/or participate in any non-professional relationship. I am requesting an investigation in this matter be conducted and a just reprimand be given to ensure other staff members are not subjected to similar behavior and to give staff confidence in TDCJ's "Zero-Tolerance" position.

Respectfully,

Sgt. Ambur N. Hale

Video Surveillance Incident Request

Unit- James V. Allred
Date- 06/15/2016
Time- 1200 Hours (approx)
Location- GP-3 Building Desk

**Texas Department of Criminal Justice**
**REPRIMAND FORM**

OIG Case# _____
MUOF# _____

| | | | |
|---|---|---|---|
| Employee Name: | Eastep, Jonathan R | SSN: | 225134754 |
| | (Last, First MI) | | |
| Payroll Job Title: | CO III | Unit/Facility/Dept: | JA |
| Date(s) of Violation(s): | 02/14/2002 | Date Pre-Hearing Investigation Completed: | 03/01/2002 |

FINDINGS (circle): GUILTY

| No. | 10 (L2) | Violation: | Falsification of Records | Yes/No |
|---|---|---|---|---|
| No. | 32 (L2) | Violation: | GIVING FALSE INFO | Yes/No |
| No. | | Violation: | | Yes/No |

Synopsis of Incident(s): On 02/14/02, Off. Eastep did make charges against Offender Anderson, Michael #623636 that were false and knowingly provided a false testimony in the disciplinary hearing regarding said disciplinary report.

Offender(s) involved (Name/TDCJ Offender ID#), if applicable: Anderson, Michael #6235636 623636

**DISCIPLINARY ACTION:**

Previous Violation(s): ☐ YES ☒ NO   If yes, list violation number(s) and date(s): N/A

Check and complete one or more of the following:
✓ REPRIMAND ONLY
____ DISCIPLINARY PROBATION: __9__ Calendar Months Beginning: __3.7.02__ Ending:* __12.6.02__
*Note to Employee: If periods of leave without pay, including periods of suspension without pay, are incurred during the disciplinary probation period, the probation period ending date will be adjusted by adding one calendar day to the original ending date for every calendar day that you are off payroll. If you are in a career program/ladder position, an adjusted disciplinary probation ending date will postpone future career ladder/program salary adjustments.
____ SUSPENSION WITHOUT PAY: (Copy of Payroll Status Change attached)
_____ Workdays Beginning: _____ Return: _____
_____ Workweeks Beginning: _____ Return: _____
Adjusted Disciplinary probation Ending Date Due to Suspension Without Pay Period: _____
____ REDUCTION IN PAY (Copy of Payroll Status Change attached)
____ DEMOTION (Copy of Payroll Status Change attached)
____ DISMISSAL RECOMMENDED, WITH FOLLOWING ACTION DURING INTERIM:
_____ Involuntary Use of Compensatory Time/Holiday Time
_____ Voluntary Use of Overtime/Vacation Time (Attach a copy of Leave Application)
_____ Suspension Without Pay (Not to report to work beginning _____
_____ Job Change to Another Position
_____ Administrative Leave (Can only be granted by Executive Director)
____ NO DISCIPLINE IMPOSED (Provide explanation in space below.)

DISCIPLINE IS: ☒ Within ☐ Above ☐ Below the guidelines. (Provide explanation if above or below the guidelines.)
If this violation was a violation of Rule #24 or Rule #25, check one of the following: This violation ☐ Was ☐ Was Not willful in nature.

EXPLANATION (If no discipline was imposed or if discipline was above or below the guidelines.): Officer admits writing info on offender disc... case and testifying to its accuracy in disc. hearing when he knew it was false. States he thought he was doing what the proc. indicated circumstances.

Robert R. Treon, Warden II _____[signature]_____ 3.7.02
Reprimanding Authority/Title (printed)   Signature   Date

Employee's Acknowledgment: I have been advised of the procedures of progressive disciplinary actions, and my right to file a grievance. I acknowledge receipt of a copy of this reprimand and know that the original will be placed in my Employee Master Personnel File. If recommended for dismissal, I verify that the following are my current address and phone number:

Mailing Address: _____

Phone Number, Including Area Code: _____

Employee Signature: ___[signature]___ Date: 03/07/02

Note to Employee: With few exceptions, you are entitled upon request: (1) to be informed about the information the agency collects about you; and (2) under Sections 552.021 and 552.023 of the Government Code, to receive and review the collected information. Under Section 559.004 of the Government Code, you are also entitled to request, in accordance with the agency's procedures, that incorrect information that the agency has collected about you be corrected.

PERS 185 (12/01) **103022**

448

TDCJ DEFS 1ST SUPP DISCLOSURE-220

Plaintiff's App. 291



Δ π EXHIBIT 3
Deponent Eastep
Date 3/14/19 Rptr VMF
WWW.DEPOBOOK.COM

EXHIBIT AA

**Texas Department of Criminal Justice**
**REPRIMAND FORM**

OIG#: _____   EEO# _____
MAUF/MIUF#: _____

| Employee Name: | Eastep | Jonathan | R. | SSN: [redacted] |
|---|---|---|---|---|
| | Last | First | MI | |

Payroll Job Title: Lt. of Corr. Officers
Date(s) of Violation(s): 02/16/09

Unit/Dept: Allred/Security   EC 1/1
Date Pre-Hearing Investigation Completed: 03/06/09
FINDINGS (check one [1]): GUILTY

VIOLATION(S):
Level: 3  No. 5c  Rule Title: Reckless Endangerment: Hazing or Horseplay without Injury   ☐ Yes ☐ No
Level: ___  No. ___  Rule Title: _____   ☐ Yes ☐ No

Synopsis of Incident(s):
On 02/16/09, Lt. Eastep horseplayed with an offender while exiting the officer's dining room. Lt. Eastep was witnessed backhanding an offender to the groin area in a playful manner. Employees are prohibited from participating in hazing or horseplay.

DISCIPLINARY ACTION:
Is this a subsequent violation(s)? ☒ Yes ☐ No  If yes, list applicable previous Rule No. violation(s) and disciplinary date(s):
#7 (LA) - 04/15/08

Check and complete one (1) or more of the following:
☐ NO DISCIPLINE IMPOSED (Provide justification at bottom of page.)
☐ REPRIMAND ONLY
☒ DISCIPLINARY PROBATION: 3 Calendar Months Beginning: 4-17-09 Ending*: 7-16-09
*Note to Employee: If you are on a full calendar month of leave without pay during your period of disciplinary probation, including a full calendar month of suspension without pay, the probation period ending date shall be adjusted by adding one full calendar month to the original ending date. If you are in a career ladder position, any period of disciplinary probation and an adjusted disciplinary probation ending date shall postpone future career ladder salary adjustments.
☐ SUSPENSION WITHOUT PAY: Workdays Beginning: _____ Return: _____
☐ REDUCTION IN PAY TO: $ _____ Beginning: _____ Ending: _____
☐ DEMOTION TO (Title/Salary Group) _____ Beginning: _____ Ending: _____
☐ DISMISSAL RECOMMENDED, WITH FOLLOWING ACTION DURING INTERIM:
　　☐ Involuntary Use of Compensatory Time/Holiday Time
　　☐ Voluntary Use of Overtime/Vacation Time (Attach a copy of PERS 24, Leave Request)
　　☐ Suspension Without Pay
　　☐ Change to Another Job Assignment
　　☐ Administrative Leave (can only be granted by the Executive Director)

DISCIPLINE IS: ☒ Within ☐ Above ☐ Below the guidelines (Provide justification at bottom of page if above or below.)
For violations of Rule No. 24 or 25, check one (1) of the following: This violation ☐ did ☐ did not involve an aggravated use of excessive force.
JUSTIFICATION (If applicable): Employee Actions First

E. C. Williams, Warden II                          1-17-05
Reprimanding Authority Name/Title (printed)   Signature   Date

Employee's Acknowledgment: I have been advised of the procedures of progressive disciplinary actions, and my right to file a grievance. I acknowledge receipt of a copy of this reprimand and know the original is to be placed in my Master Human Resources File. If recommended for dismissal, I verify the following are my current address and phone number:

Mailing Address: _____

Phone Number, Including Area Code: _____

Employee Signature: _____   Date 4-17-09
Note to Employee: With few exceptions, you are entitled upon request: (1) to be informed about the information the Agency collects about you; and (2) under Texas Government Code §§552.021 and 552.023, to receive and review the collected information. Under Texas Government Code §569.004, you are also entitled to request, in accordance with the Agency's procedures, that incorrect information the Agency has collected about you be corrected.

Original: Labor Relations Section, HRHQ (with copy of support documentation)
Copy: Employee
Copy: Unit/Department Employee Disciplinary File
Copy: Payroll Department, ONLY when the action involves a payroll issue (suspension, reduction in pay or demotion)

PERS 185 (01/09)

RECEIVED JAN 30 2012

**TDCJ DEFS 1ST SUPP DISCLOSURE-188**   Plaintiff's App. 292

Nov 03 17 03:02p    TDCJ JORDAN Human Resource                     806-661-4401              p.3
NOV-03-2017 11:28 From:                                            To:918066614401          Page:2/3

## CORRECTED COPY

### Texas Department of Criminal Justice
### REPRIMAND FORM

OIG Number _____
MAUI Number _____
EEO Number _____

Employee Name: Eastep _____ Jonathan _____ K _____ SSN: ▓▓▓▓▓▓
                      Last              First        MI

Payroll Job Title: Major of Cor Off _____ Unit or Department: _____ JA
Date of Violation(s): 10/24/17 _____ Date Pre-Hearing Investigation Completed: 10/30/17

VIOLATION(S):                                                FINDINGS (check one [1]): GUILTY

Level: 2 Number: 32 Rule Title: Destroying Evidence or Giving False Testimony/Information    ☑ Yes  ☐ No
Level: ___ Number: ___ Rule Title: _____    ☐ Yes  ☐ No

Synopsis of Incident:
On 10/24/17, during an investigation, Warden Richerson asked Major Eastep if he is in a relationship with Ms. Foster, Unit Parole Officer. He stated he was not in a relationship, they were just friends. On 10/25/17, Major Eastep provided a written statement admitting he and Ms. Foster "have begun to see other", which would indicate they are involved in a relationship.

DISCIPLINARY ACTION:
Is this a subsequent violation?   ☐ Yes ☒ No   If yes, list applicable previous rule number violation(s) and disciplinary date(s): _____

Check and complete one or more of the following:
☐ NO DISCIPLINE IMPOSED (Provide justification at bottom of page if guilty findings.)
☐ REPRIMAND ONLY
☑ DISCIPLINARY PROBATION: 6 Calendar Months Beginning: 10/31/17 Ending: 4/30/18
☐ SUSPENSION WITHOUT PAY: _____ Workdays Beginning: _____ Return: _____
☐ REDUCTION IN PAY TO: 5 _____ Beginning: _____ Ending: _____
   Method used: ☐ ____% ☐ Step (number of steps) ____ ☐ Minimum established rate
☐ DEMOTION TO (Title and Salary Group) _____ Beginning: _____ Ending: _____
☐ DISMISSAL RECOMMENDED

DISCIPLINE IS: ☑ Within ☐ Above ☐ Below the guidelines. Provide justification at the bottom of the page if above or below.
For violations of Rule Number 24 or 25, check one (1) of the following: This violation ☐ did ☑ did not involve an aggravated use of excessive force.
JUSTIFICATION (if applicable): _____

David _____ Warden  Gregory S. David   [signature] Gregory S David    10/31/17
Reprimanding Authority Name and Title (printed)  (Warden)    Signature            Date

Employee's Acknowledgment: I have been advised of the procedures of progressive disciplinary actions, and my right to file a grievance. I acknowledge receipt of a copy of this reprimand and know the original is to be placed in my Master Human Resources File. If recommended for dismissal, I verify the following are my current address and phone number.

Mailing Address: _____

Phone Number, Including Area Code: _____

Employee Signature: [signature]                      Date: 11-03-17

Note to Employee: With the exception of most exempt upon request (1) be informed about the information Ice Agency collects about you and (2) under Texas Government Code §§552.023 and 552.102, to receive and review that collected information. Under Texas Government Code §559.004, you are also entitled to request to corrected in accordance with the Agency's procedures, that incorrect information the Agency has indexed about you be corrected.
Original: Employee Relations, HRIQ (a) copy of support documentation
Copy: Employee
Copy: Unit or Department Employee Disciplinary File

RECEIVED
NOV 0 2 2017
EMPLOYEE RELATIONS

PERS 185 (01/17)

Plaintiff's App. 293



# Texas Department of Criminal Justice
## Correctional Institutions Division
## Correctional Training & Staff Development

### *Ambur Hale*

Is hereby awarded this Certificate of Appreciation for her dedicatin to her role as an instructor both in the classroom and in the Defensive Tactics Program

On this 6th day of March 2019

Major Paul Preciado
Region V Training Academy

Sergeant Joshua Ragan
Region V
Defensive Tactics Coordinator

EXHIBIT BB

Plaintiff's App. 294



**Texas Department of Criminal Justice**
**VOLUNTARY DEMOTION ACKNOWLEDGEMENT**

**Note to Employee:** With few exceptions, you are entitled upon request: (1) to be informed about the information the Agency collects about you; and (2) under Sections 552.021 and 552.023 of the Government Code, to receive and review the collected information. Under Section 559.004 of the Government Code, you are also entitled to request, in accordance with the Agency's procedures, that incorrect information the Agency has collected about you be corrected.

By my signature, I acknowledge that the below referenced position which I am accepting is a demotion from my current position. This demotion is being accepted voluntarily and is not the result of disciplinary action. I further acknowledge that my new salary will be at the minimum rate of the designated salary group.

Position Title: _C O V_

Extended Title: _____

Location of Vacancy: _Jones / Allred_

Salary Schedule & Group: _A10_

Monthly Salary: _3587.45_

Employee's Signature: _____

Employee's Month/Date of Birth: _███████_
(mm/dd)

Date: _10 27 17_
(mm/dd/yyyy)

Doc = Voluntary Demotion Acknowledgement

EXHIBIT CC

TDCJ DEFS 1ST SUPP DISCLOSURE-521



Δ π EXHIBIT
Deponent _Cook_
Date _3/4/19_ Rptr _JAC_
WWW.DEPOBOOK.COM

Plaintiff's App. 296

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

## Inter-Office Communications

TO: __Human Resources__   DATE: __3 26 18__

FROM: __Jonathan R Eastep__   SUBJECT: __Letter of Resignation__

Effective __3 31 18__, I resign my position as _____ (position title)__ with the Texas Department
of Criminal Justice. My last physical day to work will be __3 2 18__ (mm/dd/yyyy). I have checked the box that
most closely represents the reason for my resignation.

- ☐ Inadequate salary
- ☐ Lack of opportunity for advancement
- ☐ Dissatisfaction with supervisors or coworkers
- ☑ Travel

- ☐ Working hours
- ☐ Dislike/unsuitability for assigned duties
- ☐ Transfer to different State Agency
- ☐ Personal reasons not related to the job

Δ π EXHIBIT _2_
Deponent _Eastep_
Date _3/14/19_ Rptr _JAe_
WWW.DEPOBOOK.COM

My initials below indicate how to handle my leave accruals. I have also been advised that if I am utilizing
more than three consecutive days of time, I must completed a PERS 24, Leave Request.

| Leave | Initials | Options: |
|-------|----------|----------|
| Sick | | Hold for 1 year, then forfeit. |
| | ~~S~~ | ~~Donate to Sick Leave Pool (Complete PERS 205)~~   Pers 63.7 |
| Vacation | S | Lump sum payment/Deferral |
| | | Use portion/all (Warden/Department Head approval required) |
| Overtime | S | Lump sum payment/Deferral |
| | | Use portion/all (Warden/Department Head approval required) |
| Holiday | | Use prior to separation date |
| Comp | | Use prior to separation date |

My forwarding address for any future correspondence related to my employment with TDCJ, which may
include any monies owed to me, is:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

City   State   Zip Code

Area Code   Telephone Number

Employee's Signature   Date __3 26 18__   HR Rep Initials

MAR 2018

Prepared by HR Division
December 1, 2010

## TDCJ DEFS 1ST SUPP DISCLOSURE-511

EXHIBIT DD

(B) tdc01i63 - PASSPORT                    Friday, March 24, 2017, 9:56:22 AM

CSPAY20B/PAY20B          TEXAS DEPARTMENT OF CRIMINAL JUSTICE      03-24-2017
BL00142  1I63           ASSIGNMENT HISTORY BY EMPLOYEE - ASGNLS    09:56:19

SSN:            NAME:   JONATHAN R EASTEP

|           |     |        |         | UNIT/ | JOB   | TB-GRP |      |          |      |
| EFF DATE  | SEQ | REASON | POS NUM | PDC   | CLASS | STEP   | FTE  | SALARY   | PAID |
|-----------|-----|--------|---------|-------|-------|--------|------|----------|------|
| 09-01-2016 | 04 | FY/Y17 | 024119 | JA/JA | 4513 | B20/00 | 1.00 | 04453.12 | PAID |
| 09-01-2015 | 06 | AC/034 | 024119 | JA/JA | 4513 | B20/00 | 1.00 | 04453.12 | PAID |
| 09-01-2015 | 04 | FY/Y16 | 024119 | JA/JA | 4513 | B20/00 | 1.00 | 04123.25 | PAID |
| 09-01-2014 | 04 | FY/Y15 | 024119 | JA/JA | 4513 | B20/00 | 1.00 | 04022.69 | PAID |
| 03-01-2014 | 10 | AC/020 | 024119 | JA/JA | 4513 | B20/00 | 1.00 | 04022.69 | PAID |
| 09-01-2013 | 04 | FY/Y14 | 029172 | JA/JA | 4512 | B19/00 | 1.00 | 03751.54 | PAID |
| 09-01-2012 | 04 | FY/Y13 | 029172 | JA/JA | 4512 | B19/00 | 1.00 | 03572.90 | PAID |
| 10-01-2011 | 10 | AC/038 | 029172 | JA/JA | 4512 | B19/00 | 1.00 | 03572.90 | PAID |
| 09-01-2011 | 04 | FY/Y12 | 029306 | FB/FB | 4512 | B19/00 | 1.00 | 03572.90 | PAID |
| 12-01-2010 | 10 | AC/020 | 029306 | FB/FB | 4512 | B19/00 | 1.00 | 03572.90 | PAID |
| 09-01-2010 | 06 | AC/034 | 033559 | JA/JA | 4511 | B18/00 | 1.00 | 03402.74 | PAID |
| 09-01-2010 | 04 | FY/Y11 | 033559 | JA/JA | 4511 | B18/00 | 1.00 | 03287.67 | PAID |
| 09-01-2009 | 08 | AC/034 | 033559 | JA/JA | 4511 | B18/00 | 1.00 | 03287.67 | PAID |

SSN:   000000000                              MENU OPTION:
I F8 FOR MORE RECORDS
F1=HELP    F7=SCROLL UP    F8=SCROLL DOWN    F12=EXIT



Δ π EXHIBIT 4
Deponent Eastep
Date 3/14/19 Rptr
www.DEPOBOOZ.COM

Certified copy of OIG administrative case 1600009875 to the Office of the Attorney General - LEDD on 02.13.2019 by ce.
UNAUTHORIZED COPYING OR DISTRIBUTION PROHIBITED

TDCJ DEFS 2ND SUPP DISCLOSURE-2201

EXHIBIT EE                              Plaintiff's App. 298